

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DEC 11 2002

PETER DERRER, Individually and on
Behalf of all Others Similarly Situated,

                 Plaintiff,

        v.

SPIEGEL, INC., SPIEGEL HOLDINGS, INC.,
MICHAEL R. MORAN, MARTIN ZAEPFEL,
JAMES W. SIEVERS and JAMES CANNATARO,

                 Defendants.

)))))))))))))

02 C 8946

JUDGE PALLMEYER

*JURY TRIAL DEMANDED*

MAGISTRATE JUDGE ASHMAN

### CLASS ACTION COMPLAINT
### FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which
included a review of United States Securities and Exchange Commission ("SEC") filings by Spiegel,
Inc. ("Spiegel", "Spiegel Group" or the "Company"), as well as regulatory filings and reports,
securities analysts reports and advisories about the Company, press releases and other public
statements issued by the Company, and media reports about the Company, and Plaintiff believes that
substantial additional evidentiary support will exist for the allegations set forth herein after a
reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of Common Stock of Spiegel
between April 24, 2001 to April 19, 2002, inclusive (the "Class Period"), seeking to pursue remedies
under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Spiegel conducts business in this District.

5.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### *Plaintiff*

6.     Peter Derrer, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Spiegel at artificially inflated prices during the Class Period and has been damaged thereby.

### *Defendants*

7.     Spiegel is a corporation organized under the laws of Delaware with its principal executive offices located in Downers Grove, Illinois. According to its press releases, throughout the Class Period, Spiegel was a "leading international specialty retailer marketing fashionable apparel and

home furnishings to customers through catalogs, e-commerce sites, and more than 600 specialty retail and outlet stores. The Spiegel Group's businesses include Eddie Bauer, Newport News, Spiegel and First Consumers National Bank. The company's Class A Non-Voting Common Stock trades on the NASDAQ National Market System under the ticker symbol: SPGLA." Effective June 4, 2002, Spiegel's Class A Non-Voting Common stock trades on the over-the counter market under the symbol SPGLA.

8.      Spiegel Holding, Inc. ("SHI") is a corporation organized under the laws of Delaware, and owns 99.9% of the Class B Voting Common Stock of Spiegel, thereby "affording SHI control of the Company."

9.      Michael R. Moran ("Moran") is, and at all times relevant to the allegations raised herein was, Spiegel's Chairman of the Office of the President, Chief Legal Officer, Principal Operating Executive Officer and a Director.

10.     Martin Zaepfel ("Zaepfel") is, and at all times relevant to the allegations raised herein was, Spiegel's Vice Chairman, President and Chief Executive Officer and a Director.

11.     James W. Sievers ("Sievers") was at certain times relevant to the allegations raised herein Spiegel's Office of the President, Chief Financial Officer, Principal Operating Executive Officer and Principal Financial and Accounting Officer.

12.     James R. Cannataro is, and certain times relevant to the allegations raised herein was, Spiegel's executive vice president and chief financial officer.

13.     Moran, Zaepfel, Sievers and Cannataro are referred to herein as the "Individual Defendants."

14.     During the Class Period, the Individual Defendants, as the senior executive officers and/or directors of Spiegel were privy to confidential and proprietary information concerning Spiegel, its operations, finances, financial condition, present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Spiegel, as discussed in detail below. Because of their positions with Spiegel, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

15.     SHI and the Individual Defendants are liable as direct participants in, and a co-conspirator with respect to the wrongs complained of herein. In addition, SHI and the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Spiegel's business.

16.     SHI and the Individual Defendants, because of their ownership of and positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. SHI and

the Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, SHI and the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

17.      As a senior executive officer and a director and as a controlling person of a publicly-traded company whose Class A Non-Voting Common Stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq National Market ("Nasdaq") and governed by the federal securities laws, SHI and the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Spiegel's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Spiegel's common stock would be based upon truthful and accurate information. SHI's and the Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.      SHI and the Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Spiegel common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Spiegel's business, operations and management and the intrinsic value of Spiegel Class A Non-Voting Common Stock and caused Plaintiff and members of the Class to purchase Spiegel Class A Non-Voting Common Stock at artificially inflated prices.

-5-

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the Class A Non-Voting Common Stock of Spiegel between April 24, 2001 to April 19, 2002, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Spiegel Class A Non-Voting Common Stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Spiegel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

21.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Spiegel; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### A.      The Misrepresentations and Omissions

25.     The Class Period begins on April 24, 2001. On that date, Spiegel announced its financial results for the quarter ended March 31, 2001. The press release stated, in part:

> Commenting on the company's outlook, Michael R. Moran, chairman of the office of the president, stated, "Given the challenging economic environment, we have intensified our efforts to reduce expenses and conservatively manage our inventory commitments going forward. *Although the economic outlook for the second half of the year is*

> *uncertain, we have taken important actions in our credit business*
> *and in our Eddie Bauer division that are expected to positively*
> *impact earnings."*

> The company confirmed its previously issued guidance for the second
> quarter, calling for modest revenue growth and earnings of $0.02 to
> $0.05 for the quarter ending June 30, 2001. [Emphasis added.]

26.     On May 15, 2001, Spiegel filed with the SEC its Form 10-Q for the quarter ended

March 31, 2001 (the "3/31/01 10-Q"). Signed by Defendant Sievers, the 3/31/01 10-Q stated, in part:

> *The consolidated financial statements included herein are*
> *unaudited and have been prepared from the books and records of*
> *the Company in accordance with accounting principles generally*
> *accepted in the United States of America and the rules and*
> *regulations of the Securities and Exchange Commission.*  All
> adjustments (consisting only of normal recurring accruals) which are,
> in the opinion of management, necessary for a fair presentation of
> financial position and operating results for the interim periods are
> reflected. [Emphasis added.]

27.     Spiegel's offered the following disclosure in the 3/31/01 10-Q with respect to its credit

card business, including the operations of First Consumers National Bank ("FCNB"), a wholly owned

subsidiary a special-purpose bank specializing in the issuance of credit cards to Spiegel's customers.

> The Company routinely securitizes FCNB Preferred credit card and
> FCNB bankcard receivables to fund the growth of its receivables
> portfolios. When the Company securitizes credit card receivables, it
> retains interest-only strips, subordinated investor certificates,
> receivables, servicing rights, and cash reserve accounts, all of which
> are retained interests in the securitized receivables. Gains or losses on
> the sale of receivables depends in part on the previous carrying
> amount of the financial assets involved in the transfer, allocated
> between the assets sold and the retained interests based on their
> relative fair value at the date of transfer. Quoted market prices are
> not available for retained interests; therefore, the Company estimates
> the fair value based on the present value of future expected cash flows
> using management's best estimates of the key assumptions including
> portfolio yield, charge-offs, liquidation rates, interest rates, and
> discount rates commensurate with the risks involved. Gains and

losses recognized upon securitization of credit card receivables and subsequent fair value adjustments to retained interests are recorded as net pretax gains on the sale of receivables and are included in finance revenue.

Also included in finance revenue are cash flows from the trust resulting from these retained interests. This retained-interest income represents the excess cash flows related to securitized receivables that revert to the Company after payment of interest to investors, related charge-offs and servicing fees.

\* \* \*

FCNB Preferred credit finance revenue decreased 34% to $29,413 in the first quarter from $44,511 in the comparable period last year. Finance revenue in the first quarter benefited from a 25% increase in average receivables owned and improved finance charge and credit fee yields. This improvement was more than offset by lower retained-interest income from securitized receivables and lower net pretax gains on the sale of receivables compared to the prior year period. Retained-interest income was negatively impacted by an increase in charge-offs on securitized receivables compared to last year. Net pretax gains on the sale of receivables contributed $5,612 to finance revenue in the first quarter compared to $8,643 for the same period last year.

\* \* \*

Bankcard segment:

|  | Thirteen Weeks Ended | |
| --- | --- | --- |
|  | March 31, 2001 | April 1, 2000 |
| Total revenue | $ 40,277 | $ 32,639 |
| Operating income | $ 21,264 | $ 16,865 |

Bankcard revenue increased 23% to $40,277 for the first quarter, compared to $32,639 for the prior year period. The growth in revenue was primarily attributable to a 34% increase in average receivables owned and an improved finance charge and credit fee yield, offset somewhat by lower retained-interest income. Retained-interest income was negatively impacted in the quarter by an increase in charge-offs, which reduced the excess cash flows from securitized receivables that are recorded as finance revenue. The

Company sold additional bankcard receivables of $63,000 in the first quarter, compared to $75,200 in the comparable prior year period. Net pretax gains on the sale of receivables in the first quarter totaled $2,833 compared to $6,848 for the same period last year. Gains related to the sale of receivables in the first quarter were somewhat offset by declines in the fair value of retained interests, primarily resulting from an increase in charge-offs compared to the prior year.

For the 13-week period, operating income for the bankcard segment increased to $21,264 from $16,865 for the prior-year period. In addition to revenue growth, the bankcard segment also benefited from lower operating expenses.

28.     On June 7, 2001, Defendant Moran made the following statements and representations

at the U.S. Bancorp Piper Jaffray Consumer Conference in New York:

> *Management reiterated that The Spiegel Group is financially stable, achieving two consecutive years of record earnings. Moran stated, "The bottom line is that The Spiegel Group is strategically well positioned to overcome the challenges and capitalize on the opportunities that lie ahead."*

> In the presentation, management also commented on its earnings expectations. Moran stated, "We expect our second quarter earnings to be in line with our previously issued guidance that called for modest revenue growth and earnings of $0.02 to $0.05 per share. *Our current forecast includes higher securitization income for the second quarter of 2001 compared to 2000."*

> Management stated that despite current weakness in the first half of the year, it still believes its performance will improve in the second half of the year, however, at a lower rate than originally anticipated. *Management expects earnings in the second half of the year ending December 29, 2001, to increase 45 to 50 percent from the same period last year, with the earnings improvement heavily weighted to the fourth quarter. As a result, management expects net earnings for the year to decrease 10 to 15 percent from earnings of $0.95 per share reported in 2000. Moran stated, "The earnings improvement in the second half of the year is based on our expectations for somewhat improved economic conditions, a significant turnaround in Eddie Bauer's sales and earnings, and improvement in customer charge-off trends."* [Emphasis added.]

-10-

29. On July 26, 2001, Spiegel announced that it had hired a corporate controller who would be responsible for corporate accounting, financial planning and reporting.

30. On July 24, 2001, Spiegel announced its financial results for the second quarter ended June 30, 2001. The press release stated, in part:

> The Spiegel Group today announced financial results for the second quarter ended June 30, 2001. The company reported earnings of $5.0 million, or $0.04 per share, compared to earnings of $25.8 million, or $0.20 per share for the comparable period last year. Second quarter earnings were consistent with previous guidance and First Call consensus estimates.

> \* \* \*

> The $3.1 million decrease in finance revenue reflects a $17.1 million, or 35 percent, decline in revenue from the private-label credit card programs offset by a $14.0 million, or 44 percent, increase in bankcard revenue. The decline in finance revenue was primarily attributable to lower retained-interest income from securitized receivables. While the yield on receivables rose in the quarter along with the level of receivables serviced, higher charge-offs reduced the earnings performance of the credit card programs, particularly the private-label credit programs, resulting in lower retained-interest income (or excess cash flows) from the securitized receivables. Somewhat offsetting this decline, the company reported net gains on the sale of receivables of $24.7 million in this year's second quarter compared to $8.2 million in the same period last year. The incremental gains primarily reflect anticipated improvement in portfolio performance due to improving delinquencies and higher revenue yield.

> \* \* \*

> **Outlook**

> Commenting on the company's outlook, Martin Zaepfel, vice chairman, president and chief executive officer of The Spiegel Group, said, "*Although the economic outlook for the second half of the year remains uncertain, we have seen some positive indicators that should favorably impact our ability to reach our earnings objectives. Improving delinquency rates in our private-label credit*

-11-

> *programs should result in lower charge-offs and favorably impact*
> *earnings in the second half of the year. In addition, we expect to*
> *begin to see the benefit of the actions taken in our Eddie Bauer*
> *division to reposition its apparel offer and strengthen its overall*
> *financial performance, particularly in the fourth quarter.*

> Zaepfel continued, "We are responding to the current challenges in the
> economic environment by implementing conservative inventory
> commitments, *stringent credit-limit and credit-authorization*
> *controls,* relatively flat catalog circulation plans and vigilant expense
> controls. Also, our management teams are developing long-term
> strategies aimed at strengthening our market position and achieving
> higher levels of earnings." [Emphasis added.]

31.     On August 13, 2001, Spiegel filed with the SEC its Form 10-Q for the quarter ended

June 30, 2001 (the "6/30/01 10-Q"). Signed by Defendant Cannataro, the 6/30/01 10-Q stated, in

part:

> *The consolidated financial statements included herein are*
> *unaudited and have been prepared from the books and records of*
> *the Company in accordance with accounting principles generally*
> *accepted in the United States of America and the rules and*
> *regulations of the Securities and Exchange Commission.* All
> adjustments (consisting only of normal recurring accruals) which are,
> in the opinion of management, necessary for a fair presentation of
> financial position and operating results for the interim periods are
> reflected. [Emphasis added.]

32.     Spiegel's offered the following disclosure in the 6/30/01 10-Q with respect to its credit

card business, including the operations of FCNB.

> Effective April 1, 2001, the Company adopted Statement of Financial
> Accounting Standards (SFAS) 140, "Accounting for Transfers and
> Servicing of Financial Assets and Extinguishments of Liabilities,"
> which superceded SFAS 125. SFAS No. 140 establishes new
> conditions for an entity to be a qualifying special-purpose entity and
> clarifies under what conditions a transferor has retained effective
> control over transferred assets. The updated rules for transfers of
> financial assets were effective for transfers occurring after March 31,
> 2001 and generally do not affect the accounting for previous transfers.

The adoption of SFAS No. 140 did not have a material effect on the Company's consolidated results of operations or financial position.

\*   \*   \*

The Company routinely securitizes FCNB Preferred credit card and FCNB bankcard receivables to fund the growth of its receivables. When the Company securitizes credit card receivables, it retains interest-only strips, subordinated investor certificates, receivables, servicing rights, and cash reserve accounts, all of which are retained interests in the securitized receivables. Gains or losses on the sale of receivables depends in part on the previous carrying amount of the financial assets involved in the transfer, allocated between the assets sold and the retained interests based on their relative fair value at the date of transfer. Quoted market prices are not available for retained interests; therefore, the Company estimates the fair value based on the present value of future expected cash flows using management's best estimates of the key assumptions including portfolio yield, charge-offs, liquidation rates, interest rates, and discount rates commensurate with the risks involved. Gains and losses recognized upon securitization of credit card receivables and subsequent fair value adjustments to retained interests are recorded as net pretax gains on the sale of receivables and are included in finance revenue.

Also included in finance revenue are cash flows from the trust resulting from these retained interests. This retained-interest income represents the excess cash flows related to securitized receivables that revert to the Company after payment of interest to investors, related charge-offs and servicing fees.

\*   \*   \*

FCNB Preferred credit finance revenue decreased 35% to $31,691 in the second quarter from $48,724 in the comparable prior year period. For the 26-week period, finance revenue decreased 34% to $61,104 from $93,235 in the prior year period. Finance revenue continued to benefit from increases in average receivables serviced and improved finance charge and credit fee yields. This improvement was more than offset by lower retained-interest income from securitized receivables. Retained-interest income was negatively impacted by an increase in charge-offs on securitized receivables compared to last year. The Company sold additional FCNB Preferred credit card receivables of $24,000 in the second quarter compared to $96,799 in the second

quarter last year. Net pretax gains on the sale of receivables contributed $12,222 to finance revenue in the second quarter compared to $5,004 for the same period last year. For the 26-week period, receivables sold decreased $54,002 compared to a net increase of $155,001 in the prior year period. Net pretax gains on the sale of receivables totaled $17,834 in the first half compared to $13,647 for the same period last year. Incremental gains in the current year were driven by anticipated improvements in portfolio performance due to improving delinquencies.

* * *

Bankcard segment:

|  | Thirteen Weeks Ended | | Twenty-six Weeks Ended | |
|---|---|---|---|---|
|  | June 30, 2001 | July 1, 2000 | June 30, 2001 | July 1, 2000 |
| Total revenue | $ 46,851 | $ 33,481 | $ 87,128 | $ 66,120 |
| Operating income | $ 18,703 | $ 9,304 | $ 39,967 | $ 26,169 |

Bankcard revenue increased 40% to $46,851 for the second quarter, compared to $33,481 for the prior year period. The growth in revenue was primarily attributable to a 51% increase in average receivables serviced and an improved finance charge and credit fee yield, offset somewhat by lower retained-interest income. Retained-interest income was negatively impacted by an increase in charge-offs, which reduced the excess cash flows from securitized receivables that are recorded as finance revenue. The Company sold additional bankcard receivables of $30,000 in the second quarter, compared to $18,800 in the same period last year. Net pretax gains on the sale of receivables in the second quarter totaled $12,444 compared to $3,160 for the same period last year. Incremental gains in the second quarter were driven by anticipated improvements in portfolio performance, primarily related to finance charge yields.

For the 26-week period, bankcard revenue increased 32% to $87,128, compared to $66,120 for the prior year period. The growth in revenue was primarily attributable to a 54% increase in average receivables serviced and an improved finance charge and credit fee yield, offset somewhat by lower retained-interest income. Retained-interest income was negatively impacted by an increase in charge-offs, which reduced the excess cash flows from securitized receivables that are recorded as finance revenue. The Company sold

-14-

additional bankcard receivables of $93,000 in the first half of fiscal 2001, compared to $94,000 in the comparable prior year period. Net pretax gains on the sale of receivables totaled $15,277 compared to $10,008 for the same period last year. Incremental gains in the first half were driven by the sale of additional receivables and reflected anticipated improvements in portfolio performance, primarily related to finance charge yields.

For the 13-week period, operating income for the bankcard segment increased to $18,703 from $9,304 for the comparable prior year period. For the 26-week period, operating income increased to $39,967 from $26,169 in the comparable prior year period. In addition to revenue growth, the bankcard segment also benefited from lower operating expenses.

33. On October 23, 2001, Spiegel announced its financial results for the third quarter ended September 29, 2001. The press release stated, in part:

The change in finance revenue for the quarter reflects a $29.2 million, or 67 percent, decline in revenue from the private-label credit card business and a $7.5 million, or 13 percent, decrease in bankcard revenue compared to last year. The drop in finance revenue was due to slower receivables growth compared to last year, lower retained-interest income from securitized receivables, a decrease in net pretax gains from the sale of receivables, and the impact of actions taken immediately following the tragic events on September 11.

\* \* \*

For the quarter, the yield on receivables was even with last year and average receivables serviced rose 24 percent. However, the rate of growth slowed due to the decline in credit sales and aggressive actions taken by the bank to tighten its credit underwriting policies, particularly in the private-label credit programs. In addition, higher charge-offs reduced the earnings performance of the private-label credit card business, resulting in lower retained-interest income (or excess cash flows) from the securitized receivables. In addition, the company reported net gains on the sale of receivables of $10.6 million in this year's third quarter compared to $15.5 million in the same period last year. The incremental gains reported in the third quarter primarily reflect anticipated improvement in the revenue yield in the

bankcard portfolio. In the private-label credit portfolio, net gains were reduced to reflect the expectation of higher charge-offs.

\* \* \*

**Outlook**

Commenting on the company's outlook, Martin Zaepfel, vice chairman, president and chief executive officer of The Spiegel Group, said, "*Each of our merchant companies and our bank are focused on actions that will improve earnings performance in the fourth quarter. At the same time, we are developing merchandise strategies aimed at improving sales productivity and reducing the reliance on credit marketing programs to drive sales.* Each of our merchant companies will continue to enhance its brand positioning by better aligning its product offer with customers' needs and strengthening its price/value equation. *In addition, we will continue to take actions to strengthen the quality of our credit card portfolios.* [Emphasis added.]

34.     On November 13, 2001, Spiegel filed its Quarterly Report on Form 10-Q for the quarter ended September 29, 2001 (the "9/29/01 Form 10-Q"). Signed by Defendant Cannataro, the 9/29/01 Form 10-Q stated, in part:

> *The consolidated financial statements included herein are unaudited and have been prepared from the books and records of the Company in accordance with accounting principles generally accepted in the United States of America and the rules and regulations of the Securities and Exchange Commission.* All adjustments (consisting only of normal recurring accruals) which are, in the opinion of management, necessary for a fair presentation of financial position and operating results for the interim periods are reflected. [Emphasis added.]

35.     Spiegel's offered the following disclosure in the 9/29/01 10-Q with respect to its credit card business, including the operations of FCNB.

> Effective April 1, 2001, the Company adopted Statement of Financial Accounting Standards (SFAS) No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,"

-16-

which superceded SFAS 125. SFAS No. 140 establishes new conditions for an entity to be a qualifying special- purpose entity and clarifies under what conditions a transferor has retained effective control over transferred assets. The updated rules for transfers of financial assets were effective for transfers occurring after March 31, 2001 and generally do not affect the accounting for previous transfers. The adoption of SFAS No. 140 did not have a material effect on the Company's consolidated results of operations or financial position.

\*   \*   \*

The Company routinely securitizes FCNB Preferred credit card and FCNB bankcard receivables to fund the growth of its receivables. When the Company securitizes credit card receivables, it retains interest-only strips, subordinated investor certificates, receivables, servicing rights, and cash reserve accounts, all of which are retained interests in the securitized receivables. Gains or losses on the sale of receivables depends in part on the previous carrying amount of the financial assets involved in the transfer, allocated between the assets sold and the retained interests based on their relative fair value at the date of transfer. Quoted market prices are not available for retained interests; therefore, the Company estimates the fair value based on the present value of future expected cash flows using management's best estimates of the key assumptions including portfolio yield, charge-offs, liquidation rates, interest rates, and discount rates commensurate with the risks involved. Gains and losses recognized upon securitization of credit card receivables and subsequent fair value adjustments to retained interests are recorded as net pretax gains on the sale of receivables and are included in finance revenue.

Also included in finance revenue are cash flows from the trust resulting from these retained interests. This retained-interest income represents the excess cash flows related to securitized receivables that revert to the Company after payment of interest to investors, related charge-offs and servicing fees.

\*   \*   \*

FCNB Preferred credit finance revenue decreased 67% to $14,259 in the third quarter from $43,489 in the comparable prior year period. For the 39-week period, finance revenue decreased 47% to $69,181 from $129,954 in the prior year period. The decline in finance revenue is due primarily to lower retained-interest income from securitized

receivables. While average receivables serviced increased and the finance charge and credit fee yields remained relatively constant, retained-interest income decreased significantly reflecting an increase in charge-offs on securitized receivables compared to last year. The Company sold additional FCNB Preferred credit card receivables of $76,000 in the third quarter compared to $67,578 in the same period last year. The Company recorded a $4,000 reduction to net pretax gains on the sale of receivables in the 13-week period compared to a reduction of $59 in the same period last year. The reduction to net pretax gains in the third quarter reflects the expectation of higher charge-offs. In addition, the cash reserve accounts related to securitization activities have been discounted to net present value resulting in lower net pretax gains on the sale of receivables. For the 39-week period, receivables sold increased $21,998 compared to a net increase of $222,579 in the prior year period. Net pretax gains on the sale of receivables totaled $13,834 for the 39-week period compared to $13,588 for the same period last year.

\* \* \*

Bankcard segment:

|  | Thirteen Weeks Ended | | Thirty-nine Weeks Ended | |
|---|---|---|---|---|
|  | Sept. 29, 2001 | Sept. 30, 2000 | Sept, 29, 2001 | Sept. 30, 2000 |
| Total revenue | $ 50,382 | $ 57,429 | $ 137,510 | $ 123,549 |
| Operating income | $ 32,925 | $ 40,557 | $ 72,892 | $ 66,726 |

Bankcard revenue decreased 12% to $50,382 for the third quarter, compared to $57,429 for the prior year period. While average receivables serviced increased 40% and finance charge and credit fee yields remained relatively constant, retained-interest income decreased significantly compared to the prior year period. Retained-interest income was negatively impacted by an increase in charge-offs, which reduced the excess cash flows from securitized receivables that are recorded as finance revenue. The Company sold additional bankcard receivables of $93,000 in the third quarter, compared to $94,000 in the same period last year. Net pretax gains on the sale of receivables in the third quarter totaled $14,616 compared to $29,894 for the same period last year. Incremental gains in the third quarter were driven by the sale of additional receivables and anticipated improvements in portfolio performance, primarily related to finance charge yields.

-18-

For the 39-week period, bankcard revenue increased 11% to $137,510, compared to $123,549 for the prior year period. The growth in revenue was attributable to a 67% increase in average receivables serviced, offset somewhat by lower retained-interest income. Retained-interest income was negatively impacted by an increase in charge-offs, which reduced the excess cash flows from securitized receivables that are recorded as finance revenue. The Company sold additional bankcard receivables of $165,000 in the 39-week period, compared to $224,000 in the comparable prior year period. Net pretax gains on the sale of receivables totaled $29,894 compared to $25,575 for the same period last year. Incremental gains in the 39-week period were driven by the sale of additional receivables and reflected anticipated improvements in portfolio performance, primarily related to finance charge yields.

Impacted by the increase in charge-offs, operating income for the bankcard segment declined to $32,925 for the third quarter from $40,557 for the comparable period last year. For the 39-week period, operating income increased to $72,892 from $66,726 in the comparable prior year period driven by growth in the portfolio.

36.     In fact, Spiegel's results and financial statements in its (i) April 24, 2001 earnings release and the 3/31/01 Form 10-Q, (ii) July 24, 2001 earnings release and the 6/30/01 Form 10-Q and (iii) October 23, 2001 earnings release and the 9/29/01 10-Q were each and all false and misleading and prepared in violation of GAAP, including, but not limited to SFAS 140 "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", due to the fact that Spiegel's accounting of its credit card business improperly inflated its income and earnings, failed to account for increasing charge-offs, and grossly inflated the value of its securitized receivables.

37.     On November 13, 2001, Spiegel announced the "appointment of Rich Lauer to vice president of operations. In his new role, Lauer, 47, will be responsible for Distribution Fulfillment Services, Inc. (DFS), Spiegel Group Teleservices (SGTS) and Spiegel-Hermes General Service, LLC

-19-

(SHGS). Lauer also will continue to serve as president and chief executive officer of DFS. Lauer replaces David Boothby who resigned from the company."

> "This is a critical executive position that integrates many strategic objectives and tactical initiatives," said Martin Zaepfel, vice chairman, president and chief executive officer of The Spiegel Group. "Given his expertise, management ability, and extensive industry and company knowledge, we are confident that Rich will provide the operations team a strong sense of purpose and leadership. We are fortunate to have someone who is so well prepared to step into this role and make an impact."

38. The same day, November 13, 2001, FCNB announced that: "James E. Huston has joined the company as executive vice president and chief financial officer, reporting to Greg Aube, president and chief executive officer. Huston, 39, is responsible for all major areas of finance and accounting, including risk management, planning and project management, and financial reporting and controls."

39. The same day, November 13, 2001, Spiegel announced the suspension of its "quarterly dividend payment of $0.04 per share, effective December 30, 2001, which is the beginning of the first quarter of 2002. The company stated that it will utilize these funds for other capital requirements and that it will continue to evaluate its dividend policy on an ongoing basis."

40. On January 4, 2002, Spiegel announced that: "Richard T. Fersch, president and chief executive officer of its Eddie Bauer division, has elected to retire from the company effective today." Spiegel also stated that it had hired "a national search firm to find a replacement. During a transition period, Fersch will continue to work with the company to run the day-to-day operations and Martin Zaepfel will oversee all planning and strategic initiatives." More importantly,

> ***The company also announced that Eddie Bauer has realigned its
> organizational structure to ensure greater consistency in its brand
> message and customer experience across all marketing channels.***
> Steve Newman, president of the Eddie Bauer apparel division, has
> assumed additional responsibility for all creative services and sourcing.
> Prior to this change, Newman was responsible for all aspects of the
> Eddie Bauer apparel business including merchandising, planning and
> inventory management, and design and development. Newman joined
> Eddie Bauer in September of 2000 and has played a critical role in the
> company's efforts to revamp its merchandise offer and brand
> positioning. [Emphasis added.]

41.     On February 21, 2002, Spiegel announced its earnings for the fourth quarter and year

ended December 29, 2001 and also that it had "implemented a plan to sell its credit card business,

including its First Consumers National Bank subsidiary (FCNB), as part of a broader strategy to focus

increased resources to its retail business and to foster consistent earnings growth." The press release

stated, in part:

> "We have made a strategic decision to remove the credit card
> operations from our business mix to intensify our focus on our core
> retail business and strengthen our financial position," said Martin
> Zaepfel, vice chairman, president and chief executive officer of The
> Spiegel Group. "Offering credit to our customers will continue to be
> an important service. As part of this transaction, we will form a
> relationship with a third-party to provide private-label credit card
> programs to our customers."
>
> For the fourth quarter 2001, the company reported earnings from
> continuing operations of $18.1 million, or $0.14 per share, compared
> to earnings from continuing operations before the cumulative effect of
> an accounting change of $22.4 million, or $0.17 per share, in last
> year's fourth quarter. In addition, the company reported a total loss
> from discontinued operations of $396.3 million, or $3.00 per share, in
> the fourth quarter of 2001, compared to earnings from discontinued
> operations of $42.9 million, or $0.33 per share, last year. The loss
> from discontinued operations in 2001 primarily consists of an
> estimated loss on the sale of the credit card business. The amount of
> this charge is based on current expected market valuations and could

vary significantly (up or down) based upon the market for the credit card business and other factors surrounding the transaction.

\* \* \*

*As a result of its 2001 financial performance, including the estimated loss recorded in the fourth quarter for the disposition of its credit card business, the company is not in compliance with certain of its 2001 loan covenants. The company stated that it is currently working closely with its bank group and its majority shareholder to restructure its credit facilities.*

*Zaepfel stated, "We have strong support from our majority shareholder and are confident that we will be able to secure the necessary financial support. Our goal is to have new financing arrangements in place by mid-April. In the interim, with the support of our majority shareholder, we have adequate liquidity and cash flows to fund our day-to-day operations. Additionally, the anticipated sale of the credit card business will reduce our debt and capital requirements."*

\* \* \*

Zaepfel said, "Our fourth quarter results were extremely disappointing and although the economic downturn clearly impacted our ability to stimulate sales, *weaknesses in our merchandise offer and marketing programs also contributed to the lackluster sales performance, particularly in our Eddie Bauer division. During the fourth quarter, we planned for Eddie Bauer's new brand positioning and revamped product offer to deliver higher sales productivity. While expectations were lowered based on the difficult economic conditions, customer acceptance was obviously lower than expected."*

\* \* \*

**Results From Discontinued Operations**

Because The Spiegel Group intends to sell its credit card business, financial results from the business and the estimated loss on the disposal of the business are shown as discontinued operations.

-22-

*The company reported a net loss of $85.7 million, or $0.65 per share, from discontinued operations for the fourth quarter of 2001, reflecting the company's loss from its private-label and bankcard credit card operations and a charge to reduce the net gains on the sale of receivables. In last year's fourth quarter, net earnings from discontinued operations were $42.9 million, or $0.33 per share.* Higher charge-offs negatively impacted the credit card business in the fourth quarter, particularly in the private-label credit card programs. As a result, net gains on the sale of receivables were reduced by $78 million in the fourth quarter to reflect the weakness in the portfolio performance.

*Zaepfel stated, "In 1999 and 2000, during a stronger economic period, the company aggressively grew its credit card accounts, which included extending credit to higher-risk market segments. At the same time, we adopted a 'risk-based' pricing policy to match credit pricing with the level of risk. In the fourth quarter of 2000, in response to rising delinquencies and charge-offs in our private-label credit card programs, we began implementing actions to strengthen our credit portfolio and reduce charge-offs. These actions included implementing more restrictive underwriting policies, more aggressive collection efforts and selectively re-pricing certain segments of the portfolio. However, the economic downturn, which began in mid-2000 and accelerated in 2001, combined with the high account growth that was heavily weighted toward higher-risk accounts, resulted in a rapid deterioration in our credit portfolio and a significant earnings shortfall."*

*In discontinued operations, the company also has recorded an estimated net loss on the sale of its credit card business of $310.5 million, or $2.35 per share.* The estimated loss on the disposition of the credit card business is primarily related to three components: 1) loss on the disposition of assets based upon independent valuations 2) operating losses from the measurement date (end of December), to the expected date of sale (second quarter 2002) and 3) other disposition expenses. These estimates are based on current market valuations and could vary depending on market conditions and the final structure of the transaction. [Emphasis added.]

42.    Spiegel's representations and statements throughout the Class Period and specifically those contained in Paragraphs 25-28, 30-35, 40 and 41 above were materially false and misleading

when made as they misrepresented and/or omitted one or more of the following adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, including, but not limited to:

(a)   Spiegel's financial statements and results of operations violated GAAP including SFAS 140 "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", were each and all false and misleading and prepared in violation of GAAP, including, but not limited to SFAS 140 "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", due to the fact that Spiegel's accounting of its credit card business improperly inflated its income and earnings, failed to account for increasing charge-offs, and grossly inflated the value of its securitized receivables;

(b)   For much of 1999 and 2000, Spiegel aggressively grew its credit card accounts, which included extending credit to higher-risk market segments, the result of which was a rapid deterioration in Spiegel's credit portfolio and a significant earnings shortfall in fiscal 2001;

(c)   FCNB had inadequate, failing and improper internal and financial controls, risk management systems and accounting practices;

(d)   Due to FCNB's deteriorated financial condition, lack of internal controls and proper accounting the Office of Comptroller of Currency (the "OCC"), FCNB's primary federal regulator, was threatening FCNB with a "cease and desist proceeding" and would eventually result in a Consent Order entered

into by FCNB with the OCC regarding, among others, the FCNB's accounting practices, internal controls, risk management systems, capital, liquidity, product offering, transactions with affiliates, and growth;

(e)    Due to FCNB's deteriorated financial condition, lack of internal controls and improper accounting Spiegel would violate its financial covenants and obligations under its credit facilities and would be required to obtain approximately $160 million in "liquidity support" from its majority shareholder;

(f)    Spiegel's Eddie Bauer division, which comprised more than one-half of Spiegel's total revenues, was being mismanaged, had dramatic over-capacity, and Spiegel lacked the financial stability to aggressively market new Eddie Bauer fashion or product lines, putting Eddie Bauer at a significant competitive disadvantage in the retail market; and

(g)    As a result of the foregoing, Spiegel had no reasonable basis upon which to project "earnings in the second half of the year ending December 29, 2001, to increase 45 to 50 percent from the same period last year, with the earnings improvement heavily weighted to the fourth quarter" and "net earnings for the year to decrease 10 to 15 percent from earnings of $0.95 per share reported in 2000."

## B.  The Truth is Revealed

43.    On April 19, 2002, Spiegel finally revealed the true facts regarding the deterioration

of its credit card business and the devastating impact of this deterioration on Spiegel's overall business

health.

> Commenting on its efforts to sell its credit card operations the
> company stated that the process is ongoing and discussions with
> interested parties are at various stages. *The company also stated that*
> *based on a more current market valuation, the company now*
> *expects the loss on disposition of this business to be higher than*
> *previously estimated. The change in the loss on disposition will*
> *result in lower earnings for the 2001 fiscal year than were*
> *previously reported. The 2001 earnings change will be reflected in*
> *the company's Form 10-K, which has not yet been filed.*
>
> *   *   *
>
> The company also stated that its bank is engaged in discussions with
> the Office of the Comptroller of the Currency, the bank's primary
> federal regulator. *These discussions relate to the timing for the*
> *previously announced disposition of the bank, and the terms and*
> *conditions under which the Bank will operate during this period,*
> *including with respect to capital, liquidity, product offering,*
> *transactions with affiliates, and growth.*
>
> The company is continuing to work closely with its bank group to
> restructure its credit facilities. The company had previously announced
> that it expected to reach an agreement with its lenders by mid-April.
> However, due to the developments discussed above, negotiations with
> the bank group will extend beyond that time. *Meanwhile, the*
> *company continues to rely on liquidity support provided through its*
> *majority shareholder. The funding provided to date from this*
> *source is approximately $160 million.*
>
> In addition, due to these outstanding business developments, the
> company has not filed its Form 10-K for the 2001 fiscal year.
> Consequently, the company received a Nasdaq Staff Determination on
> April 17, 2002. The Staff Determination indicates that the company
> has not complied with Marketplace Rule 4310(c)(14) by not filing its
> Form 10-K for the fiscal year ended December 29, 2001. Filing of a

Form 10-K is required for continued listing of the company's securities. [Emphasis added.]

44.     On April 22, 2002, the next trading day following Spiegel's April 19, 2002 announcements, Spiegel's Class A Non-Voting Common Stock fell from a high of $3.15 on April 19, 2002 to a low of $1.01 on April 22, 2002 or a one-day decline of more than 67%, on ten times normal trading volume, and a decline of more than 90% from the Class Period high of $10.71.

## C.     Post-Class Period Statement and Admissions

45.     On May 29, 2002, Spiegel announced that it had entered "an agreement" with the OCC with respect to FCNB. The press release stated, in pertinent part, as follows:

> FCNB's agreement with the OCC calls for FCNB to comply with certain requirements with respect to capital, liquidity, growth, product offering, and transactions with affiliates. The agreement, among other things, includes restrictions on extending credit to certain customers and requires the bank to obtain a $198 million guarantee, which has been provided through the company's majority shareholder. In addition, the bank must provide to the OCC the details of a plan to sell, merge or dispose the bank. [...]

46.     In fact, the "agreement" with OCC was actually a twenty-page "Consent Order" [#2002-40] entered into on May 15, 2002 by FCNB in order to avert the commencement of a "cease and desist proceeding" against FCNB. The Consent Order contained, among others, the following "orders" and prohibitions of the OCC with respect to the conduct of FCNB's business:

> --"The Bank shall immediately, and until further notice by the OCC, cease and desist any and all transactions with its affiliates" except those authorized by OCC or permitted by banking regulations for national banking associations."
>
> --"The Bank shall immediately review all existing contracts and agreements with all of its affiliated companies, written or otherwise, to determine whether such contract or agreement represents an arm's length transactions whose terms and conditions are fair and reasonable

to the Bank. [...] shall terminate within forty-five days ... all contracts and agreements with affiliates not on an arm's length basis and shall similarly terminate all such contracts or agreements whose terms and conditions are not demonstrably fair and reasonable to the Bank."

--"At a minimum, the Bank shall immediately develop, document and implement policies, procedures, systems and controls to ensure that, on an on-going basis, the books and records of the Bank: [...] reflect all of the assets, liabilities, capital, income and expenses of the Bank in accordance with Generally Accepted Accounting Principles ("GAAP")."

--"The Bank shall engage subject to the supervisory non-objection of the Director of Supervision/Fraud (the "Director"), an independent accounting firm to review all material 2001 income and expense accounts, all material asset and liability accounts as of December 31, 2001, and all affiliate party transactions since January 1, 1999. For purposes of this Order, "material" shall have the same meaning accorded in Securities and Exchange Commission Staff Accounting Bulletin No. 99 on Materiality, or as the OCC may, in its discretion, otherwise determine."

--"With the assistance of the independent accounting firm, the Board shall cause to be developed and implemented revised written accounting policies and procedures for all significant Bank activities including sale of assets, and other securitization activities."

--"The Bank shall obtain and begin using on an ongoing basis, a residual asset valuation model ("model") that comports with industry practice and OCC Bulletin 2000-16 [...] The Bank's valuation estimate and the applicable valuation assumption shall comply with GAAP and OCC Bulletin 99-46."

--"On an on-going basis, the Bank shall ensure that it is accurately reporting on allowance for loan and lease losses ('ALLL') for all credit card receivables."

--"The Board shall ensure that the Bank has appropriate management information systems in place so that the Bank's management can effectively monitor the performance of the Preferred and Bankcard receivables by product marketing initiative, and vintage. The Bank shall generate reports to analyze assets quality in terms of portfolio dimensions, composition, and performance."

-28-

--"The Bank shall develop, document and implement policies, procedures, systems and controls designed to identify, monitor and control on an on-going basis, the total credit risk associated with any single customer. Until such policies, procedures, systems and controls are in place and operational, the Bank shall not issue any additional card(s) to any existing Bankcard or Preferred card customer."

--"The Board shall cause to be developed and implemented and thereafter ensure Bank adherence to written risk management program [...] The Board shall ensure that the Bank has processes, personnel, and control systems to ensure implementation of and adherence to the [risk management] program [...] The Board shall identify and appoint an individual with demonstrated experience and skills in providing overall risk management to implement the Bank's risk management program."

--"Effective immediately, the Bank shall develop and implement policies and procedures governing the retention of documents in the ordinary course of business."

47.     On June 3, 2002, the Nasdaq delisted "the company's Class A common stock on the Nasdaq National Market System effective with the open of business on June 3, 2002, based on the company's filing delinquencies and other public interest concerns."

48.     Since June 4, 2002, Spiegel's Class A common stock has been "trading on the over-the-counter market under the ticker symbol SPGLA."

49.     On July 11, 2002, Spiegel "named Fabian Monsson as president and chief executive officer for its Eddie Bauer division effective immediately." The press release stated, in pertinent part, as follows:

In making the announcement, Zaepfel stated, "We are extremely pleased to have someone with Monsson's experience and retailing capability to lead Eddie Bauer as we work to reinvigorate the brand. Monsson is a highly regarded retail executive who is credited with upgrading H&M's image and steering the company into a leadership position. He has a proven ability to develop highly efficient and fast processes in sourcing and merchandising, which will be particularly

-29-

important as Eddie Bauer strives to be quicker and more flexible in delivering products and services that address customers' needs. I am confident that Monsson's expertise along with his passion and energy will have a significant, positive influence on the future course and success of Eddie Bauer."

50.     An article titled "Fashionably Late" appeared in the August 2002 issue of Forbes magazine, and detailed the systemic problems of Spiegel's Eddie Bauer division. The article stated, in pertinent part, as follows:

> ***Some observers fault the credit card mess for Spiegel's near-demise. That's only half the story. Serial mismanagement at Eddie Bauer is also to blame.***
>
> \*     \*     \*
>
> ***While Mansson brings a keener fashion sense, cash-poor Spiegel almost certainly lacks marketing muscle to back him up.*** "When Gap does something new, you see it on television right away," says Ladenburg Thalmann analyst Eric Beder. When was the last time you saw a snappy Eddie Bauer ad on "Must-See Thursday"? Probably long before you traded in your Eddie Bauer Explorer. [Emphasis added.]

51.     An article titled "Spiegel Still Seeks Salvation", dated October 7, 2002, appeared in *Crains Chicago Business* and provided the following additional details:

> With no buyer in sight for its troubled credit card business and a stalemate with its banks over restructuring broken credit agreements, catalog retailer Spiegel Inc. is pinning its hopes on Eddie Bauer to save the floundering company.
>
> \*     \*     \*
>
> "I've heard this same story for the past 15 years," says Robert Spector, a retail expert who wrote "The Legend of Eddie Bauer" in 1995. "As Eddie Bauer went through different CEOs, they would talk about going back to the authentic Eddie Bauer, but they never really did it. Whether this group of merchants will be able to pull it off remains to be seen."

After straying from its roots in the mid-1990s, Eddie Bauer followed Abercrombie & Fitch into the urban youth market, with little success. Then, last fall, it bounded into office apparel, filling 40% of its stores with "dress casual" clothing - and watched sales plummet.

*"We've been trying to be everything to everyone, and we've confused the customer," says Engle Saez, who joined Redmond, Wash.-based Eddie Bauer as chief creative director after two years with Starbucks Corp.*

\* \* \*

*Another problem: Eddie Bauer has too much real estate. Its 541 retail and outlet stores are too big and there are too many of them, the result of an aggressive expansion Spiegel undertook after buying the company in 1988.*

Indeed, New York investment firm Morgan Stanley & Co. has had Eddie Bauer on its "tenant watch list" since May, warning mall owners as recently as late August that the company is a potential credit risk given its parent's precarious financial state.

Eddie Bauer closed 43 stores and opened eight last year; it plans to close 45 stores and open five this year.

The stores most likely to be shuttered are in the South, where Eddie Bauer is less productive, the report says. The warning is based on a standard scan that Morgan Stanley's real estate investment trust conducts to search out retailers teetering on the brink, says Matthew Ostrower, the analyst who wrote the report.

**Family ties**

Spiegel has so far managed to avoid a bankruptcy filing by relying on the deep pockets of its majority shareholder, Michael Otto, a multibillionaire who controls the world's largest catalog retailer, Germany's Otto Versand, and whose empire holds a majority stake in Northbrook-based Crate & Barrel.

The Otto family, which controls 90% of Spiegel shares, has put $360 million into the company this year to keep it afloat. But the cash infusion has yet to satisfy the syndicate of 18 banks negotiating with Spiegel to restructure a $750-million revolving credit agreement. *And*

*Spiegel's auditors won't sign off on the books for 2001 or the first half of 2002 until the new bank line is in place.*

Martin Zaepfel, the Otto Versand executive tapped to take over Spiegel as vice-chairman, president and CEO last year, said in a written statement: "Our majority shareholder has shown a strong commitment to the Spiegel Group for more than 20 years, including its recent significant financial support. We expect this support to continue as we move forward in our efforts to stabilize and strengthen our business."

*Still, Eddie Bauer, for all its maneuvering, will be hard-pressed to rebound quickly enough to lift its parent, which fell into further disarray earlier this year after aggressively expanding its credit card business to high-risk cardholders.*

While the easy credit boosted sales, it cost the company dearly when the economy turned. The delinquency rate soared to 15%, compared with the industry average 5%, prompting Spiegel to put the credit card business on the market in February.

**Costly credit**

It has found no buyers, and some analysts say a liquidation of the credit card business is a possibility.

Credit card sales accounted for 75% of Spiegel catalog's revenues and 59% of sales at Newport News - another catalog division - in 2001, according to New York-based Ladenburg Thalmann & Co. analyst Eric Beder. Tighter credit rules imposed by federal regulators have meant that sales have dropped dramatically at both units. [Emphasis added.]

52.     Spiegel has yet to file its Annual Report on Form 10-K for fiscal 2001, or its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2002 and June 30, 2002.

## FALSE FINANCIAL STATEMENTS

53.     In order to falsely state its net income and EPS during the Class Period, Defendants caused Spiegel to violate GAAP and SEC rules by, among others, violating SFAS 140 "Accounting

for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", due to the fact that Spiegel's accounting of its credit card business improperly inflated its income and earnings, failed to account for increasing charge-offs, and grossly inflated the value of its securitized receivables. Defendants' failure to properly account for its credit card business and gross over-valuation of its securitized receivables misstated Spiegel's earnings and EPS throughout the Class Period.

54.    Spiegel included its false and incorrect financial statements and results in press releases and in SEC filings, including the 3/31/01 10-Q, 6/30/01 10-Q and 9/29/01 10-Q. These SEC filings represented that the financial information presented therein was a fair statement of Spiegel's financial results and that the results were prepared in accordance with GAAP.

55.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Spiegel's operations due to Spiegel's violation of GAAP including SFAS 140 "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities", in that Spiegel's accounting of its credit card business improperly inflated its income and earnings, failed to account for increasing charge-offs, and grossly inflated the value of its securitized receivables.

56.    Due to these accounting improprieties, Spiegel presented its financial results in a manner which violated GAAP, including the following fundamental accounting principles:

        (a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 20, para. 10);

(b)     The principal that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, para. 34);

(c)     The principal that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, para. 40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and the public in general (FASB Statements of Concepts No. 1, para. 50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, para. 42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, paras. 58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, para. 79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, paras. 95, 97).

57.     Further, the undisclosed adverse information concealed by Defendants during the Class Period is the type of information which because of SEC regulations, regulations of the national stock exchanges and customary business practices, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

58.     The market for Spiegel's Class A Non-Voting Common Stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Spiegel's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Spiegel

Class A Non-Voting Common Stock relying upon the integrity of the market price of Spiegel's Class A Non-Voting Common Stock and market information relating to Spiegel, and have been damaged thereby.

59.     During the Class Period, defendant materially misled the investing public, thereby inflating the price of Spiegel's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendant's statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

60.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendant made or caused to be made a series of materially false or misleading statements about Spiegel's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Spiegel and its business, prospects and operations, thus causing the Company's Class A Non-Voting Common Stock to be overvalued and artificially inflated at all relevant times.

61.     Defendant's materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's Class A Non-Voting Common Stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

62.     As alleged herein, defendant acted with scienter in that defendant knew that the public

documents and statements issued or disseminated in the name of the Company were materially false

and misleading; knew that such statements or documents would be issued or acquiesced in the

issuance or dissemination of such statements or documents as primary violations of the federal

securities laws.   As set forth elsewhere herein in detail, defendant, by virtue of his receipt of

information reflecting the true facts regarding Spiegel, his control over, and/or receipt and/or receipt

of information of Spiegel's allegedly materially misleading misstatements and/or his associations with

the Company which made him privy to confidential proprietary information concerning Spiegel,

participated in the fraudulent scheme alleged herein.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

63.     At all relevant times, the market for Spiegel's Class A Non-Voting Common Stock

was an efficient market for the following reasons, among others:

>    (a)     Spiegel's stock met the requirements for listing, and was listed and actively
>
>            traded on the Nasdaq, a highly efficient and automated market;
>
>    (b)     As a regulated issuer, Spiegel filed periodic public reports with the SEC and
>
>            the Nasdaq;
>
>    (c)     Spiegel regularly communicated with public investors via established market
>
>            communication mechanisms, including through regular disseminations of press
>
>            releases on the national circuits of major newswire services and through other

wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Spiegel was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for Spiegel's Class A Non-Voting Common Stock promptly digested current information regarding Spiegel from all publicly available sources and reflected such information in Spiegel's stock price. Under these circumstances, all purchasers of Spiegel's Class A Non-Voting Common Stock during the Class Period suffered similar injury through their purchase of Spiegel's Class A Non-Voting Common Stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

65.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Spiegel who knew that those statements were false when made.

## COUNT I

### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     During the Class Period, Spiegel and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Spiegel's Class A Non-Voting Common Stock; and (c) cause Plaintiff and other members of the Class to purchase Spiegel's Class A Non-Voting Common Stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

68.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class A Non-Voting Common Stock in an effort to maintain artificially high market prices for Spiegel's Class A Non-Voting Common Stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's Class A Non-Voting Common Stock would be based on truthful, complete and accurate information.

70.     Spiegel and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Spiegel as specified herein.

71.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spiegel's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Spiegel and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Spiegel's Class A Non-Voting Common Stock during the Class Period.

72.     The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

73.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Spiegel's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its Class A Non-Voting Common Stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

74.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Spiegel's Class A Non-Voting Common Stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Spiegel's publicly-traded Class A Non-Voting Common Stock were artificially inflated, and

relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Class A Non-Voting Common Stock trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Spiegel Class A Non-Voting Common Stock during the Class Period at artificially high prices and were damaged thereby.

75.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Spiegel, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Spiegel Class A Non-Voting Common Stock, or, if they had acquired such Class A Non-Voting Common Stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

76.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Class A Non-Voting Common Stock during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of
### The Exchange Act Against SHI and the Individual Defendants

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     SHI and the Individual Defendants acted as a controlling person of Spiegel within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, SHI and the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. SHI and the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

81.     As set forth above, Spiegel, SHI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their

positions each as a controlling person, SHI and the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Spiegel's, SHI's and the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's Class A Non-Voting Common Stock during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated:   December 10, 2002           PETER DERRER, Individually and on Behalf of all
                                     Others Similarly Situated, Plaintiff


                            By:  _____

                                 Marvin A. Miller
                                 Jennifer Winter Sprengel
                                 Christopher B. Sanchez
                                 **MILLER FAUCHER and CAFFERTY LLP**
                                 30 North LaSalle Street
                                 Suite 3200
                                 Chicago, Illinois 60602
                                 (312) 782-4880

                                 *Designated as Local Counsel*

                                 S. Gene Cauley
                                 **CAULEY GELLER BOWMAN & COATES, LLP**
                                 11311 Arcade Drive
                                 Suite 200
                                 Little Rock, Arkansas 72212
                                 (561) 750-3000

                                 Guri Ademi
                                 Shpetim Ademi
                                 **ADEMI & O'REILLY, LLP**
                                 3620 East Layton Avenue
                                 Cudahy, Wisconsin 53110
                                 (414) 482-8000

                                 *Attorneys for Plaintiff*

## CERTIFICATE OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, _Peter Derner_ ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint in this matter and authorizes its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transaction(s) in Spiegel, Inc.'s Class A Non-Voting Common Stock during the class period are as follows (attach extra sheets if necessary):

| No. of Shares Purchased (P)/Sold(S) | Price | Date |
| --- | --- | --- |
| 100 (?) | $ 4.73 | Dec. 26 /01 |
| 600 (?) | $ 4.61 | Dec. 27 /01 |
| 4000 (?) | $ 3.28 | Jan. 24 /02 |

5. During the three years prior to the date of this certification, Plaintiff has not served or sought to serve as a representative party for any class in an action filed under the federal securities laws, except as follows:_____

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the plaintiff's pro rata share of any class recovery, except as ordered or approved by the Court.

7. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _2nd_ day of June, 2002

Drafted by:
Ademi & O'Reilly LLP

DOCKETED
DEC 1 1 2002

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet 02C 8 946

JUDGE PALLMEYER

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s): Peter Derrer,**

County of Residence: Switzerland

Plaintiff's Atty:  Miller Faucher and Cafferty LLP
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

**Defendant(s):Spiegel, Inc., et al.**   MAGISTRATE JUDGE ASHMAN

County of Residence:

Defendant's Atty:

FILED-EDA
DEC 10 02
U.S. DISTRICT COURT

II. Basis of Jurisdiction:   **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties **(Diversity Cases Only)**

Plaintiff:- **N/A**

Defendant:- **N/A**

IV. Origin :   **1. Original Proceeding**

V. Nature of Suit:   **850 Securities / Commodities / Exchange**

VI.Cause of Action:   **15 U.S.C. §§ 78j(b) and 78t(a)**

VII. Requested in Complaint

Class Action: **Yes**

Dollar Demand:

Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date:   1/10/0

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**   Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**Peter Derrer,**

v.

**Spiegel, Inc., et al.**

Case Number:

**02C 8 946**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Peter Derrer, individually and on behalf of all others similarly situated, Plaintiff

JUDGE PALLMEYER

MAGISTRATE JUDGE ASHMAN

| (A) | (B) |
|---|---|
| SIGNATURE *S. Gene Cauley* | SIGNATURE |
| NAME S. Gene Cauley | NAME Marvin A. Miller |
| FIRM Cauley Geller Bowman & Coates, LLP | FIRM Miller Faucher and Cafferty LLP |
| STREET ADDRESS 11311 Arcade Drive, Suite 200 | STREET ADDRESS 30 North LaSalle Street, Suite 3200 |
| CITY/STATE/ZIP Little Rock, Arkansas 72212 | CITY/STATE/ZIP Chicago, Illinois 60602 |
| TELEPHONE NUMBER (561) 750-3000   FAX NUMBER | TELEPHONE NUMBER (312) 782-4880   FAX NUMBER 782-4485 |
| E-MAIL ADDRESS | E-MAIL ADDRESS mmiller@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES ☑   NO ☐ |
| TRIAL ATTORNEY?   YES ☑   NO ☐ | TRIAL ATTORNEY?   YES ☑   NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL?   YES ☑   NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Christopher B. Sanchez | NAME Jennifer Winter Sprengel |
| FIRM Same as (B) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER   FAX NUMBER | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS csanchez@millerfaucher.com | E-MAIL ADDRESS jsprengel@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06272989 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☒ | MEMBER OF TRIAL BAR?   YES ☐   NO ☑ |
| TRIAL ATTORNEY?   YES ☒   NO ☐ | TRIAL ATTORNEY?   YES ☑   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☒   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☑   NO ☐ |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**Peter Derrer,**

v.

**Spiegel, Inc., et al.**

**DOCKETED**

DEC 1 1 2002

Case Number: **02C 8946**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Peter Derrer, individually and on behalf of all others similarly situated, Plaintiff

JUDGE PALLMEYER

MAGISTRATE JUDGE ASHMAN

| (E) | | | (F) | | |
|---|---|---|---|---|---|
| SIGNATURE *Guri Ademi /mdm* | | | SIGNATURE *Shpetim Ademi /mdm* | | |
| NAME Guri Ademi | | | NAME Shpetim Ademi | | |
| FIRM Ademi & O'Reilly, LLP | | | FIRM Same as (E) | | |
| STREET ADDRESS 3620 East Layton Avenue | | | STREET ADDRESS | | |
| CITY/STATE/ZIP Cudahy, Wisconsin 53110 | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER (414) 482-8000 | FAX NUMBER | | TELEPHONE NUMBER | FAX NUMBER | |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☒ | MEMBER OF TRIAL BAR? | YES ☒ | NO ☐ |
| TRIAL ATTORNEY? | YES ☒ | NO ☐ | TRIAL ATTORNEY? | YES ☒ | NO ☐ |
| | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |

| (G) | | | (H) | | |
|---|---|---|---|---|---|
| SIGNATURE | | | SIGNATURE | | |
| NAME | | | NAME | | |
| FIRM | | | FIRM | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY/STATE/ZIP | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER | FAX NUMBER | | TELEPHONE NUMBER | FAX NUMBER | |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | TRIAL ATTORNEY? | YES ☐ | NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |

U.S. DISTRICT COURT
02 DEC 10 PM 3:06
FILED
03-04