# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8946 | **DATE** | 7/8/2004 |
| **CASE TITLE** | In Re Spiegel, Inc. Securities Litigation | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' joint motion to strike (Docket No. 60-1) is granted in part and denied in part. The motions to dismiss filed by Mr. Moran and Mr. Sievers (Docket No. 57-1), Mr. Cannataro (Docket No. 68-1), and KPMG (Docket No. 53-1) are granted in part and denied in part. The motions to dismiss filed by Dr. Otto, Dr. Crüsemann, Dr. Müller, and Mr. Hansen (Docket No. 55-1) and by Mr. Zaepfel (Docket No. 76-1, 76-2) are denied, and SHI's motion to dismiss (Docket No. 66-1) is granted. Plaintiffs' motion to modify the discovery stay (Docket No. 48-1) is also granted. Plaintiffs have until July 28, 2004 to file an amended complaint consistent with this opinion, and Defendants have until August 27, 2004 to answer or otherwise plead. Rule 16 conference is set for September 15, 2004, at 9:30 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | JUL 0 9 2004 | |
| | Notified counsel by telephone. | | | date docketed | 110 |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | 7/8/2004 | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| ETV | courtroom deputy's initials | | U.S. DISTRICT COURT CLERK | ETV | |
| | | | 2004 JUL -8 PM 5:23 Date/time received in central Clerk's Office | mailing deputy initials | |

| | |
|---|---|
| IN RE SPIEGEL, INC. SECURITIES LITIGATION, ) ) ) ) | No. 02 C 8946<br>Judge Rebecca R. Pallmeyer |

**DOCKETED**

.JUL 0 9 2004

## MEMORANDUM OPINION AND ORDER

Six individual plaintiffs have filed this federal securities class action lawsuit on behalf of "all

those who purchased" Spiegel, Inc. stock between February 16, 1999 and June 4, 2002 (the "Class

Period"). Spiegel is an international specialty retailer that markets apparel and home furnishings

to customers through catalogs, more than 550 specialty retail and outlet stores, and e-commerce

sites. Defendants James R. Cannataro, Michael R. Moran, James W. Sievers, Martin Zaepfel,

Michael Otto, Horst R. A. Hansen, Michael E. Crüsemann, and Peter Müller (the "Individual

Defendants") are all current or former officers and directors of Spiegel. Defendant Spiegel

Holdings, Inc. ("SHI") is the owner of 99.9% of Spiegel's Class B voting shares, which were not

publicly traded, and Defendant KPMG LLP was Spiegel's independent public accountant. Plaintiffs

allege that Defendants engaged in a fraudulent scheme to boost product sales by issuing credit

cards to high-risk creditors; securitizing the credit card receivables through phony sales to trusts,

which allowed Spiegel to understate its debt by more than $3 billion and overstate its earnings by

$240 million; and improperly delaying the collapse of the securitizations to hide Spiegel's financial

distress. Plaintiffs claim that these actions violated Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 ("SEA" or the "Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5.

Plaintiffs have asked the court to lift the mandatory discovery stay imposed under the

Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*, a request

Defendants oppose. Defendants, in turn, seek to strike or dismiss the complaint for failure to

comply with the pleading requirements of FED. R. CIV. P. 8(a) and 9(b) and the PSLRA, and for

110

failure to state a claim. For the reasons set for here, Defendants' joint motion to strike is granted in part and denied in part; the motions to dismiss filed by Dr. Otto, Dr. Crüsemann, Dr. Müller, and Mr. Hansen and by Mr. Zaepfel are denied; the motions to dismiss filed by Mr. Moran and Mr. Sievers, Mr. Cannataro, and KPMG are granted in part and denied in part; SHI's motion to dismiss is granted; and Plaintiffs' motion to modify the discovery stay is granted.

## PROCEDURAL BACKGROUND

Spiegel's legal problems began in or about February 2002 when the Office of the Comptroller of the Currency ("OCC") initiated an enforcement action against First Consumers National Bank ("FCNB"), a wholly-owned subsidiary acquired by Spiegel in 1990. FCNB was a credit card bank that engaged primarily in the business of issuing general-purpose and private label credit cards to individuals interested in purchasing Spiegel merchandise. (Cmplt. ¶¶ 48, 49.)[1] The OCC substantially lowered FCNB's rating largely due to concern about "the low quality of the bank's receivables" and "a great many deficiencies in the bank's operations." *See S.E.C. v. Spiegel, Inc.*, No. 03 C 1685, 2003 WL 22176223, at *24 (N.D. Ill. Sept. 15, 2003). Without admitting any wrongdoing, on May 14, 2002, FCNB signed a Stipulation and Consent to the Issuance of a Consent Order (the "OCC Consent Order"), which the Comptroller of the Currency of the United States accepted on May 15, 2002. *See In the Matter of First Consumers Nat'l Bank*, Enforcement Action No. 2002-04, 2002 WL 1483604 (O.C.C. May 14, 2002). (*See also* Ex. E to Cannataro Mem.) That Order required that FCNB be liquidated by December 2002, and placed "significant restrictions" on credit for both new and existing FCNB customers. *Spiegel*, 2003 WL 22176223, at *24.

---

[1]     Plaintiffs' Consolidated Amended Complaint dated October 31, 2003 is cited as "Cmplt. ¶ __."

On December 10, 2002, Peter Derrer initiated the consolidated proceedings at issue here by filing a class action lawsuit against Spiegel, SHI, Mr. Moran, Mr. Sievers, Mr. Cannataro, and Mr. Zaepfel. Louis Meeuwenberg, James W. Sampair, Jr. and Tim Martin filed three additional class action lawsuits against the same defendants on December 16, 2002, January 22, 2003, and January 27, 2003, respectively. On March 11, 2003, all four cases were consolidated before this court and Johann Oliver, Lisa Oliver, Andrew Dennore, Ronald Peters, Steven Simmons, and Dionne Tonetti were appointed lead plaintiffs pursuant to § 21D of the SEA, 15 U.S.C. § 78u-4(a)(3). Plaintiffs all claim that the high-risk credit practices Spiegel conducted through FCNB led Plaintiffs to purchase Spiegel common stock at artificially inflated prices during the Class Period. On May 12, 2003, Plaintiffs filed a Consolidated Amended Complaint, adding Dr. Otto, Dr. Crüsemann, Mr. Hansen, Dr. Müller, and KPMG as defendants.

On March 7, 2003, the Securities and Exchange Commission ("SEC") filed a civil action against Spiegel, charging that the Company violated federal securities laws by (1) failing to file its 2002 Form 10-K (due on April 1, 2002) and 2002 Form 10-Q (due in mid-May 2002); and (2) failing to disclose advice from KPMG on February 7, 2002 that the Company may not be able to continue as a "going concern"; i.e., that there was "substantial doubt about the Company's ability to continue as a going concern." (Ex. A to Motion to Stay, at 1; Cmplt. ¶¶ 169, 182, 198.) *See also Spiegel*, Docket No. 1 (N.D. Ill. 2003). Without admitting any of the charges, Spiegel immediately consented to the entry of a partial final judgment of permanent injunction. On March 11, 2003, Judge James B. Zagel appointed Stephen J. Crimmins, an attorney with Piper Hamilton, LLP in Washington, D.C., as Independent Examiner to review Spiegel's financial records "from January 1, 2000 to date" and to provide a written report of Spiegel's financial condition and identify any material accounting irregularities. (Ex. A to Motion to Stay, at 1-2.) *See also Spiegel*, Docket No.

3 (N.D. Ill. Mar. 11, 2003). On March 17, 2003, Spiegel filed for Chapter 11 bankruptcy in the Southern District of New York.

Several months later on August 11, 2003, Mr. Moran and Mr. Sievers moved to dismiss Plaintiffs' complaint in this case. Rather than responding to that motion, Plaintiffs filed a second Consolidated Amended Complaint ("Complaint") on October 31, 2003, which is currently pending before this court. The new Complaint drops the now-bankrupt Spiegel as a named defendant and incorporates findings from the Independent Examiner's Report, which Judge Zagel ordered disclosed to the public on September 15, 2003. *See Spiegel*, 2003 WL 22176223. Plaintiffs also filed a motion to modify the discovery stay mandated by the PSLRA. 15 U.S.C. § 78u-4(b)(3)(B). Defendants responded with six separate motions to dismiss and a joint motion to strike the Complaint.

## FACTUAL BACKGROUND

Spiegel is an international specialty retailer founded in 1875 that markets apparel and home furnishings to customers through catalogs, more than 550 specialty retail and outlet stores, and e-commerce sites. (Cmplt. ¶¶ 2, 27.) KPMG served as Spiegel's certified public accountant responsible for auditing the company's financial statements and issuing related opinions. (*Id.* ¶ 39.) SHI owns 99.9% of the Class B Voting Common Stock of Spiegel, which represents 90% of Spiegel's ownership (the remaining 10% consists of publicly-held Class A non-voting shares). Dr. Otto and his family (the "Otto Family") in Hamburg, Germany maintained effective control over SHI and, thus, controlled most of the company's voting shares. In addition, after gaining control of Spiegel in 1982, the Otto Family ensured that Spiegel's Board of Directors was comprised of "interlocking directorships tied to other entities controlled by the Otto Family," including Otto Versand (GmbH & Co.) ("Otto Versand"), a Hamburg-based company that is "the largest mail order

group in the world," and Otto Versand Group, among others. (*Id.* ¶¶ 28, 417, 418.) *See also Spiegel*, 2003 WL 22176223, at *3, 7.

Dr. Otto is Chairman of Spiegel's Board of Directors and also served as Chairman of Spiegel's Board Committee (or Executive Committee) and Audit Committee. (*Id.* ¶ 29.) Mr. Moran at various times served as Spiegel's "Chairman of the Office of the President," Chief Legal Officer, and Principal Operating Executive Officer. He also served as a Director and as Chairman of the Board of FCNB. (*Id.* ¶¶ 30, 48.) Mr. Zaepfel was at various times Spiegel's Vice Chairman, President, and Chief Executive Officer. He also served as a Director and as a member of Spiegel's Board Committee. (*Id.* ¶ 31.) Dr. Crüsemann is a company Director, as well as a member of Spiegel's Board Committee and Finance Committee. He also served as a member of Otto Versand's Executive Board, Director of Finance of Otto Versand, and Chief Financial Officer of Otto Versand Group. (*Id.* ¶ 32.)

Mr. Hansen is a Spiegel Director and a member of the company's Audit Committee. Prior to 1994, he also served as a member of Otto Versand's Executive Board, the Director of Finance of Otto Versand, and Chief Financial Officer of Otto Versand Group. (Cmplt. ¶ 33.) Dr. Müller is similarly a Spiegel Director and member of the Audit Committee. Prior to January 1998, he served as a member of Otto Versand's Executive Board and as Director of Advertising and Marketing for that company. (*Id.* ¶ 34.) Mr. Sievers at various times served as Spiegel's "Office of the President," Chief Financial Officer, Principal Operating Executive Officer, and Principal Financial and Accounting Officer. (*Id.* ¶ 35.) Mr. Cannataro was Spiegel's Executive Vice President and Chief Financial Officer. (*Id.* ¶ 36.)

## A.    Spiegel's Credit Card Practices

Spiegel has a merchandising division, comprised of its Eddie Bauer, Newport News, and Spiegel subsidiaries, and a bankcard segment, consisting primarily of the credit card operation of

FCNB. With more than 500 retail stores, Eddie Bauer accounted for a majority of Spiegel's retail store sales. Newport News and Spiegel Catalog accounted for most of Spiegel's catalog sales revenues, and relied more heavily on credit as opposed to cash transactions. (Cmplt. ¶¶ 2, 3, 46-49.) On the bankcard side, FCNB issued two types of credit cards: a general-purpose MasterCard or Visa (the "FCNB Bankcard") that could be used at various locations, and a private label Preferred Charge card (the "FCNB Preferred Card") that could only be used at the Company's merchant divisions. (*Id.* ¶¶ 48, 49.) Beginning in 1997, FCNB also issued co-branded FCNB Bankcards imprinted with the logo of one of Spiegel's merchant divisions. (*Id.* ¶¶ 48, 49.)

Prior to February 16, 1999, Spiegel was performing poorly due in part to increased competition for its catalog business among internet and other retailers, and declining same-store sales at Eddie Bauer. (Cmplt. ¶ 3.) To reverse these negative trends, Spiegel aggressively increased its marketing and issuance of FCNB Preferred Cards. (*Id.* ¶ 4.) Historically, FCNB was responsible for developing and managing Spiegel's credit granting procedures for both FCNB Bankcards and Preferred Cards. (*Id.* ¶ 50.) With regard to the Preferred Cards, FCNB obtained a list of prospects from credit bureaus and evaluated those prospects using proprietary credit scoring systems developed by Spiegel based on historical data from FCNB's account base. (*Id.*)

During the Class Period, however, Spiegel started offering incentives to encourage customers to accept credit. For example, Spiegel offered FCNB Preferred Card promotional programs such as delayed billing (not charging purchases until the end of a specified period) and deferred billing (requiring no monthly payment for a specified period, and imposing no finance charge if a bill were paid in full at the end of the deferral period). (Cmplt. ¶ 52.) In addition, Defendants[2] used a technique called the "net down" process to create a credit portfolio skewed

---

[2]     Throughout the Complaint, Plaintiffs frequently charge "defendants" with conduct likely attributable to fewer than all defendants in this case. This is the subject of Defendants' motion to strike, addressed below. For purposes of this factual statement, the court uses the terminology as found in the Complaint.

towards high risk customers, who are often the best "responders" to credit card offers. Under this approach, Defendants gave FCNB a pool of prospective customers with risk levels ranging from "A" (low risk) to "F" (high risk), and FCNB had a credit bureau screen the customers to determine their eligibility for pre-approved credit. FCNB then gave Defendants the list of pre-approved applicants reflecting a full range of credit risks. Defendants and Spiegel's merchant subsidiaries, however, dropped from their catalog and mailing lists many prospective customers within the "A" and "C" risk levels (the more credit-worthy customers). As a result, the pre-approved credit solicitations went primarily to customers at the "D" through "F" risk levels, a population with substantially higher credit risk than the one pre-screened by the credit bureau for FCNB, but more likely to "respond" to the solicitations. (*Id.* ¶¶ 53, 55, 56.) In fact, by the spring of 2001, 62% of Spiegel's new credit card customers were rated "E" or "F," compared to only 31% in 1998. (*Id.* ¶ 339.) According to Plaintiffs, "[t]he effect was to deprive FCNB of the ability to control [FCNB's own] risk, and instead give it to the merchants, whose primary concern was boosting their sales numbers." (*Id.* ¶ 53.) This practice continued until at least April 2002 when, Plaintiffs allege, without further explanation, "Spiegel and FCNB agreed that FCNB should expect a mailed distribution that mirrors the pool of customers pre-approved for the granting of credit."[3] (*Id.* ¶ 57.)

In addition to the "net down" technique, Defendants allegedly eliminated a critical monitoring process known as "back-end screening." Back-end screening involves conducting a second credit check on a pre-approved credit prospect at the time credit is actually to be extended to determine whether the customer still qualifies. (Cmplt. ¶ 58.) Citing the Independent Examiner's Report, Plaintiffs claim that Defendants stopped back-end screening on FCNB Preferred Card accounts during portions of 1999 and 2000, "just as Spiegel was engaged in its major acquisition of subprime customers." (*Id.*) As a result, a high percentage of Spiegel customers receiving credit did not

---

[3]     The court is uncertain of the meaning of this allegation.

7

actually qualify for it, and they later accounted for a significant portion of the charge-offs of uncollectible credit card receivables Spiegel reported as late as 2002 and 2003. (Id.)

Defendants further damaged Spiegel's credit portfolio allegedly by adopting liberal "open to buy" policies relating to "the amount of credit [the company] gave to new customers and the increases in credit it gave to existing customers." (Cmplt. ¶ 59.) In addition, Defendants authorized purchases by customers who were delinquent in their payments or had incurred debt in excess of their credit limits. Finally, Defendants followed a "recency" policy for delinquent accounts, treating them as current "provided the delinquent customer made only a minimum payment following two months of nonpayment." (Id.) By using all of these methods, Plaintiffs claim, Defendants were able to boost sales with easy credit. (Id.)

## B.    Spiegel's "Return to Profitability"

For a three-year period beginning in mid-1998, Spiegel seemingly turned its sales around and started posting positive sales growth. (Cmplt. ¶¶ 62-63.) For example, in November 2000, Defendants forecast Spiegel Catalog net sales for 2000 at $770.2 million, a 22% increase over the previous year. This gave the catalog division its first reported profit in over three years. Similarly, Defendants forecast Newport News net sales of $473 million, a 15% increase over the previous year. (Id. ¶ 63.) During 1999 and 2000, Spiegel's merchandise revenue rose by over $419 million, and between 1998 and 2000, the company's earnings increased from $3.3 million to over $120 million. (Id. ¶ 66.) According to Plaintiffs, Defendants accomplished this growth by lowering credit standards and extending credit to high-risk borrowers likely to make purchases. Indeed, from 1997 to 2001, Spiegel's credit card receivables grew from $1.7 billion to over $3.5 billion. (Id.) By lowering Spiegel's credit standards, Plaintiffs allege, Defendants caused the company's "top-line" revenues – particularly its catalog merchandise sales – to receive an "extraordinary boost that could only be sustained through the continuous issuance of additional credit cards to marginal and

8

sub-standard credit risks, enticed to purchase goods and services on credit that they could not otherwise obtain." (*Id.*)

In Plaintiffs' view, the primary beneficiary of these "artificially inflated sales" was Dr. Otto. More than half of the apparel Spiegel sold originated with Otto Versand, and Spiegel bought almost all of its private label merchandise through Otto Family businesses. (Cmplt. ¶ 66.) Plaintiffs also claim that certain of the Individual Defendants personally profited from Spiegel's boost in sales. Mr. Moran received a $1,711,599 bonus for 2000 and a $4,000,000 severance payment when he retired in mid-2001, both based on Spiegel's 2000 earnings. Mr. Moran also received a $709,000 bonus for the first six months of 2001, in addition to a pro-rated portion of his $445,000 annual salary. (*Id.* ¶ 67, 68.) Mr. Sievers similarly received a $1,616,574 bonus for 2000 and a $4,000,000 severance payment when he retired in mid-2001, both based on Spiegel's 2000 earnings. He was also paid a $671,000 bonus for the first six months of 2001 in addition to a pro-rated portion of his $445,000 annual salary. (*Id.* ¶ 69.)

## C.     Spiegel's Business Disclosures

Throughout the Class Period, Defendants issued or contributed to dozens of press releases and news articles discussing Spiegel's "targeted" and "refined" marketing strategies and programs. Plaintiffs claim that Defendants never disclosed the allegedly "artificial boost to revenue and profits resulting from defendants' virtually extending credit to customers whom defendants knew or recklessly disregarded were unable to pay for the goods they purchased." (Cmplt. ¶ 70.) Plaintiffs also claim that Defendants failed to disclose the deleterious impact these policies were having on the collectibility of Spiegel's credit card assets. For example, during fiscal year 2000, 108% of the increase in merchandise sales revenue compared to the previous year was primarily attributable

to purchases made through un-seasoned accounts opened by low-income, high risk borrowers who obtained credit under Spiegel's relaxed credit standards.[4] (*Id.*)

## D. Spiegel Securitizes its Credit Card Receivables

### 1. Asset Securitization

Credit card securitization is a process that allows banks and other issuers of credit cards to convert their receivables into cash. (Cmplt. ¶¶ 4 n.1, 72.) In a typical securitization, the owner of credit card receivables sells them to one or more Special Purpose Entities ("SPEs"), which commonly take the form of trusts. Investors in a securitization receive certificates or notes that give them the right to receive a certain return on their investment. The issuer of the certificates receives cash upon the sale of the receivables to the SPEs, and also retains an interest in the receivables. (*Id.* ¶ 72.) This "retained interest" is subordinated in favor of payment to the investors and includes only those "interests in the trust that remain after all investors are paid and all other obligations of the trust are satisfied." (*Id.* ¶ 72 n.3.) There are generally two types of retained interests: (1) a claim to excess principal receivables in the trusts; and (2) interest-only strips ("I/O strips"), representing a right to receive the interest portion of the receivables after all investors in the trust have been paid their interest. (*Id.* ¶ 73.)

---

[4] Defendants have submitted numerous documents which they insist demonstrate that they did in fact disclose Spiegel's expanding credit programs and "aggressive customer acquisition plans," including "tactics such as the support of credit programs through direct mail solicitation." (Memorandum of Law of Defendants Michael Moran and James Sievers in Support of Motion to Dismiss Pursuant to Rule 9(b) and the PSLRA ("Moran & Sievers Mem."), at 4-5.) Assuming the court may fairly consider such materials at this stage, *see Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 844 n.8 (N.D.Ill. 2003) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-81 (11th Cir. 1999)) (court may consider SEC filings in a motion to dismiss without converting the motion to one for summary judgment), the court is not prepared to conclude that disclosure of aggressive marketing plans and direct mail credit solicitation is tantamount to disclosure of the alleged practice of extending credit primarily to poor credit risks.

In addition to what Plaintiffs characterize as "the protection afforded by the retained interest,"[5] investors in a securitization are protected by certain "credit enhancements," such as cash collateral accounts and insurance policies, that ensure payment of an investor's principal and interest if the cash flow from the securitized receivables proves insufficient. (Cmplt. ¶ 72.) The trust documents also contain trust performance requirements, sometimes called "triggers" or "pay out events" which, if violated, result in trust investors receiving an immediate payout of all collected cash receipts until the obligation to them is satisfied. When such "rapid amortization" occurs, the trust no longer has the use of principal proceeds to purchase newly-generated receivables. The issuer, similarly, loses the benefit of excess cash flows, which must all go immediately to repay principal to investors. (Id.) The Spiegel trusts had eight trust triggers, including failure to make certain payments or transfers of funds, and failure of the receivables to meet certain minimum performance standards in maintaining (1) an adequate "profit ratio," i.e., the "difference between portfolio yield and base rate" (the "excess spread trigger"); (2) a maximum level of delinquent accounts (the "delinquency ratio trigger"); and (3) an appropriate limit on defaults in the portfolio (the "default rate trigger"). (Id. ¶ 72 n.5.)

## 2. Spiegel's Securitizations

Spiegel first began securitizing its credit card receivables through FCNB in the early 1990s. Plaintiffs describe FCNB's securitization transactions during the Class Period as follows:

> A Spiegel customer using a preferred card or an FCNB bankcard at a Spiegel merchant purchases an item and creates a receivable in favor of FCNB. The merchant looks to FCNB to pay the amount of the charge, less an interchange fee. And FCNB then looks to the customer to pay principal, interest (at typical credit card rates), late fees and other charges.
>
> Rather than holding the receivables on its financial statements, FCNB sells it to an intermediary special purpose entity ("SPE"). By selling the receivable, FCNB is

---

[5]     Plaintiffs do not explain how an issuer's "retained interest" in the receivables translates into "protection" for investors.

relieved of the obligation to maintain capital against it, as well as the obligation to fund the receivable. However, with Spiegel's securitizations, Spiegel remained in control over the cardholder's account and adjust[ed] payment terms or fees.

The SPE then resells the receivable to a so-called qualified special purpose entity ("QSPE") . . . structured as a common law master trust. Each QSPE sells multiple series of certificates or notes to investors at different times.

Each series also assigns the retained interest to Spiegel Acceptance Corp. ("SAC") (a wholly owned subsidiary of Spiegel) or to FCNB. FCNB then transfers part of its retained interest to Financial Services Acceptance Corporation ("FSAC") (also a Spiegel affiliate). These retained interests generate "finance revenue" for Spiegel that essentially comes from excess cash flows after required payments to the investors in the trusts and deductions are made.

(Cmplt. ¶ 76.) *See Spiegel*, 2003 WL 22176223, at *49.

Explaining further, Plaintiffs allege that FCNB transferred its FCNB Bankcard receivables to First Consumers Master Trust ("FCMT") which, in turn, issued a collateral certificate representing a beneficial interest in the receivables of FCMT to First Consumers Credit Card Note Trust ("FCCCNT"). FCCCNT then sold a series of notes to investors in public offerings, collateralized by the certificates issued by FCMT and FCCCNT, and used the proceeds from the offering to retire the collateral certificates. (Cmplt. ¶ 227.) A similar technique was used to transfer FCNB Preferred Card receivables to Spiegel Master Trust ("SMT") and then to Spiegel Credit Card Master Trust ("SCCMT") which, in turn, sold a series of notes to investors in public offerings. (*Id.* ¶ 228.) Plaintiffs identify two public debt offerings during the Class Period: (1) the Spiegel Credit Card Master Note Trust ("SCCMNT") Series 2000-A, issued on December 19, 2000; and (2) the SCCMNT Series 2001-A, issued on July 19, 2001. Three additional securitization transactions during that period were private placements. All told, Spiegel's five securitization transactions in late 2000 and 2001 resulted in "financings or commitments of approximately $3.4 billion."[6] (*Id.* ¶ 77.)

---

[6]     It appears that there were no public debt offerings of the FCMT or FCCCNT trusts during the Class Period. As explained below, all of the trusts went into rapid amortization in early March 2003. The privately placed securitizations have either been paid in full or "will be in the near future." The publicly-offered SCCMNT Series 2000-A and SCCMNT Series 2001-A, however, "each have approximately $300 million owing to investors and are currently being paid down in

In Plaintiffs' view, the offering documents used to sell these securitization investments to the public did not disclose the substantial risks to the collectibility of the credit card receivables being securitized; i.e., the focus on a subprime customer base, the use of the "net down" process, the power of merchant retailers to control the final credit granting process, and the failure to conduct back-end screening. (Cmplt. ¶¶ 79-80.) The disclosures also failed to indicate that the series were close to violating the excess spread trigger applicable to the Spiegel trusts; i.e., the series did not have an adequate "profit ratio" or "difference between portfolio yield and base rate." In addition, the offering documents did not disclose that the interchange fees and other charges would have to be increased to avoid a payout event in the asset-backed notes being offered for sale to the public. (*Id.* ¶ 80.)

### E. Spiegel's Representations Regarding its Financial Condition

#### 1. Understated Debt and Overstated Gain

Plaintiffs allege that throughout the Class Period, Defendants "misleadingly represented" (1) that Spiegel's securitization transactions constituted bona fide sales, such that the company could remove from its balance sheet its credit card receivables and the face value of any notes sold to investors; (2) that cash flows from the transferred credit card receivables were sufficient to support repayment of the certificates or notes as well as any credit card losses that might be sustained; and (3) that the sales of credit card receivables were "without recourse" so the company was not required to record any reserves for losses that might arise.[7] (Cmplt. ¶ 82.) According to Plaintiffs, Defendants structured the securitization transactions to make it appear that Spiegel had sold the credit card receivables to the SPEs in exchange for cash; in reality, however, the SPEs

---

rapid amortization at the rate of approximately $30 million a month." (Cmplt. ¶ 78.)

[7]    Plaintiffs claim the sales of credit receivables were "with recourse," meaning that Spiegel was obligated to make payments to the SPEs or to repurchase some of the transferred receivables. (Cmplt. ¶ 82; Moran & Sievers Mem., at 7.)

did not assume the risks or rewards of ownership required to treat the transfers as sales. (*Id.* ¶¶ 83, 215.) Those rights and burdens remained with Spiegel. (*Id.* ¶ 233.) Under such circumstances, Plaintiffs say, Generally Accepted Accounting Principles ("GAAP") required that the financial statements of the SPEs be consolidated with those of Spiegel. Had this occurred, Spiegel "would have recorded billions of dollars in additional debt" related to the credit card receivables. (*Id.* ¶¶ 85, 217-222, 229.) For example, Spiegel's 2001 Form 10-K revealed that the company's debt had been understated by more than $3.5 billion for the nine months ended September 29, 2001. (*Id.* ¶ 244.)

Adding to the problem, in Plaintiffs' view, was the fact that Spiegel inaccurately calculated "hundreds of millions of dollars in gains it reported on the receivables it 'sold' during the Class Period" because "numerous, material internal control deficiencies existed at FCNB." (Cmplt. ¶ 236.) Spiegel allegedly used inappropriate valuation and modeling methodologies based on, in Plaintiffs' words, "best estimates" of certain key assumptions, such as portfolio yield, charge-offs, liquidation rates, interest rates, and discount rates. Those estimates, however, were unreliable; for example, Spiegel used a finance charge rate that was too high, and charge-off and discount rates that were too low. As a result, Plaintiffs say, Defendants overstated Spiegel's earnings by $240 million. (Cmplt. ¶¶ 86, 87, 238, 239.) "Had Spiegel given appropriate consideration to the deterioration of the receivables portfolio in determining the fair values of the retained interests," the company would have recorded material write-offs instead of inflated gains. (*Id.* ¶ 88.)

### 2.  Interchange Rate Manipulation

In exchange for providing credit to Spiegel's merchant divisions, FCNB charged the merchants an interchange fee based on a percentage of the dollar value of the credit transactions processed by FCNB. The merchants were to pay the interchange fee to FCNB, which then transferred the fee to Spiegel Acceptance Corp. ("SAC"), a wholly owned subsidiary of Spiegel.

14

Spiegel used the interchange fee to calculate both the amount of the finance charge collections and the overall "portfolio yield" – a "key metric used to measure the performance of the Trusts" which is reported by FCNB to note investors in Monthly Noteholder Statements. (Cmplt. ¶¶ 76, 89, 90.)

By February 2001, Plaintiffs claim, the declining performance of Spiegel's Preferred Card portfolio was threatening to violate the excess spread trigger in the trust documents and send the securitized notes into rapid amortization. (Cmplt. ¶ 91.) To avoid this result, Mr. Moran and Mr. Sievers decided in April 2001 that the trusts would report that the merchant companies were paying a higher interchange rate to FCNB; specifically, Defendants unilaterally increased the interchange rate from 1% to 5%, retroactive to January 1, 2001. "Defendants did this by simply reflecting the accumulated amount of interchange fees calculated at 5% on the trustee servicer report filed with the SEC for April 2001, for the period January 2001 through April 2001. Spiegel did not amend prior servicer reports." By increasing the interchange rate, Defendants "were able to report that portfolio yield was increased and subsequently the excess spread percentage was higher." (*Id.* ¶¶ 92, 93.)

Relying on the Independent Examiner's Report, Plaintiffs allege that Spiegel had no basis for increasing the interchange rate because (1) Spiegel did not perform a benchmarking study[8]; (2) Spiegel did not amend any of its operating agreements with the merchant divisions to reflect the higher interchange rate; (3) Spiegel and the merchants continued to record the interchange rate at 1% on their general ledgers; (4) contemporaneous documents show that Defendants were concerned with decreasing excess spreads in April and October 2001 but "knew or recklessly disregarded that the consequences of reaching excess spread funding triggers would require significant cash deposits to restricted cash accounts"; and (5) all financial documents except the

---

[8]     Plaintiffs do not explain how a "benchmarking study" works, but it presumably entails "attempt[ing] to validate the higher interchange rates" the company adopted. *See Spiegel*, 2003 WL 22176223, at *57.

Monthly Noteholders Statements continued to reflect a 1% interchange rate. (*Id.* ¶ 94.) By using

an inflated interchange rate in calculating portfolio yield and excess spread, Defendants allegedly

misrepresented the financial performance of Spiegel's trust portfolio assets for the publicly-held

asset securitizations (the SCCMNT Series 2000-A and SCCMNT Series 2001-A) and for at least

one of the three privately placed asset securitizations, between at least April and December 2001.

(Cmplt. ¶ 95.) According to Plaintiffs, Defendants' "improper manipulation of the interchange rate"

delayed a pay out event under the trust agreements for nearly two years until 2003. (*Id.* ¶ 96.)

### 3.   Trust Trigger Violations

In addition to manipulating the interchange rate, Defendants also "knowingly or recklessly

failed to disclose" that Spiegel violated certain trust triggers associated with the portfolios, including

the payment rates,[9] delinquency ratio (measuring the aggregate amount of receivables in the

Preferred Card portfolio that were more than 91 days past due), default ratio (the percentage of

charge-offs in the receivable pool held in the Spiegel Master Trust ("SMT")), and excess spread

ratio. (Cmplt. ¶¶ 97, 98, 256-84.) For example, Spiegel did not disclose that it violated a 4.5%

payment rate trigger for the SMT 1999-A agreement in the second quarter of fiscal year 2000,

which would have resulted in an automatic pay out event were it not for a waiver obtained from all

certificate holders. (*Id.* ¶¶ 257, 258.)

During the third quarter of fiscal year 2000, Spiegel violated the default ratio pay out trigger

for SMT 1999-A, but again obtained the necessary waivers to reset the trigger from 12% to 13.5%.

(*Id.* ¶¶ 259-61.) Projecting a violation of the delinquency ratio payout trigger for the SMT 1999-B

agreement in the same quarter, Spiegel similarly raised that trigger from 4.75% to 13.5% and

---

[9]      A "weak" payment rate means that "cardholders are paying back principal at a
slower rate than anticipated, which may foreshadow future collectibility problems with respect to
the accounts receivable." (Cmplt. ¶ 257.)

revised the definition of delinquency to be 31 days, as opposed to 91 days, past due.[10] (*Id.* ¶¶ 262, 263.)  By the end of 2000, Spiegel projected a violation of the new 13.5% default ratio trigger for the SMT 1999-A agreement and did not have the necessary waivers.  To address this problem, Spiegel unilaterally raised the default ratio to 17%.  (*Id.* ¶ 265.)  In October 2000, Spiegel also charged-off accounts to reduce delinquencies, thereby artificially reducing the delinquency ratio for the SMT 1999-B for the fourth quarter of 2000.  (*Id.* ¶ 266.)  Ultimately, Spiegel violated the SMT 1999-A default ratio pay out trigger in the second quarter of fiscal year 2001 and agreed to pay down the series and refinance the private placement through the issuance of a public offering.  (*Id.* ¶ 275.)  Spiegel obtained a waiver from J.P. Morgan, the Administrative Agent for the conduit banks, to avoid a payout event on the SMT 1999-B in the same quarter.  (*Id.* ¶ 276.)  In September 2001, however, Spiegel violated the delinquency ratio triggers for the SMT 1999-B and FCMT 1999-B series.  (Cmplt. ¶ 280.)  Spiegel's Form 10-Qs and Form 10-Ks did not fairly disclose these actual or projected trust trigger violations.

Spiegel's reporting failures were not limited to the Preferred Card SMT portfolios.  As noted, Spiegel publicly offered the SCCMNT 2000-A series on December 19, 2000.  By April 2001, Spiegel's management realized that the company was in danger of violating the 3.5% excess spread funding trigger, which would have required a significant increase to the Excess Spread Restricted Cash Account from $12 million to $60 million in May 2001.  (Cmplt. ¶ 269.)  To avoid this excess funding requirement, Spiegel increased the interchange rate from 1% to 5%.  (*Id.* ¶¶ 92, 93, 270.)  In September 2001, Spiegel projected violations of the excess spread triggers for SCCMNT 2000-A and SCCMNT 2001-A.  The company increased the excess spread percentage by increasing the interchange rate from 5% to 6%, which enabled Spiegel to temporarily avoid its

---

[10]     The court recognizes that Spiegel's alleged unilateral increase in the delinquency ratio payout trigger created a false appearance of financial soundness, but is uncertain why Plaintiffs are also critical of Spiegel's decision to revise the definition of delinquency from 91 days past due to 31 days past due.

17

full cash funding obligations. (*Id.* ¶¶ 281, 282.) As with the SMT portfolios, Spiegel did not disclose the actual or projected trigger events for the SCCMNT series in its financial reports. (*Id.* ¶ 273.)

## F. Problems with FCNB

Throughout the Class Period, Spiegel represented that FCNB had the requisite expertise to manage the higher risk and increased servicing requirements associated with FCNB's sub-prime lending activities. In fact, Plaintiffs allege, Defendants knew that Spiegel's system of internal control was completely deficient. (Cmplt. ¶ 99.) The May 15, 2002 OCC Consent Order, for example, cited FCNB's lack of a current chart of accounts; supervisory failures to approve entries to the company's books and records; failures to require documentary support for entries; and failures to reconcile account balances on a periodic and comprehensive basis. (*Id.* ¶ 99 n.7.) *See also Spiegel*, 2003 WL 22176223. Contributing to the problems was the fact that FCNB was not able to make independent underwriting decisions without influence from Spiegel's management, which was more concerned with facilitating retail sales than controlling credit risk. (*Id.* ¶ 101.) In Plaintiffs' view, FCNB gave in to pressure from Spiegel management and lowered its credit underwriting standards in 1999 and 2000, becoming increasingly dependent upon high-risk credit card customers. (*Id.*)

The OCC also found that during this time, FCNB lacked the appropriate management information systems ("MIS") to effectively monitor the performance of its credit card receivables. (Cmplt. ¶ 102.) For example, FCNB was unable to determine the total credit risk associated with any single customer and, thus, could not generate reports that appropriately analyzed asset quality in terms of portfolio dimension, composition, and performance. (*Id.*) In addition, Spiegel's own MIS and reports "failed to include adequate information relating to product profitability, account volumes, delinquencies, charge-offs, recoveries, bankruptcies, fraud, over limits, credit line increases, debt

management programs, aggregation, and other key elements and assumptions that Defendants used to calculate revenues and earnings from its securitization activities." (*Id.*)

To illustrate the "disarray and unreliability of" FCNB's credit and financial MIS, Plaintiffs note that for the year ended December 30, 2000, Spiegel reported that its credit card receivables more than 60 days past due totaled $270.2 million. When Spiegel filed its financial statements for the year ended December 29, 2001, however, it reported that the actual value of credit card receivables more than 60 days past due as of December 30, 2000 was $470.9 million, 74% more than reported in the prior year's financial statements. (Cmplt. ¶ 103.)

Plaintiffs allege that Defendants' "scheme to issue millions of credit cards to sub-standard credit risks[] caused FCNB's credit card receivables outstanding to grow from $1.7 billion at the end of 1997 to over $3.5 billion at the end of 2001." (Cmplt. ¶ 105.) As a result, Defendants needed to make Spiegel's asset securitizations look like sales transactions rather than the financing arrangements they really were. When Defendants used FCNB to fund the transactions, the OCC stepped in and directed the bank to curtail its unrestricted growth of credit receivables and to maintain certain risk-adjusted capital levels. (*Id.* ¶¶ 105-106.)

## G.     Spiegel's Financial Crisis

Plaintiffs claim that Defendants' fraudulent activities at Spiegel started to unravel in early 2002. In January 2002, Mr. Cannataro led several other senior members of Spiegel's management in forming what they called the "Condor Group," which served as a "crisis management team to deal with Spiegel's problems." (Cmplt. ¶ 168.) On February 7, 2002, KPMG wrote to Mr. Cannataro as Spiegel's CFO and raised the prospect that KPMG would have to issue Spiegel a going concern opinion raising "substantial doubt about the Company's ability to continue as a going concern." (Cmplt. ¶ 169.) *See Spiegel*, 2003 WL 22176223, at *22 (a "going concern opinion" is "universally dreaded by corporate management"); *Copy-Data Systems, Inc. v. Toshiba America,*

*Inc.*, 755 F.2d 293, 299 (2d Cir. 1985) (a "going concern opinion" is a "most serious qualification on a financial statement because it generally indicates an auditor's opinion that a company is faced with a serious risk of bankruptcy, and, therefore, that valuation of its assets as part of a going concern may be incorrect").

Shortly thereafter on February 21, 2002, Spiegel "shocked the market" by announcing its plan to sell FCNB and its accrued loss in connection with that sale of $310 million. (Cmplt. ¶¶ 13, 170.) The February 21 press release did not mention, among other things, that KPMG had threatened to issue a going concern opinion; that Spiegel's net loss in 2001 was understated by $190 million (48%); that Spiegel's operating results for fiscal year 2001 showed a loss of $226 million, and not a profit of $15 million as reported in the press release; that Spiegel had violated trust triggers on its securitized credit card portfolios; that Spiegel was in the middle of a $300 million "liquidity crisis"; or that the interchange rate Spiegel reported to its securitization trustee was not the rate actually used by Spiegel merchants. (*Id.* ¶ 172.) Even absent these disclosures, the price of Spiegel's common stock fell from $2.80 per share to $2.50 per share in response to the press release. (*Id.* ¶ 171.)

On March 15, 2002, Ludwig Richter, Director of Corporate Accounting at Otto Versand, reported to Dr. Otto and Mr. Zaepfel regarding his review of Spiegel's financial statements and a meeting he attended with KPMG in February 2002. Mr. Richter stated that KPMG's audit opinion would likely contain a going concern qualification unless the company obtained (1) a written funding commitment to cover a projected cash shortfall; (2) an executed agreement to sell Spiegel's credit card business; and (3) a waiver of Spiegel's loan covenants (already in default) or a renegotiated credit agreement.[11] (Cmplt. ¶¶ 174, 432.)

_____

[11] MBIA was the insurer of Spiegel's securitizations. *Spiegel*, 2003 WL 22176223, at *27 n.14.

### 1. The March 27, 2002 Meeting in Germany

On March 25, 2002, the Condor Group met to discuss a number of "life threatening" issues facing Spiegel.[12] (Cmplt. ¶¶ 175, 433.) Treasurer John Steele reported that Spiegel's investment bankers at J.P. Morgan had advised him that the company's credit portfolio was worth only a quarter of what J.P. Morgan "originally thought."[13] Internal audit director Michael McKillip reported that Spiegel would have to restate the interchange rate used to calculate excess spread, which would "blow a trigger in the preferred card 2000-A and 2001-A securitizations trusts." (*Id.* ¶¶ 168, 175.) The group agreed that Mr. Zaepfel and Mr. Cannataro, among others, should immediately travel to Germany to personally advise Dr. Otto of the situation. (*Id.* ¶¶ 175, 433.) The two men left the next day and met with Dr. Otto and Dr. Crüsemann on March 27, 2002.[14] (*Id.* ¶¶ 176, 434.) At the meeting, Spiegel's management gave Dr. Otto and Dr. Crüsemann a written analysis of the difficulties facing the company, including:

- The OCC determined a month earlier to substantially lower FCNB's rating.
- [T]he "final draft" of the OCC's consent order for FCNB required "significant restrictions" on credit for both new and existing FCNB customers.
- [T]hese OCC restrictions on FCNB's ability to grant credit would result in a reduction in annual net sales by the Spiegel merchant companies of between $192 million and $442 million.
- J.P. Morgan concluded that it would be "very difficult" to sell the bankcard business at all. . . Spiegel believed it would have to simply "walk away" from its

---

[12]    Plaintiffs put the phrase "life threatening" in quotes but do not indicate who they are quoting. *See Spiegel*, 2003 WL 22176223, at *24 (stating that on March 25, 2002, "the Condor Group met to discuss a number of 'life threatening' issues facing Spiegel").

[13]    The record does not reflect when J.P. Morgan formed its "original[] thought" as to the value of Spiegel's credit card portfolio.

[14]    Alexander Birken, Otto Versand's Vice President of Group Controlling, was also present at the meeting. On August 15, 2002, he moved to the U.S. at Dr. Otto's request and became Spiegel's Chief Administrative Officer. (Cmplt. ¶ 176.) At the time of the meeting, Mr. Zaepfel and Dr. Crüsemann constituted all members of Spiegel's Board Committee, which was empowered to act for Spiegel's full board. (*Id.* ¶¶ 177, 420.)

bankcard business [which] could have a $310 million equity impact for Spiegel, and a $170 million debt impact.[15]

• J.P. Morgan also advised Spiegel that it could probably not sell its preferred card portfolio.

• J.P. Morgan advised Spiegel that it would be difficult to finance new receivables off-balance sheet through a securitization transaction, as investors would be wary of Spiegel's financial condition.

• Without FCNB to service its credit card receivables, . . . Spiegel's merchant companies would have to pay a 6% to 12% servicing fee to a third-party servicer . . . For each 1% increase in the fee above the existing 2% [paid to FCNB], Spiegel would suffer a $13 to $15 million reduction in EBT [earnings before taxes].

• "The Spiegel Group is in a liquidity crisis" and "will soon be illiquid."

• Spiegel was in default on its loan covenants, and its plan to restructure its finances by mid-April "is no longer possible." . . . "There is also a growing threat of an involuntary bankruptcy proceeding being filed against us by our creditors."

• "Due to the impact of OCC restrictions on our merchant businesses and significantly lower expectations for the disposition of our credit business, we cannot proceed with a credit restructuring based on the 2002 plan presented to the banks."

• Spiegel was then facing "a probable rapid amortization in our ABS financings, which will divert cash flow ($60 million/month) from Spiegel to ABS investors."

• Both KPMG and Rooks Pitts [Spiegel's outside counsel prior to retaining Kirkland & Ellis] recently (March 2002) advised Spiegel that, in the absence of a benchmarking study to support a higher interchange rate, Spiegel would have to restate its interchange rate and excess spread calculations for 2001. Such recalculations of excess spread would cause Spiegel's 2000-A and 2001-A series securitizations to breach their triggers, "causing both to go into early amortization." The result would be diversion of approximately $40 million excess monthly cash flow from Spiegel to pay down these series.

(Cmplt. ¶¶ 178, 435.) *See also Spiegel*, 2003 WL 22176223, at *24-26, 44. The written presentation also advised Dr. Otto and Dr. Crüsemann about their obligations under the U.S. securities laws. (Cmplt. ¶¶ 179, 436.)

## 2. The 2001 Form 10-K

Days after the March 27, 2002 meeting in Germany, Spiegel was due to file its 2001 annual report on Form 10-K. The form was already prepared and "virtually ready for filing" but after consulting with Dr. Otto, Mr. Zaepfel and Mr. Cannataro decided to file a "notification of late filing"

---

[15]     Plaintiffs do not explain what they mean by the terms "equity impact" and "debt impact." Presumably, if Spiegel "walked away" from the bankcard business it would suffer a $310 million reduction in equity value and a $170 million increase in reported debt.

on Form 12b-25 on April 1, 2002. (Cmplt. ¶¶ 182, 438.) Spiegel gave the following reason for the delay:

> As has been publicly disclosed, the Registrant is not currently in compliance with its 2001 loan covenants and has reached a strategic decision to sell its credit card subsidiary, and as a result the Registrant is not in a position to issue financial statements for its 2001 fiscal year pending resolution of these issues.

(*Id.* ¶ 183.) Spiegel also stated that "[a]s disclosed in the Company's press release on February 21, 2002, a significant loss will be reported in the 2001 earnings statement due to the Company's decision to sell the bank." (*Id.* ¶ 184.) Plaintiffs claim that the real reason for the delay in filing the 2001 Form 10-K "was that defendants did not want to have to reveal the auditors' 'going concern' audit opinion qualification on Spiegel's 2001 financial statements." (*Id.* ¶¶ 14, 185, 186, 297, 298.)

On April 19, 2002, Spiegel issued a press release "regarding the status of several business initiatives." (Cmplt. ¶¶ 187, 439.) According to Plaintiffs, Spiegel "had to say something to the public that day, as that morning Nasdaq had changed Spiegel's trading symbol from SPGLA to SPGLE, based on Spiegel's failure to file its Form 10-K."[16] (*Id.*) Plaintiffs allege that the press release was materially false and misleading because it failed to disclose or misrepresented that (1) the OCC was discussing additional liquidity and capital requirements for FCNB, as well as restrictions on its credit granting measures; (2) a pay out event would prevent Spiegel from receiving up to $40 million per month from the trust and divert funds to the repayment of principal on the notes; and (3) Spiegel intended to create a revised business plan with financial projections significantly lower than those previously submitted to the bank group. (*Id.* ¶ 189.)

On April 22, 2002, Spiegel requested a hearing before Nasdaq to explain why it had not filed its Form 10-K and to avoid immediate delisting. At a May 17, 2002 delisting hearing, "Nasdaq received assurances . . . that the Company would file its 10-K by May 28, 2003, regardless of the status of its negotiations with its lenders." (Cmplt. ¶¶ 192, 440.) A few days earlier on May 13,

---

[16]     Plaintiffs do not explain the significance of the trading symbol change.

2002, KPMG had repeated its advice to Spiegel's Audit Committee that KPMG would have to issue a going concern opinion. (*Id.* ¶ 196.)

On May 15, 2002, Spiegel's outside counsel, Kirkland & Ellis, told Spiegel's management that the SEC might initiate an enforcement action against the company if it failed to file its Form 10-K. (Cmplt. ¶ 441.) The same day, the OCC and FCNB entered into a consent order. The consent order (1) restricted transactions between FCNB and its affiliates and required FCNB to complete a review of all existing agreements with affiliated companies; (2) required FCNB to obtain an aggregate of $198 million in guarantees through Spiegel's majority shareholder; (3) restricted FCNB's ability to accept, renew, or rollover deposits; (4) restricted FCNB's ability to issue new credit cards and make line increases; (5) required FCNB to file with the OCC a disposition plan to sell, merge, or liquidate; (6) required FCNB to maintain sufficient assets to meet daily liquidity requirements; (7) required FCNB to complete a comprehensive risk management assessment; (8) established minimum capital levels for FCNB; and (9) provided for increased oversight by, and reporting to, the OCC. (*Id.* ¶ 197.)

In mid-May 2002, Spiegel failed to file its Form 10-Q reporting on its performance during the first quarter of 2002. In its notification of late filing, Spiegel reiterated the explanation given for its failure to file the 2001 Form 10-K. (Cmplt. ¶ 198.) On May 29, 2002, Mr. Zaepfel sent Mr. Hansen a handwritten letter stating (in German) that Mr. Zaepfel and Dr. Otto were of the opinion that Spiegel should accept a delisting rather than file a Form 10-K with a going concern statement, "even though we know that we are not complying with the law by not filing a 10-K." (*Id.* ¶ 442.) During an Audit Committee meeting on May 31, 2002, attorneys from Kirkland & Ellis again advised that Spiegel needed to file its Form 10-K, stating that failure to do so "would be breaking the law." (*Id.* ¶ 443.)

By June 2002, however, Spiegel still had not filed its 2001 Form 10-K. On June 3, 2002, Nasdaq delisted "the company's Class A common stock on Nasdaq National Market System effective with the open of business on June 3, 2002, based on the company's filing delinquencies and other public interest concerns." (Cmplt. ¶ 200.) On June 4, 2002, the date the Class Period ends, Spiegel revealed that its 2001 financial statements would have a going concern qualification in the audit report. As a result, Spiegel's stock fell by 51% to close at $0.49 on June 5, 2002. (Id. ¶¶ 15, 202.)

When Spiegel finally filed its 2001 Form 10-K on February 4, 2003, it reported a loss that was more than $189 million higher than previously indicated. Spiegel also reduced its previously reported "gains on off-balance receivables" by more than $206 million. (Cmplt. ¶ 203.) On March 7, 2003, Spiegel issued a press release announcing that the SEC had commenced a civil proceeding against the company, alleging violations of Sections 10(b) and 13(a) of the Securities Exchange Act. Spiegel also announced that it had entered into a Consent and Stipulation with the SEC, partly resolving those claims. (Id. ¶¶ 16, 207, 296.) On March 11, 2003, Spiegel issued another press release announcing a pay out event on FCNB's securitization transactions. As a result of that pay out event, Spiegel was unable to fund its ongoing operations and filed for bankruptcy on March 17, 2003. (Id. ¶¶ 18, 78, 208.)

## DISCUSSION

Plaintiffs claim that Defendants violated § 10(b) of the SEA and Rule 10b-5 promulgated thereunder by engaging in a "plan, scheme and course of conduct" to deceive the investing public regarding Spiegel's high-risk credit practices and induce Plaintiffs to purchase Spiegel common stock at artificially inflated prices during the Class Period. (Cmplt. ¶ 463.) Plaintiffs also charge that SHI and the Individual Defendants violated § 20(a) of the SEA because they acted as controlling persons of Spiegel and had the power to control the company's decisions, "including the

content and dissemination of the various statements which plaintiffs contend are false and misleading." (*Id.* § 475.)

Defendants have jointly moved to strike all of the allegations in the Complaint and have also filed six separate motions to dismiss. Plaintiffs object to all of the motions and ask the court to lift the PSLRA's automatic discovery stay. The court addresses each argument in turn.

## I.    Joint Motion to Strike

Defendants first argue that the Complaint should be stricken in its entirety on procedural grounds for failing to comply with the requirements of FED. R. CIV. P. 8(a) and (e), and for improperly relying on statements in the Independent Examiner's Report. As explained below, the court disagrees.

### A.    Rule 8

Rule 8 requires that a complaint set forth "a short and plain statement of the claim," and that each averment be "simple, concise, and direct." FED. R. CIV. P. 8(a) and (e). "A complaint that is prolix and/or confusing makes it difficult for the defendant to file a responsive pleading and makes it difficult for the trial court to conduct orderly litigation." *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 775-76 (7th Cir. 1994). In fraud cases, however, Rule 9(b) requires plaintiffs to state "with particularity" the circumstances constituting the fraud; that is, the "who, what, when, where, how" of the fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). In addition, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

Defendants argue that Plaintiffs' Complaint violates Rule 8 because it constitutes improper "puzzle pleading." (Def. Mem., at 3.)[17] The Fifth Circuit has described "puzzle pleading" as a "not

---

[17]    Defendants' Memorandum of Law in Support of Joint Motion to Strike the Complaint is cited as "Def. Mem., at __."

uncommon mask for an absence of detail," *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 178

(5th Cir. 1997), and a California court noted that "courts have repeatedly lamented plaintiffs'

counsel's tendency to place 'the burden . . . on the reader to sort out the statements and match

them with the corresponding adverse facts to solve the puzzle of interpreting Plaintiffs' claims.'"

*Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998) (quoting *In re Oak Technology*

*Sec. Litig.*, No. 96-20552 SW, 1997 WL 448168, at *5 (N.D. Cal. Aug. 1, 1997)). Relying primarily

on cases from California, Defendants describe three "hallmarks" of puzzle pleading:

> (1) the division of the class period into a few or several time periods in which it is
> alleged that the defendants made materially false statements or omissions, (2)
> within each time period, a series of paragraphs supposed to contain allegedly false
> or misleading statements (sometimes boldfaced in part) made during the period,
> and (3) following each series, an omnibus paragraph alleging that the statements
> within the time period were false or misleading when made, and setting forth a
> laundry list of supposedly "true facts" (usually set out in numerous subparagraphs)
> purporting to demonstrate just that.

(*Id.*) (citing *In re Splash Technology Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073-75 (N.D.

Cal. 2001)). According to Defendants, the Complaint has all of these characteristics: (1) Plaintiffs

have divided the Class Period into nine time periods[18] during which Defendants made materially

false statements or omissions; (2) Plaintiffs present a series of paragraphs containing the allegedly

false or misleading statements; and (3) each series is followed by an omnibus paragraph alleging

that the statements were materially false and misleading when made because they failed to

disclose certain adverse facts. (*Id.* at 4.)

Plaintiffs respond that the Complaint complies with Rule 8 and clearly sets forth the

allegations of fraud. In paragraphs 46-106, the Complaint describes Defendants' schemes to

defraud, such as offering credit primarily to sub-prime creditors under relaxed standards to

---

[18]     The nine time periods suggested by the Complaint are (1) February 16, 1999 to
March 16, 1999; (2) April 22, 1999 to March 24, 2000; (3) April 25, 2000 to November 14, 2000;
(4) December 14, 2000; (5) January 4, 2001 to March 30, 2001; (6) April 24, 2001 to June 7, 2001;
(7) June 29, 2001 to July 16, 2001; (8) July 24, 2001 to January 2002; and (9) February 2, 2002.
(Def. Mem., at 4 n.1.)

artificially boost sales; overstating Spiegel's gains and understating its debts; manipulating the interchange rate to avoid trust trigger violations; and hiding the fact that trust trigger violations occurred. The Complaint next lists Defendants' false and misleading statements and explains why they are false and misleading. (Cmplt. ¶¶ 107-167.) Paragraphs 168-208 then identify the corrective disclosures that advised the market of the fraud. Plaintiffs also added separate sections describing Defendants' violations of GAAP, (Id. ¶¶ 209-357), and KPMG's role in the fraud. (Id. ¶¶ 358-416.) (See Pl. 12(f) Resp., at 6.)[19]

With two exceptions, discussed below, the court finds that Plaintiffs' Complaint satisfies the procedural pleading requirements of Rules 8 and is neither unduly prolix nor confusing. Defendants complain that the Complaint is prejudicial because "the challenged allegation[s] ha[ve] the effect of confusing the issues or [are] so lengthy and complex that [they] place[] an undue burden on the responding party." (Def. Mem., at 6) (quoting Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc., 11 F. Supp. 2d 1006, 1009-10 (N.D. Ill. 1998)). Given the complexity of the allegations and Defendants' extensive motions to dismiss, however, the claim of prejudice is not well-taken. Though the Complaint is arguably inartfully drafted in certain respects and repetitive, the court is satisfied that Defendants can fairly respond to the allegations and that there is no sufficient basis for striking the Complaint in its entirety. See Spearman Industries Inc. v. St. Paul Fire and Marine Ins. Co., 109 F. Supp. 2d 905, 907 (N.D. Ill. 2000) (motions to strike are "disfavored and usually denied").

## B.    Independent Examiner's Report

Defendants next object to Plaintiffs' references to, and reliance upon, statements from the Independent Examiner's Report. See Spiegel, 2003 WL 22176223. Defendants claim that

---

[19]    Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Motion to Strike the Complaint is cited as "Pl. 12(f) Resp., at ___."

Plaintiffs have violated Rule 8 by cutting and pasting into the Complaint certain self-serving portions of the Report, which addressed conduct and knowledge attributable to Spiegel, and then ascribing that same conduct and knowledge to "Defendants" generally. (Def. Mem., at 7-8.) In Defendants' view, "it is virtually impossible to ascertain which defendants are responsible for which allegedly wrongful acts" because Plaintiffs have indiscriminately grouped them together, or merely attributed the acts to Spiegel, which is not a named defendant. (*Id.* at 8.) While this argument goes too far – Defendants have managed to seek dismissal of the particular allegations against them – the court does agree that Plaintiffs must specify the particular defendants responsible for each particular act and cannot simply attribute to "defendants" conduct that clearly could not encompass all Defendants in this case. (*See, e.g.,* Cmplt. ¶ 63, alleging that "Defendants prepared and approved forecasts" for Spiegel Catalog and Newport News, and ¶ 93, charging "defendants" with "unilaterally increas[ing] the interchange rate," none of which could apply to Spiegel's auditor, KPMG). To the extent Plaintiffs attribute conduct or knowledge to Spiegel, moreover, it may not serve as a basis for imputing the same conduct or knowledge to Defendants, absent some factual support.

Defendants also claim that Plaintiffs have improperly alleged facts that were merely alleged by a third party. (Def. Mem., at 12-13) (citing *Geinko v. Padda*, No. 00 C 5070, 2002 WL 276236, at *6 n.8 (N.D. Ill. Feb. 27, 2002)) (plaintiffs' attorneys "cannot shirk their Rule 11 obligation to conduct an appropriate investigation into the facts . . . by merely stating that 'the SEC alleges' certain additional facts"). In fact, Plaintiffs have done more than copy allegations from another complaint. The Independent Examiner's Report, prepared at the direction of the court and with the consent of Spiegel and the SEC, is based on "the overall record accumulated during [the] investigation," including (1) a review of Spiegel's financial records "from January 1, 2000 to date"; (2) a review of more than 800,000 documents produced by Spiegel, its attorneys, FCNB, and

KPMG, among others; and (3) some 51 witness interviews, including all of the Individual Defendants in this case. *Spiegel*, 2003 WL 22176223, at *2, n.1, and Appendix A and B. In addition, the Report is part of Spiegel's public filings with the SEC; Spiegel filed it on September 12, 2003 as part of its Form 8-K. (Pl. 12(f) Resp., at 12-13.)

More problematic is the fact that Plaintiffs claim to be relying on the Report as the basis for allegations made on "information and belief" in accordance with the PSLRA. (*Id.* at 14.) *See* 15 U.S.C. § 78u-4(b)(1) ("if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"). Defendants argue that Plaintiffs never indicate in the Complaint that any allegations are made on information and belief, except in one footnote (Cmplt. ¶ 234 n.15), and that the court therefore cannot evaluate whether the claims have merit. (Def. Reply, at 11-12) (courts have a "'gatekeeping role' to stop at the threshold unwarranted claims of falsity alleged on information and belief").[20] To avoid any confusion, Plaintiffs are directed to identify the allegations in the Complaint that are made on information and belief and to state the facts on which the belief is based. The court also expects Plaintiffs to clarify when the basis for the belief is the Independent Examiner's Report.

Defendants' remaining objections are without merit. The fact that "[n]othing in Mr. Crimmins's Report has ever been subjected to cross-examination, rebuttal, or any other type of adversarial testing" does not render those allegations improper. (Def. Mem., at 13.) Defendants will have the opportunity to test the allegations in discovery or at trial. *See, e.g., Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (a complaint may not be dismissed unless plaintiffs could not prevail "under any set of facts that *could be proved* consistent with the allegations") (emphasis added). Nor is the Complaint so "disjointed" as to be prejudicial to Defendants merely because Plaintiffs have incorporated only certain portions of the Report "in scattershot fashion." (Def. Mem.,

---

[20]     Defendants' Reply Memorandum of Law in Further Support of Joint Motion to Strike the Complaint is cited as "Def. Reply, at ___."

at 10-11.) Defendants do not need to know where the statements appeared in the Report in order to fairly answer them in the Complaint. Finally, although the court shares Defendants' concerns about the size of the Complaint (216 pages and 477 paragraphs), the court disagrees that Defendants are prejudiced by the size. "Rule 8 does not set out a page limit, but rather requires that "[e]ach averment of a pleading shall be simple, concise, and direct." *Oil Express Nat'l, Inc. v. D'Alessandro*, No. 96 C 1528, 1997 WL 613276, at *2 (N.D. Ill. Sept. 26, 1997). Except as stated herein, Plaintiffs have satisfied this requirement in this complex case.

## II.    Motions to Dismiss

Defendants argue in six separate motions that the Complaint must be dismissed for failure to state a claim. The purpose of a motion to dismiss is to test the sufficiency of the plaintiffs' complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Plaintiffs alleging fraud must do so "with particularity," FED. R. CIV. P. 9(b), meaning "the who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo*, 901 F.2d at 628. The particularity requirement ensures that plaintiffs "conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

In addition to complying with Rule 9(b), Plaintiffs must also follow the strict pleading requirements of the PSLRA, which was enacted to discourage claims of "so-called 'fraud by hindsight.'" *Amzak Corp. v. Reliant Energy, Inc.*, No. 03 C 0877, 2004 WL 407027, at *2 (N.D. Ill. Jan. 28, 2004) (quoting *In re Brightpoint, Inc. Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001)). The PSLRA requires plaintiffs to "specify each statement alleged

to have been misleading, [and] the reason why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). *See also Chu v. Sabratek Corp. ("Chu I")*, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000).

To state a claim under § 10(b) of the Securities Exchange Act and SEC Rule 10b-5, plaintiffs must allege that each defendant "(1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff[s] relied, and (6) that reliance proximately caused plaintiff[s'] injuries." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280 (7th Cir. 1996). To state a claim under § 20(a) of the Act, Plaintiffs must allege "(1) a primary securities violation; (2) [that] each of the Individual Defendants exercised general control over the operations of [Spiegel]; and (3) [that] each of the Individual Defendants 'possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised.'" *Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941, 969 (N.D. Ill. 2004) (quoting *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992)).

All of the Defendants variously argue that the Complaint does not identify any false or misleading statements attributable to them; that Plaintiffs have failed to allege scienter; and that there is no basis for control person liability under § 20(a) of the Securities Exchange Act. The court addresses each motion in turn.[21]

### A.    Dr. Otto, Dr. Crüsemann, Dr. Müller, and Mr. Hansen

Dr. Otto, Dr. Crüsemann, Dr. Müller, and Mr. Hansen (the "German Defendants") argue that the Complaint fails to allege that they made any false or misleading statements during the Class

---

[21]    To the extent Defendants' arguments overlap, the court addresses them only once except where separate discussion is appropriate.

Period, or that they acted with knowledge or motive to deceive. In the absence of a viable § 10(b) claim, the German Defendants say, Plaintiffs' § 20(a) claim against them fails as well.

### 1. False and Misleading Statements

The German Defendants first claim that Plaintiffs have not identified any false or misleading statements directly attributable to them during the Class Period. Plaintiffs have instead utilized the "group pleading doctrine," which "allows plaintiffs to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company." *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 946 (N.D. Ill. 2003) (quoting *Sutton v. Bernard*, No. 00 C 6676, 2001 WL 897593, at *5 n.5 (N.D. Ill. Aug. 9, 2001)). According to the German Defendants, Plaintiffs have not identified any SEC filings, press releases, or statements to analysts that are attributable to any of them specifically. (Otto et al. Reply, at 2.)[22] All Plaintiffs have done is presume, based upon their status as directors and/or shareholders of Spiegel and its related entities, that the German Defendants were involved in making those statements. (*Id.*) The problem with this approach, the German Defendants argue, is that the group pleading doctrine predates the PSLRA and is no longer a viable theory. Plaintiffs deny that they have relied on group pleading and insist that regardless how their allegations are characterized, they have satisfied the pleading requirements of the PSLRA.

The Seventh Circuit has not yet addressed whether plaintiffs may rely on group pleading in light of the PSLRA. The only Court of Appeals to have decided the issue concluded that the group pleading doctrine does not survive the PSLRA. In *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004), the Fifth Circuit held that group pleading "cannot

---

[22]     Defendants Dr. Michael Otto, Dr. Michael Crüsemann, Dr. Peter Müller, and Mr. Horst Hansen's Reply in Support of Motion to Dismiss is cited as "Otto et al. Reply, at ___."

withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth

with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or

omission' sufficient to give 'rise to a strong inference that the defendant acted with the required

state of mind.'" *Id.* at 364 (quoting 15 U.S.C. § 78u-4(b)). Given the PSLRA's directive that each

defendant must be enlightened as to his or her part in the alleged fraud,

> corporate officers may not be held responsible for unattributed corporate statements
> solely on the basis of their titles, even if their general level of day-to-day
> involvement in the corporation's affairs is pleaded. However, corporate documents
> that have no stated author or statements within documents not attributed to any
> individual may be charged to one or more corporate officers provided specific
> factual allegations link the individual to the statement at issue. Such specific facts
> tying a corporate officer to a statement would include a signature on the document
> or particular factual allegations explaining the individual's involvement in the
> formulation of either the entire document, or that specific portion of the document,
> containing the statement.

*Id.* at 365.

Other courts have expressly declined to decide whether the group pleading doctrine

remains viable after the PSLRA. *See Phillips v. Scientific-Atlanta, Inc.*, __ F.3d __, 2004 WL

1382906, at *3 (11th Cir. June 22, 2004) (noting that "courts are now debating" the viability of the

group pleading doctrine in the wake of the PSLRA, but finding it unnecessary to address the issue

in resolving the appeal); *In re Cabletron Systems, Inc.*, 311 F.3d 11, 40 (1st Cir. 2002) (noting that

"[t]his circuit has recognized a very limited version of the group pleading doctrine for securities

fraud," but finding it unnecessary to decide whether the doctrine survived the PSLRA to resolve the

appeal). The Ninth and Tenth Circuits, which affirmatively embraced the group pleading doctrine

prior to the enactment of the PSLRA, have not addressed its application post-PSLRA. *See Wool*

*v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987) ("[i]n cases of corporate fraud

where the false or misleading information is conveyed in prospectuses, registration statements,

annual reports, press releases, or other 'group- published information,' it is reasonable to presume

that these are the collective actions of the officers"); *Schwartz v. Celestial Seasonings, Inc.*, 124

F.3d 1246, 1254 (10th Cir. 1997) ("[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers").

Courts in this district are split as to whether group pleading survives the PSLRA. In *Danis v. USN Communications, Inc.*, 73 F. Supp. 2d 923 (N.D. Ill. 1999) (Conlon, J.), the court allowed the plaintiffs to rely on group pleading to charge "high-level" directors familiar with the "day-to-day operations of [USN] at the highest levels" with making material misstatements and misrepresentations in a registration statement/prospectus and subsequent public filings. *Id.* at 939 n.9. The plaintiffs alleged pervasive problems with USN's "provisioning, billing, and accounting systems, systems core to USN's existence," as well as "severe improprieties regarding the manner in which USN represented various figures, such as sales and revenue, in its financial documents," but did not allege facts tying each of the individual defendants to the alleged misconduct. *Id.* at 938 and n.9. The court declined to dismiss the plaintiffs' complaint on that basis, stating that until the Seventh Circuit holds otherwise, "this court is unwilling to read the PSLRA as abolishing all remnants of notice pleading and the liberal standards under which motions to dismiss are viewed." *Id.* at 939 n.9. *See also Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2004 WL 574665, at *17 (N.D. Ill. Mar. 22, 2004) (Guzman, J.) (declining to dismiss complaint on the basis of group pleading because courts in the district continue to recognize the doctrine); *Sutton*, 2001 WL 897593, at *5 (Grady, J.) ("absent guidance from the Seventh Circuit, we are unwilling to hold that the PSLRA abolished the group pleading doctrine").

Judge Castillo reached a contrary conclusion in *Chu v. Sabratek Corp.* ("*Chu II*"), 100 F. Supp. 2d 827 (N.D. Ill. 2000), in which the plaintiffs alleged that group pleading was appropriate as to individual defendants who were responsible for Sabratek's general operations, including

"oversight of financial reports to the SEC, audits, and press releases." *Id.* at 835. The plaintiffs

alleged facts sufficient to satisfy Rule 9(b), supplying "ample detail" as to the contents of the

misrepresentations, when and where they were made, and how they furthered the allegedly

fraudulent scheme. *Id.* at 836. They did not, however, comply with the PSLRA's requirement that

each defendant be shown to have acted with scienter.

> The simple fact of a defendant's status as an officer or director of a company,
> without more, does not give rise to a strong inference that that defendant knew or
> recklessly disregarded the falsity of statements released by the company.

*Id.* at 837. *See also Geinko v. Padda*, No. 00 C 5070, 2001 WL 1163728, at *4 n.3 (N.D. Ill. Sept.

28, 2001) (Coar, J.) (ignoring allegations made against "defendants" generally based on *Chu's*

rejection of the group pleading doctrine).

Other courts have drawn distinctions, finding that the group pleading doctrine has at least

some limited application after the PSLRA. In *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d

942 (N.D. Ill. 2002) (Bucklo, J.), the court found that allegations attributed to four identified

"principal individual defendants" satisfied the "group pleading doctrine of the PSLRA." *Id.* at 947.

Allegations attributed to the company, which was not named as a party, and to "defendants"

generally, however, were "insufficient to satisfy the heightened pleading requirements of Rule 9(b)")

(citing *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)). In *Dardick v. Zimmerman*, 149 F. Supp.

2d 986 (N.D. Ill. 2001), Judge Shadur cautioned against using labels such as "group pleading,"

noting that "there is of course no question that it is not fatal for any complaint to collectivize

'defendants' in certain respects." *Id.* at 987. The plaintiff there charged the defendants generally

with failing to disseminate accurate information about their company, which caused him to

purchase stock at artificially inflated prices. *Id.* at 988. The court found the complaint, which

detailed the defendants' knowledge and control as senior officers and directors of the company,

sufficient because the plaintiff was alleging a failure to disclose "a deep and pervasive corporate

illness – the existence of LINC's extraordinarily serious financial difficulties – rather than, for

example, the assertedly flawed accounting practices that Judge Castillo addressed in *Chu.*" *Id.*

See also *In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003 WL 262369, at *15 (N.D. Ill. Feb. 7,

2003) (Lefkow, J.) (quoting *Dardick* to hold that "'proper course' is to examine each individual's

liability based on each 'defendant's own conduct (or, where applicable, on respondeat superior

principles)'"); *Lindelow v. Hill*, No. 00 C 3727, 2001 WL 830956, at *7-8 (N.D. Ill. July 20, 2001)

(Holderman, J.) (allowing group pleading where, as in *Dardick*, "plaintiffs' allegations of

misrepresentations concern matters fundamental to the operations of Sabratek and Moon, namely

Moon's ability (or inability) to conduct or even 'get ready for' a market launch of OneMedPlace.com

in 1999").

In *Johnson v. Tellabs, Inc.*, Judge St. Eve declined to affirmatively decide whether the group

pleading doctrine survived the PSLRA. She noted, however, that the PSLRA requires plaintiffs to

allege facts supporting an inference that false or misleading statements are attributable to

individual defendants, and held that

> [a] plaintiff is therefore required at least to include allegations in the complaint
> relating to an individual defendant's duties or legal obligations that create a
> presumption that the company's statement was somehow caused by or attributable
> to an individual defendant. Simply alleging an individual defendant's title is not
> enough.

262 F. Supp. 2d at 946-47.

This court agrees that group pleading may be appropriate in certain circumstances

notwithstanding the PSLRA, as long as the complaint sets forth facts demonstrating that each

defendant may be responsible for the fraudulent statements. In this case, Plaintiffs allege that the

German Defendants each held positions of authority with respect to Spiegel. Dr. Otto is the "sole

voting shareholder" of Spiegel and allegedly controlled the company by placing Otto Family

business "associates" – including the other German Defendants – in leadership positions. (Cmplt.

37

¶¶ 417, 418.) In addition to being Spiegel Directors, Dr. Otto and Dr. Crüsemann both served as members of Spiegel's Board Committee, which "routinely operated on behalf of the board." (*Id.* ¶¶ 118, 177, 418, 420, 438, 442, 447, 450.) Dr. Crüsemann, Dr. Müller, and Mr. Hansen were also Spiegel Directors and served on the company's Audit Committee. Plaintiffs allege that by virtue of their ownership of, and positions with the company, the German Defendants "controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public." (*Id.* ¶ 452.) Plaintiffs further allege that the German Defendants all received copies of Spiegel's allegedly fraudulent press releases and reports, and "had the ability and opportunity to prevent their issuance or cause them to be corrected." (*Id.*)

In addition to these general allegations, Plaintiffs allege that Dr. Crüsemann knew about significant problems with Spiegel's "easy credit" practices by at least November 2001, based on his statement at a November 27 Audit Committee meeting that the Board thought the credit practices were "under control – obviously they were not." (Cmplt. ¶ 163.)[23] Plaintiffs emphasize that Dr. Otto and Dr. Crüsemann were both instrumental in the decision to not file the 2001 Form 10-K despite warnings from Kirkland & Ellis that failure to do so would violate securities laws. (*Id.* ¶¶ 446, 447.) In addition, Mr. Hansen was allegedly aware that Spiegel had violated, or was in imminent danger of violating, various trust triggers, and he received documentation in October 2001 detailing the serious credit problems facing FCNB. That documentation attributed FCNB's problems to increasing "delinquency 'roll rates' and, in turn, charge-offs." (*Id.* ¶¶ 158, 160, 163,

---

[23] Plaintiffs appear to be quoting Dr. Crüsemann, but they do not indicate how they learned of his alleged statement. The court suspects that Plaintiffs have taken this language directly from the Independent Examiner's Report. *See Spiegel,* 2003 WL 22176223, at *16 (noting that at the November 27, 2001 meeting in Hamburg, "Audit committee member Michael Cruesemann [sic] (also Otto Versand CFO) responded that 'the Audit Committee and the Board had been previously told by management that these things were under control - obviously they were not'").

262, 310.) Mr. Hansen was also present at the May 31, 2002 Audit Committee meeting when Kirkland & Ellis advised that Spiegel needed to file its Form 10-K or risk violating securities laws. (*Id.* ¶ 443.) As for Dr. Müller, Plaintiffs focus on his membership on the Audit Committee and assume he was in attendance at certain meetings. They also note that Dr. Müller participated in an analysis of the pros and cons of withholding Spiegel's 2001 Form 10-K, notwithstanding the advice from Kirkland & Ellis. (*Id.* ¶ 191, 196, 444.)

Plaintiffs have done much more than simply identify the German Defendants' titles; Plaintiffs have alleged that the German Defendants were intimately involved with, and had significant control over, Spiegel's operations and specific disclosures (or nondisclosures). *Compare Tellabs*, 262 F. Supp. 2d at 946-47 (individual defendants' titles alone could not serve as a basis for attributing company misrepresentations to them). The German Defendants object that they only had knowledge of certain limited allegations beginning no earlier than November 27, 2001, "near the end of the more than 3-year class period, and . . . after the alleged misrepresentations and omissions all had been made." (Otto et al. Mem., at 9.)[24] In fact, Plaintiffs identify misrepresentations made after November 27, 2001 but still within the Class Period. (*See, e.g.*, Cmplt ¶¶ 170, 173, 182-83.) In addition, as directors of Spiegel and members of its Board and/or Audit Committees, the German Defendants were each involved to varying degrees in the decision to not file the 2001 Form 10-K, which is adequate, for pleading purposes, to support an inference that they had similar involvement with earlier public filings or, at a minimum, had the ability or duty to be involved and ensure the accuracy and fairness of Spiegel's disclosures. For purposes of a motion to dismiss, Plaintiffs have sufficiently alleged that the misrepresentations and omissions at issue in this case may be attributable to the German Defendants. After discovery, the court may

---

[24] The Memorandum of Law of Defendants Dr. Michael Otto, Dr. Michael Crüsemann, Dr. Peter Müller, and Mr. Horst Hansen in Support of Motion to Dismiss is cited as "Otto et al. Mem., at __."

be willing to consider the issue again on summary judgment or entertain a motion to revise the proposed Class Period.

## 2. Scienter

The German Defendants next argue that the Complaint is devoid of any allegations creating a "strong inference" of scienter. The parties agree that Plaintiffs must plead facts establishing that the German Defendants acted with intent to deceive. *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). The Seventh Circuit has not addressed the proper test for scienter in light of the PSLRA, and courts in this district are once again split. Many courts agree that the PSLRA adopts the standard enunciated by the Second Circuit, requiring plaintiffs to allege (1) facts showing that defendants had both motive and opportunity to commit fraud; or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Press v. Chemical Investment Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). *See In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 726 (N.D. Ill. 2003) (Bucklo, J.); *In re System Software Associates, Inc.*, No. 97 C 177, 2000 WL 283099, at *13 (N.D. Ill. Mar. 8, 2000) (Pallmeyer, J.); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *7 (N.D. Ill. Nov. 4, 1998) (Coar, J.) (adopting Second Circuit standard but not Second Circuit's interpretation of that standard); *Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1257 (N.D. Ill. 1997) (Moran, J.) (same); *Fugman v. Aprogenex, Inc.*, 961 F. Supp. 1190, 1195 (N.D. Ill. 1997) (Aspen, J.) (same).

Recently in *Johnson v. Tellabs*, 303 F. Supp. 2d 941 (N.D. Ill. 2004), however, Judge St. Eve rejected the test set forth by the Second Circuit as being inconsistent with the PSLRA. *See also Tellabs*, 262 F. Supp. 2d at 954-55. She instead held that plaintiffs "may use 'motive and opportunity' or 'circumstantial evidence' to establish scienter under the PSLRA, only if Plaintiffs' allegations support a strong inference that each Defendant acted recklessly or knowingly." *Id.* at 961. *See also Chu*, 100 F. Supp. 2d at 823; *Danis*, 73 F. Supp. 2d at 937-38; *Great Neck Capital*

*Appreciation Investment Partnership v. PricewaterhouseCoopers*, 137 F. Supp. 2d 1114, 1120

(E.D. Wis. 2001) (same). As explained below, the court concludes that Plaintiffs have sufficiently

alleged scienter as to the German Defendants under either approach.

Plaintiffs allege that the German Defendants knew about or recklessly disregarded the

fraudulent scheme at Spiegel. Recklessness requires "conduct which is highly unreasonable and

which represents an extreme departure from the standards of ordinary care . . . to the extent that

the danger was either known to the defendant or so obvious that the defendant must have been

aware of it." *Neopharm*, 2003 WL 262369, at *14 (quoting *Rehm*, 954 F. Supp. at 1255). Plaintiffs

point to their allegations of various GAAP violations and some 13 "red flags" which they say "should

have alerted each of the German Directors that Spiegel was artificially inflating its financial results."

(Pl. Otto et al. Resp., at 27.)[25] For example, Spiegel issued statements highlighting its strong

performance without accounting for the risks associated with extending credit to primarily sub-prime

borrowers. Spiegel also used a "net down" process to attract those sub-prime borrowers and

created a portfolio of creditors who did not fairly qualify for credit with FCNB. In addition, FCNB

had material internal control deficiencies and lacked adequate banking records to track and

manage its credit card portfolio. (*Id.* at 27-29.)

The German Defendants do not deny that these qualify as "red flags" but argue that there

are no allegations that they specifically knew about any of them. (Otto et al. Reply, at 9-10.) The

court has already found sufficient allegations, however, that the German Defendants had access

to information about the company's financial practices during the Class Period, and that they had

specific knowledge of Spiegel's credit-related problems by at least October or November 2001.

In addition, Spiegel allegedly recorded $240 million of phony gains and understated its debt by

---

[25]     Lead Plaintiffs' Memorandum of Law in Opposition to Defendants Dr. Michael Otto, Dr. Michael Crüsemann, Dr. Peter Müller, and Mr. Horst Hansen's Motion to Dismiss is cited as "Pl. Otto et al. Resp., at __."

some $3 billion during the Class Period. "The more serious the error, the less believable are defendants' protests that they were completely unaware of [Spiegel's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." *Rehm*, 954 F. Supp. at 1256. The evidence may ultimately show that the German Defendants were not in a position to detect the errors notwithstanding their status as directors and members of Spiegel's Board and Audit Committees, and notwithstanding any information they received, but that is not a basis for dismissal.

Plaintiffs' allegations of a strong inference of motive and opportunity to commit fraud are more tenuous. To establish motive, Plaintiffs must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Tricontinental*, 215 F. Supp. 2d at 949. Dr. Otto is alleged to have personally benefitted from the fraud because more than half of the apparel sold during the Class Period originated with his other companies. (Cmplt. ¶ 66.) In addition, Dr. Otto allegedly placed "associates" loyal to him in positions of authority at Spiegel. The German Defendants argue, in response, that "it defies logic that Dr. Otto would jeopardize the value of his 90% equity stake in Spiegel to sell some additional items of clothing." (Otto et al. Reply, at 10.) The other German Defendants apparently did not even own stock in the Otto family businesses, though all were intimately involved with those companies, serving at various times as directors and officers.

Regardless of whether these allegations constitute motive, the other indicators of scienter are, in this court's view, sufficient to withstand the German Defendants' motion to dismiss. Plaintiffs' allegations go beyond mere accounting irregularities to assert systemic failures resulting from unsound credit policies, which ultimately led to Spiegel's bankruptcy. "To the outsider looking in, it is surely strongly inferential that every officer or director of [Spiegel] either had the knowledge of such deep financial difficulties or, if not, that his failure to have such knowledge equated to

reckless disregard." *See Dardick*, 149 F. Supp. 2d at 988-89 and n.2 (denying motion to dismiss allegations against senior officers and directors accused of failing to disclose the "basic deterioration of LINC's corporate health"). *But see Tellabs*, 262 F. Supp. 2d at 946 n.7 ("[i]t is entirely clear . . . that the PSLRA abolishes the use of the group pleading doctrine to allege defendant's scienter"); *Chu II*, 100 F. Supp. 2d at 837 ("pleading scienter based exclusively on a defendant's corporate position is insufficient to survive a motion to dismiss").

As noted, Plaintiffs have alleged the German Defendants' knowledge of, and involvement in, the decision not to file Spiegel's 2001 Form 10-K. Given their positions as company directors and their extensive ties to Dr. Otto, Spiegel's sole voting shareholder, Plaintiffs have raised a strong inference that the German Defendants similarly knew about Spiegel's sub-prime credit practices throughout the Class Period. The Complaint thus creates a strong inference that the German Defendants either knew about or recklessly disregarded Spiegel's high-risk credit practices and sinking financial condition, and failed to disclose them to the public.

### 3. Reliance

Even if Plaintiffs have alleged scienter, the German Defendants argue, they have not alleged reasonable reliance on any misrepresentations or omissions. Plaintiffs' claim of reliance is based on the fraud-on-the-market theory, which holds that "efficient trading markets automatically establish a causal link between material misstatements or omissions and a stock purchaser's injury, and manifest that link in the stock's price." *Tatz v. Nanophase Technologies Corp.*, No. 01 C 8440, 2003 WL 21372471, at *7 (N.D. Ill. June 13, 2003). According to the German Defendants, the market was on notice as of April 1, 2002 that it lacked material information on Spiegel because the company filed a Form 12b-25 instead of its Form 10-K. (Otto et al. Mem., at 12.) As a result, the German Defendants claim, the market for Spiegel's stock was not efficient after that date and Plaintiffs cannot establish reliance based on the fraud-on-the-

market doctrine. (*Id.*) The court is unwilling to adopt this rationale. The German Defendants are essentially arguing that Plaintiffs could not rely on the price of Spiegel common stock because the company's own conduct – withholding material information from the public – rendered that price suspect. Fraudulently withholding information from the market ought not insulate defendants from liability to purchasers who rely on the stock price. The German Defendants' motion to dismiss on this basis is denied.

### 4.    Control Person Liability

To state a claim under § 20(a) of the Act, Plaintiffs must allege (1) a primary violation of § 10(b); (2) each defendant's control over the operations of Spiegel; and (3) each defendant's power or ability to control the specific transaction or activity forming the basis of the primary violation. *Tellabs*, 303 F. Supp. 2d at 969; *Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727. Section 20(a) does not require scienter or heightened pleading. *Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727. For the reasons stated, Plaintiffs have satisfied the first element of this test. The German Defendants dispute, however, that the Complaint fairly alleges their ability to control the operations of Spiegel or the specific transactions giving rise to liability under § 10(b). To the contrary, Plaintiffs allege that Dr. Otto controlled Spiegel by placing loyal "associates" in leadership positions; that by virtue of their positions as directors and members of Spiegel's Audit and Board Committees, all of the German Defendants "controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public"; and that the German Defendants all received copies of Spiegel's allegedly fraudulent press releases and reports, and "had the ability and opportunity to prevent their issuance or cause them to be corrected." (Cmplt. ¶ 452.) "Determination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727 (quoting *Lindelow*, 2001 WL 830956, at *9).

Plaintiffs have sufficiently alleged a § 20(a) claim and the German Defendants' motion to dismiss is denied.

## B.    Mr. Moran and Mr. Sievers

Like the German Defendants, Mr. Moran and Mr. Sievers claim that Plaintiffs have not alleged that they made any false or misleading statements, or that they acted with fraudulent intent. Mr. Moran and Mr. Sievers also insist that their general expressions of optimism and forward-looking statements are not actionable under § 10(b).

### 1.    False and Misleading Statements

Mr. Moran and Mr. Sievers do not deny that they made statements on behalf of Spiegel, such as signing financial disclosures and issuing press releases. (*See, e.g.,* Cmplt. ¶¶ 112, 126, 142-44, 146.) They argue instead that the statements were not false or misleading because they were consistent with GAAP and were accompanied by numerous "frank disclosures" regarding Spiegel's credit practices. The court considers Defendants' arguments in turn.

### a.    GAAP Violations

GAAP are "the official standards adopted by the American Institute of Certified Public Accountants (the 'AICPA'), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the 'APB'), and the Financial Accounting Standards Board (the 'FASB')." *In re K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 889-90 (8th Cir. 2002). Sources for GAAP include APB opinions, FASB Accounting Research Bulletins ("ARB"), and FASB Statements of Financial Accounting Standards ("SFAS"). *Id.* at 890. "[A] violation of GAAP generally will not be sufficient to establish fraud, [but] when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter." *First Merchants,* 1998 WL 781118, at *10 (quoting

*Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996)).

Plaintiffs allege that Mr. Moran and Mr. Sievers caused Spiegel to issue artificially inflated financial statements using a variety of improper accounting practices, including: (1) accounting for transfers of receivables to the SPEs as sales; (2) using unreliable models and assumptions to calculate gains on sales of receivables; (3) failing to disclose actual or potential trust trigger violations; and (4) recognizing revenue on a subset of Spiegel's credit transactions for which projected charge-off rates "exceeded 50%." (Cmplt. ¶¶ 51-59, 82-85, 215-17, 229-35, 238-41, 243-45, 256-79, 302-47, 387-89.) Mr. Moran and Mr. Sievers argue that Plaintiffs have made only conclusory assertions that Spiegel's accounting practices violated GAAP, which do not satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. As explained below, the court concludes the Complaint does satisfy those requirements.

### i.     Accounting for Asset Securitizations

Plaintiffs allege that Defendants violated GAAP by accounting for Spiegel's asset securitizations as off-balance sheet transactions. SFAS No. 125 allows this only if the transferred assets are isolated from the transferor and the transferor relinquishes control over them. (Cmplt. ¶ 220.) Spiegel did not relinquish control, Plaintiffs claim, because it retained the right to change account terms, to charge receivables off as uncollectible, to collect the cash on the receivables "sold," and to commingle the cash it collected with its own cash deposits. (*Id.* ¶ 233.) Spiegel also "retain[ed] the risks and rewards of ownership over the transferred receivables." (*Id.* ¶ 229.) Mr. Moran and Mr. Sievers insist that SFAS expressly allows for "retained interests over which the transferor has not relinquished control." (Moran & Sievers Mem., at 17.) Plaintiffs' objection, however, is that Spiegel failed to properly disclose that it had retained such control and, instead, improperly accounted for the transactions as sales. Relying on language in Spiegel's March 30,

2001 Form 10-K, Mr. Moran and Mr. Sievers insist that they did disclose the fact that "[c]ertain of the Company's retained interests [in sold receivables] are subordinate to investors' interests." (*Id.*) A general assertion that "certain" retained interests are subordinate to investors' interests, however, does not necessarily establish fair disclosure of the true nature of the specific transactions at issue here. Mr. Moran and Mr. Sievers also deny any improper accounting practices, arguing that FCNB's agreements were the same as those used by other entities and that there was nothing wrong with allowing FCNB to act as servicer of the transferred receivables. (*Id.* at 17-18.) That may well prove to be true but it is not a proper inquiry on a motion to dismiss. *See Tatz v. Nanophase Technologies Corp.*, No. 01 C 8440, 2002 WL 31269485, at *3 (N.D. Ill. Oct. 9, 2002) (motion to dismiss "tests whether the plaintiff has stated a claim, not whether the plaintiff will prevail on the merits").

### ii.    Calculating Retained Interests

Plaintiffs claim that Spiegel's mathematical models used to calculate the value of retained interests also violated GAAP, namely, FASB Statement of Financial Accounting Concepts ("SFAC") No. 5 and SFAS No. 125 and 140. The company allegedly overstated its assets and earnings by some $240 million by using asset valuation techniques and methodologies that failed to reflect the deteriorating nature of the underlying high-risk credit portfolio. (Cmplt. ¶¶ 87, 88.) By using unsubstantiated assumptions to determine the value of the retained interests, Plaintiffs allege, Spiegel's financial statements and public filings materially misstated the company's financial health. (*Id.* ¶¶ 315-27.) As further support for this argument, Plaintiffs cite to the May 2002 OCC Consent Order, which stated that (1) FCNB needed to start using a residual asset valuation model ("RAV") that comports with industry practice; (2) FCNB's valuation estimates and assumptions must comply with GAAP and be acceptable to the OCC; and (3) FCNB needed prior OCC approval to record an

estimated residual value not generated according to the company's written policies. (Pl. Moran & Sievers Resp., at 31.)[26]

Mr. Moran and Mr. Sievers argue that the May 2002 OCC Consent Order does not establish any GAAP violations between February 16, 1999 and the date they retired on June 30, 2001. (Moran & Sievers Mem., at 19) (citing *DiLeo*, 901 F.2d at 627-28) (there is no "fraud by hindsight"). Plaintiffs' numerous other allegations, however, indicate that violations occurred during that period. The mere fact that FCNB continued to sell credit card receivables after the Consent Order and admitted no wrongdoing in no way defeats Plaintiffs' claim that Defendants' actions prior to that date constitute fraud. Mr. Moran and Mr. Sievers next deny that Spiegel improperly reported its preferred card securitizations and securitized receivables and urge that any discrepancies in such reports cannot form the basis of a claim under § 10(b) or Rule 10b-5. (*Id.* at 19-20.) In support of this position, they cite *Premier Capital Mgmt., L.L.C. v. Cohen*, No. 02 C 5368, 2003 WL 21960357 (N.D. Ill. Aug. 15, 2003) (Gottschall, J.), in which the plaintiffs tried to support allegations of fraud by pointing to the fact that financial statements prepared close in time included widely varying figures. *Id.* at *7. The court found that plaintiffs had failed to allege any facts suggesting that the differences in the financial statements were attributable to fraud, and could not rest their securities fraud claim on the differences alone. *Id.* This case is easily distinguishable because Plaintiffs here have alleged facts challenging the underlying models used to develop the financial statements, not merely the existence of differences in those statements.

Mr. Moran and Mr. Sievers also claim that Plaintiffs' allegations regarding the RAV model "amount to nothing more than a claim that Spiegel's estimation of complex variables such as portfolio yield . . . and charge-off rates . . . – with the benefit of hindsight – should have been

---

[26]     Lead Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss Claims Asserted against Defendants Michael Moran and James Sievers Pursuant to Rule 9(b) and the PSLRA is cited as "Pl. Moran & Sievers Resp., at __."

different." (Moran & Sievers Mem., at 21.) In Defendants' view, Spiegel made erroneous business judgments; it did not violate GAAP. Plaintiffs have alleged, however, that the improper estimates were deliberate efforts to conceal the company's deteriorating portfolio. Defendants' assertion that the evidence will show only that they could or should have been able to make better estimates is beyond the scope of a motion to dismiss.

### iii.    Trust Trigger Violations

The Complaint charges Defendants with causing Spiegel to violate GAAP (SFAS 78) by failing to disclose actual or potential trust trigger violations. It also specifically charges Mr. Moran and Mr. Sievers with manipulating and altering trust delinquency ratios and portfolio yields to make it appear that no trigger violations were occurring. (Cmplt. ¶¶ 97, 98, 256-84.) SFAS 78 provides that "callable obligations" – i.e., obligations for which a creditor has the right to demand repayment – are not treated as current liabilities if the creditor has waived the right to repayment for more than a year, or if it is probable that a violation will be cured within a grace period. Mr. Moran and Mr. Sievers claim that Plaintiffs "utterly fail to allege facts showing that it was improbable that any trust trigger violations would be waived or cured." (Moran & Sievers Mem., at 22.) Plaintiffs respond that Spiegel could not obtain effective waivers based on fraudulently altered information, and the court is inclined to agree. Plaintiffs have not made that explicit allegation in the Complaint, however, and must do so.

In a related allegation, Plaintiffs claim that Mr. Moran and Mr. Sievers deliberately manipulated the interchange fee, raising it from 1% to 5% in April 2001 to "mak[e] it appear that the asset securitizations were in compliance with their respective indentures." (Pl. Moran & Sievers Resp., at 29.) Spiegel then maintained two sets of books – one which "reported the inflated portfolio yields to the public noteholders of the asset securitization," and one which "continued to report the benefits of the 1% fee to Spiegel's public investors." (Id.) Mr. Moran and Mr. Sievers

argue that Plaintiffs have not identified any public statements that were false or misleading as a result of the increase in the interchange rate, noting that they did not sign the Monthly Noteholder Statements. (Moran & Sievers Reply, at 7; Cmplt. ¶ 95.)[27] To the extent the manipulated interchange rate allowed Spiegel to artificially avoid trust trigger violations and misreport its financial condition in other public filings, however, Mr. Moran and Mr. Sievers arguably did issue false statements as a result of that alleged GAAP violation. Defendants' objections that there was in fact a basis for the 5% rate and that any delay in reporting the increase on the general ledger merely reflected mismanagement cannot be resolved on a motion to dismiss.

As for the remaining GAAP allegations, the court "need not parse through each and every alleged misstatement in the complaint to determine if it is actionable. It is sufficient for pleading purposes that at least some of the GAAP violations (and other material misstatements and omissions) alleged by plaintiffs are actionable." *Sutton*, 2001 WL 897593, at *4.

### b. Spiegel's Credit Practices

In addition to the GAAP violations, Plaintiffs allege material misstatements based on Spiegel's failure to disclose that (1) it began issuing credit predominantly to high-risk creditors; (2) Spiegel's merchant divisions, and not FCNB, were determining who received credit; and (3) it was not performing back-end screening. (Pl. Moran & Sievers Resp., at 23.) Mr. Moran and Mr. Sievers claim that Spiegel "consistently and repeatedly" disclosed its expanding credit programs. (Moran & Sievers Mem., at 25-26.) Nothing in the allegedly "frank disclosures" they cite, however, reveals that Spiegel was targeting sub-prime creditors while eliminating measures to ensure that extending credit to them was appropriate. Defendants respond that the omitted information did not harm the portfolio. (Moran & Sievers Reply, at 11.) They also claim that the facts material to

---

[27]   The Reply Memorandum of Defendants Michael Moran and James Sievers in Support of Motion to Dismiss Pursuant to Rule 9(b) and the PSLRA is cited as "Moran & Sievers Reply, at __."

investors – expanding numbers of accounts, rising delinquency rates, and rising charge-off rates – were fully disclosed. (*Id.* at 11-12.) To the extent Plaintiffs have alleged that investors were not informed of material reasons behind those rising delinquency and charge-off rates, the Complaint adequately alleges that the disclosures were materially false and misleading.

The specific allegations regarding the use of the "net down" process, on the other hand, are not sufficient as against Mr. Moran and Mr. Sievers. Plaintiffs identify four solicitations during the Fall of 2001 where "Spiegel Catalog dropped high percentages of the pre-approved customers who were good credit risks (risk levels A-C), but dropped low percentages (or none) of the pre-approved customers who were poor credit risks (risk levels D-F)." (Cmplt. ¶ 54.) Mr. Moran and Mr. Sievers both retired on June 30, 2001 and, thus, could not be responsible for misstatements made later that fall.

### 2. Scienter

Mr. Moran and Mr. Sievers next argue that Plaintiffs have not alleged any facts giving rise to a strong inference that they acted with fraudulent intent. Plaintiffs note their allegations that Mr. Moran and Mr. Sievers manipulated the interchange rate to avoid trust trigger violations.

They first cite an absence of any evidence of motive to commit fraud. Plaintiffs point to the fact that both received sizeable bonuses and retirement packages in 2001, which were based on Spiegel's 2000 earnings. (Pl. Moran & Sievers Resp., at 37) (citing *Florida State Bd. of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 661 (8th Cir. 2001)) (motive served as part of circumstantial case of scienter where company's overstated earnings occurred right before defendant's compensation package was set to expire). Such a salary and benefits incentive is arguably too general to satisfy the scienter requirement, particularly in the absence of any additional evidence of wrongdoing, such as suspicious timing. Indeed, "[u]nder Plaintiffs' argument, virtually any corporate executive would have the requisite intent to defraud, since most salaries and

benefit packages have some incentive-based dimension." *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411, at *11 (N.D. Ill. June 29, 2001) (Kocoras, J.) Plaintiffs also claim that Mr. Moran and Mr. Sievers were motivated by a desire to perpetuate the fraud, but this argument is circular and does not demonstrate particular motive on the part of Mr. Moran and Mr. Sievers.

Mr. Moran and Mr. Sievers also insist that they cannot be charged with scienter solely based on their status as high-ranking corporate executives. *See Tellabs*, 262 F. Supp. 2d at 957 ("[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company"). Plaintiffs claim that this is "but one factor that goes into the totality of the circumstances," including the expanded sub-prime credit portfolio, manipulated interchange rate, and improper accounting practices. (Pl. Moran & Sievers Resp., at 35 n.37.) Mr. Moran and Mr. Sievers respond that the only basis for imputing knowledge to them is their role in Spiegel's "core operations," which is not sufficient under the PSLRA. (Moran & Sievers Reply, at 17) (citing *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 754 (S.D. Tex. 2003)) (PSLRA prohibits imputing knowledge of core operations "without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems").

The Complaint alleges that Mr. Moran and Mr. Sievers reviewed reports or drafted memoranda revealing the deteriorating quality of Spiegel's credit portfolio, not just that they must have known about the alleged fraud based on their status as officers of Spiegel and, in the case of Mr. Moran, a director of FCNB. At a November 2000 board meeting, Mr. Moran assured the directors that FCNB was under control, but the minutes reflect knowledge or reckless disregard of problems: "there has been a degrading in the quality of new customer groups . . . To improve Preferred credit portfolio for 2001, certain actions have been taken [including] reestablished back-

end screening." (Cmplt. ¶ 134.) In January 2001, Mr. Sievers drafted and circulated a memo raising "serious doubts about our ability to manage our credit business" and showing increasing default rates. (*Id.* ¶ 140.)

In addition, Plaintiffs charge Mr. Moran and Mr. Sievers with deliberate GAAP violations which were aimed at hiding Spiegel's risky credit card practices. As noted, for example, Mr. Moran and Mr. Sievers allegedly manipulated interchange rates to avoid and disguise trust trigger violations. Significantly, when Spiegel could no longer control or cover the violations, it went into bankruptcy. Defendants are correct that GAAP violations do not alone demonstrate scienter. *Tellabs*, 262 F. Supp. 2d at 956-57. As explained above, however, Plaintiffs have alleged facts "supporting an inference that defendants recklessly disregarded the deviance or acted with gross indifference to the misrepresentations in its financial statements." *System Software*, 2000 WL 283099, at *14. Mr. Moran and Mr. Sievers attempt to avoid such an inference by noting that KPMG approved Spiegel's accounting procedures and confirmed that they were in accord with GAAP. (Moran & Sievers Mem., at 33) (citing *Grassi v. Information Resources, Inc.*, 63 F.3d 596, 600 (7th Cir. 1995)) (rejecting claim of deliberate accounting fraud against company whose financial statements were reviewed by its outside auditors). To the extent KPMG is likewise charged with securities fraud in connection with its work for Spiegel, the court cannot say that Defendants lacked the requisite scienter merely because KPMG signed off on their accounting practices.[28]

Nor is this case similar to *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), in which the court dismissed securities fraud allegations against individual defendants accused of failing to disclose "deterioration in credit quality allegedly caused by [the company's] aggressive

---

[28] KPMG argues that Spiegel officers did not disclose all relevant practices to its accountants. Although this argument may not be considered in support of KPMG's motion to dismiss, it arguably provides a further basis for denying the motion filed by Defendants Moran and Sievers.

efforts to attract new customers." *Id.* at 538. The plaintiffs complained of significant losses in the first quarter of 1997 due to defendants' reckless disregard of negative trends in the credit card industry and in the company's customer base. *Id.* at 528, 539. The court held that such allegations at most demonstrated that the company "embarked on a business strategy of aggressively recruiting new customers without adequately accounting for the increased risk this endeavor posed." *Id.* at 540. In this case, conversely, Plaintiffs allege that Defendants deliberately sought out sub-prime creditors with known credit problems in an effort to boost sales figures, and then hid their practices from the public, ultimately leading to Spiegel's bankruptcy. This is more than just a bad business decision and is sufficient to allege scienter against Mr. Moran and Mr. Sievers.

### 3. Material and Actionable Statements

Mr. Moran and Mr. Sievers claim that their alleged misstatements amount to general expressions of optimism or forward-looking statements that are either immaterial or not actionable under § 10(b) and Rule 10b-5. To be material, a statement must "significantly alter the total mix of information available to the investor." *In re Old Banc One Shareholders*, No. 00 C 2100, 2004 WL 1144043, at *4 (N.D. Ill. Apr. 30, 2004). "[M]ere puffery and glowing representations of expected boom are not enough to state claims" under the SEA. *Tellabs*, 262 F. Supp. 2d at 951. As examples of such puffery, Mr. Moran and Mr. Sievers point to press releases touting "realized progress" in the merchandising and bankcard segments; "solid" sales and earnings gains at Newport News; and a "significant" earnings contribution made by the Preferred Card programs. (Moran & Sievers, Mem., at 35.) Materiality, however, presents a mixed question of law and fact and requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of these facts to him and these assessments are peculiarly ones for the trier of fact." *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 1999 WL 688780, at *8 (N.D. Ill. Apr. 16, 1999) (quoting *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 466 (7th Cir. 1981)). At

this stage of the proceedings, the court declines to find that all of the statements attributed to these Defendants are immaterial.

Mr. Moran and Mr. Sievers also seek to rely on the PSLRA's safe harbor for forward-looking statements. A forward-looking statement is not actionable if: "(1) 'the statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or if the statement is immaterial; or (2) if the plaintiffs fail[] to prove that the statement was made with actual knowledge that it was false or misleading." *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 842-43 (N.D. Ill. 2003). Forward-looking statements include statements (1) "containing a projection of revenues" or other financial items; (2) "of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; (3) "of future economic performance"; and (4) "of the assumptions underlying or relating" to the aforementioned statements. *Asher v. Baxter Int'l, Inc.*, No. 02 C 5608 et al., 2003 WL 21825498, at *6 (N.D. Ill. July 24, 2003) (quoting 15 U.S.C. § 78u-5(i)(1)).

Mr. Moran and Mr. Sievers argue that Plaintiffs fail to allege that Defendants had actual knowledge that their projected improvements in earnings per share were unattainable. They also point out that each statement was accompanied by the following warning:

> This press release contains statements that are forward-looking statements within the meaning of applicable federal securities laws and are based upon Spiegel, Inc.'s current expectations and assumptions, which are subject to a number of risks and uncertainties that could cause actual results to differ from those anticipated.

(Moran & Sievers Mem., at 39.) The Complaint, however, contains allegations that Mr. Moran and Mr. Sievers knew the projections were false because they deliberately failed to disclose the deterioration of the credit portfolio or the unsound techniques which caused it. In making a forward-looking statement, a speaker must "speak the whole truth," *Stransky v. Cummins Engine*

*Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995), and is liable if a statement contains "an omission of a known material fact which makes the affirmative statement misleading or false." *Asher*, 2003 WL 21825498, at \*6. Given the allegations that Defendants knowingly omitted material information, the general disclaimers are not enough to save them from potential liability at this stage of the proceedings.

### 4.    Control Person Liability

The only objection Mr. Moran and Mr. Sievers raise to control person liability under § 20(a) is that Plaintiffs failed to allege a primary violation under § 10(b). Having rejected the latter argument, the court finds that the former fails as well.

### C.    Mr. Cannataro

The allegations against Mr. Cannataro are based on his service as Spiegel's CFO from July 1, 2001 through the end of the Class Period. Mr. Cannataro argues that the allegations should be dismissed because Plaintiffs have not alleged that he knowingly made any false or misleading statements, or that he acted with fraudulent intent. Plaintiffs claim that Mr. Cannataro made false statements in two 2001 press releases; in a statement to the Audit Committee; in two signed Form 10-Qs; and in connection with the 2001 Form 10-K. The first press release, issued on July 24, 2001, announced Spiegel's second quarter 2001 results. Mr. Cannataro stated:

> While under last year's record performance, earnings were in line with our expectations. We anticipate substantial year-over-year earnings improvement in the fall season as we compare against last year's weaker sales period, particularly at Eddie Bauer . . .

(Cmplt. ¶ 155.) In a second press release dated September 6, 2001, Mr. Cannataro discussed Spiegel's credit card receivables:

> After seeing positive delinquency trends in prior months, an improvement in customer charge-offs was anticipated in the second half of the year, however, subsequently delinquency rates have increased our private-label credit business. In reaction, we are implementing more restrictive credit measures aimed at lowering our charge-off exposure and improving the quality of our portfolio, although it will

take time for these actions to make an impact. Therefore, we now expect higher charge-offs to negatively affect our earnings in the third and fourth quarters . . .

(*Id.* ¶ 157.) In addition to these press releases, Mr. Cannataro made the following statement at Spiegel's November 27, 2001 Audit Committee meeting:

it is clear the Risk Management function at FCNB did not monitor what was happening closely enough, and did not exercise independent judgment when they should have been resisting pressure from the merchants to loosen up credit.

(*Id.* ¶ 163.)

Mr. Cannataro claims that Plaintiffs have not explained how these statements were false, much less that he knew them to be false at the time. (Cannataro Mem., at 6.)[29] Plaintiffs posit that the statements are false and misleading because Spiegel failed to disclose, among other things, that "the reported financial results were the product of numerous financial manipulations." (Pl. Cannataro Resp., at 4) (citing Cmplt. ¶ 167.)[30] Plaintiffs do not claim that Mr. Cannataro made the financial manipulations himself, however, nor do they explain how Mr. Cannataro allegedly learned of such manipulations. Indeed, the July 24, 2001 statement occurred just three weeks after he took over as CFO, and Plaintiffs make no effort to explain how Mr. Cannataro knew the September 6, 2001 statement was false other than directing the court to 204 other paragraphs in the Complaint, most of which never mention Mr. Cannataro. *See Tellabs*, 262 F. Supp. 2d at 957 ("[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company"). As for the Audit Committee meeting, Plaintiffs do not allege that Mr. Cannataro attended any previous committee meetings, or that he reviewed any documents revealing the fraud prior to that time. Contrary to Plaintiffs' assertion, the

---

[29]     Defendant James R. Cannataro's Memorandum of Law in Support of Motion to Dismiss Pursuant to Rule 9(b) and the PSLRA is cited as "Cannataro Mem., at __."

[30]     Lead Plaintiffs' Memorandum of Law in Opposition to Defendant James R. Cannataro's Motion to Dismiss Pursuant to Rule 9(b) and the PSLRA is cited as "Pl. Cannataro Resp., at __."

mere fact that Mr. Cannataro acknowledged on November 27, 2001 that "the Risk Management function at FCNB did not monitor what was happening closely enough" (Cmplt. ¶ 163), in no way suggests that he "knew and understood the scope and the magnitude of the credit problems at Spiegel." (Pl. Cannataro Resp., at 7.)

Mr. Cannataro did sign Spiegel's Form 10-Qs for the quarters ended June 30, 2001 and September 29, 2001, which "confirmed the previously announced financial results" Plaintiffs allege to be false and misleading. (Cmplt. ¶¶ 156, 162.) Again, however, Plaintiffs fail to explain how Mr. Cannataro knew the statements were false, aside from the fact that he became CFO on July 1, 2001. Plaintiffs note that Spiegel's internal audit director circulated two documents in late October 2001 "that alerted senior management to the seriousness of the credit problems then facing FCNB." They also cite the internal auditor's "key credit indicator's report" which forecast that Preferred Card charge-offs would jump from $206.2 million in 2000 to $388.4 million in 2001. (Pl. Cannataro Resp., at 7.) Significantly, however, Plaintiffs do not allege that Mr. Cannataro actually received or reviewed any of these documents, though they do specifically allege that Mr. Zaepfel and Mr. Hansen received them. (Cmplt. ¶¶ 158, 159.)

The only allegation that does satisfy the heightened pleading requirements is Plaintiffs' claim that Mr. Cannataro "made the decision to delay filing the Form 10-K . . . after consultation with Otto." The Complaint indicates that Mr. Cannataro formed the Condor Group in mid-January 2002 specifically to "deal with Spiegel's problems." (Cmplt. ¶ 168.) In March 2002, Mr. Cannataro flew to Germany to advise Dr. Otto and Dr. Crüsemann about those problems, and included in a written presentation an explanation of the company's reporting obligations under U.S. securities laws. (Id. ¶¶ 435, 436.) Shortly after that meeting, Spiegel filed a notification of late filing on Form 12b-25. (Id. ¶ 438.) Mr. Cannataro focuses on Dr. Otto's power as sole voting shareholder as evidence that he alone made the decision to delay filing the Form 10-K and issue the allegedly

misleading Form 12b-25 instead. For purposes of a motion to dismiss, however, Plaintiffs have sufficiently alleged that Mr. Cannataro knowingly participated in the decision to withhold the Form 10-K to hide Spiegel's deteriorating financial situation from investors.

As with the other Defendants, Plaintiffs have sufficiently alleged a primary violation under § 10(b) to state a claim under § 20(a). Mr. Cannataro objects that he lacked the power or ability to control Spiegel's actions, noting again the extensive control wielded by Dr. Otto and the other German Defendants. (Cannataro Mem., at 22.) As noted, "[d]etermination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *Sears, Roebuck and Co.*, 291 F. Supp. 2d at 727 (quoting *Lindelow*, 2001 WL 830956, at *9). Thus, Mr. Cannataro's motion to dismiss is denied with respect to this single matter only.

### D.    Mr. Zaepfel

Dr. Otto assigned Mr. Zaepfel as a liaison to oversee Spiegel's reorganization efforts beginning in or about September 1997. (Cmplt. ¶ 62.) Mr. Zaepfel focused his energies on Spiegel Catalog, which he viewed as an "urgent" problem. (*Id.*) After Mr. Moran and Mr. Sievers retired in June 2001, Mr. Zaepfel assumed the position of President and CEO of Spiegel on July 1, 2001. Plaintiffs claim that Mr. Zaepfel made false and misleading statements in Spiegel's 1998, 1999, and 2000 Form 10-Ks – all of which he signed – because the forms materially misstated Spiegel's "revenues, earnings and financial positions" and asserted "opinions, projections and forecasts [that] were lacking in a reasonable basis." (*Id.* ¶¶ 110, 122, 145.) At that time, Mr. Zaepfel was an outside director of Spiegel and not yet CEO. (Zaepfel Reply, at 12 n.6.)[31] In addition, Mr. Zaepfel stated in an October 23, 2001 press release that Spiegel was developing merchandise strategies

---

[31]    The Reply Memorandum of Law of Defendant Martin Zaepfel in Further Support of Motion to Dismiss is cited as "Zaepfel Reply, at __."

aimed at improving productivity and reducing reliance on credit marketing programs. (*Id.* ¶¶ 161, 167.) In a second press release dated February 21, 2002, Mr. Zaepfel disclosed the company's practice of "extending credit to higher-risk market segments"; the deterioration of the company's credit portfolio and violation of certain loan covenants; and the company's efforts to secure necessary financial support. (*Id.* ¶¶ 170, 172.) Finally, Mr. Zaepfel allegedly knowingly and fraudulently delayed the filing of Spiegel's 2001 Form 10-K. (*Id.* ¶ 14.) Mr. Zaepfel denies that any of these statements were false or misleading, or that Plaintiffs have adequately alleged fraudulent intent.

### 1. False and Misleading Statements

Like Mr. Moran and Mr. Sievers, Mr. Zaepfel argues that his statements were not false or misleading because they did not violate GAAP or hide Spiegel's credit practices. (Zaepfel Mem., at 9-12.)[32] For the reasons already explained, this argument is unavailing. *See supra*, pp. 45-51. Mr. Zaepfel also argues that Plaintiffs have not explained why the October 2001 and February 2002 press releases were false. (*Id.* at 12.) In fact, Plaintiffs allege that the press releases failed to disclose that Spiegel was targeting sub-prime creditors while eliminating measures to ensure that extending credit to them was appropriate, and that FCNB was operating in violation of federal banking regulations. (Cmplt. ¶ 167.) Mr. Zaepfel responds that the press releases are "vague and general assertions of optimism," and that they constitute forward-looking statements under the PSLRA's safe harbor provision. (Zaepfel Mem., at 14-16.) These arguments fail for the same reasons stated in connection with Mr. Moran's and Mr. Sievers' motion.

---

[32] The Memorandum of Law of Defendant Martin Zaepfel in Support of Motion to Dismiss is cited as "Zaepfel Mem., at ___."

## 2. Scienter

As for scienter, Plaintiffs argue that Mr. Zaepfel knew on or around July 1, 2001 that Spiegel Catalog was using credit to pump sales. (Pl. Zaepfel Resp., at 5; Cmplt. ¶ 151.)[33] This alone does not demonstrate knowledge of the allegedly fraudulent nature of those credit practices. Nevertheless, Plaintiffs also claim that Mr. Zaepfel received copies of reports from Spiegel's internal auditor dated October 18, 2001 and October 31, 2001 which detailed the weakening condition of Spiegel's credit card receivables and the rising default rates. (Cmplt. ¶¶ 158-60.) Mr. Zaepfel claims that the information contained in the October 2001 reports was disclosed to the market shortly thereafter. (Zaepfel Reply, at 10-11.) The cited press release, however, does not disclose Spiegel's practice of extending credit primarily to sub-prime creditors while eliminating safety measures designed to ensure their ability to pay.

Mr. Zaepfel also attended a March 15, 2002 meeting during which Otto Versand's Director of Corporate Accounting reported on Spiegel's deteriorating portfolio and informed the company that KPMG's audit report for 2001 would likely contain a going concern qualification. (*Id.* ¶ 174.) Mr. Zaepfel flew to Germany with Mr. Cannataro and attended the March 27, 2002 meeting regarding Spiegel's financial problems and responsibilities under U.S. securities laws. Finally, Mr. Zaepfel, along with Mr. Cannataro, decided that Spiegel should not file the 2001 Form 10-K after consulting with Dr. Otto. (*Id.* ¶¶ 175-82.) Mr. Zaepfel insists that he "advocated that Spiegel file its 2001 Form 10-K – despite opposition from Spiegel's majority shareholder." (Zaepfel Reply, at 11) (citing *Spiegel*, 2003 WL 22176223, at *38.) Even assuming that is true, Plaintiffs have alleged that Mr. Zaepfel ultimately decided that the Form 10-K should not be filed. Taken together, all of these allegations are sufficient to plead scienter. Of course, if evidence adduced during discovery

---

[33]     Lead Plaintiffs' Memorandum of Law in Opposition to Defendant Martin Zaepfel's Motion to Dismiss the Consolidated Class action Complaint is cited as "Pl. Zaepfel Resp., at __."

establishes that others made the decision to withhold the Form 10-K over Mr. Zaepfel's objection, he may well prevail on summary judgment.

### 3. Control Person Liability

Plaintiffs have stated a primary violation against Mr. Zaepfel under § 10(b) and he has offered no other compelling basis for dismissing Plaintiffs' § 20(a) claim against him. Mr. Zaepfel's motion to dismiss is therefore denied.

### E. KPMG LLP

Spiegel was a longstanding and "significant" client of KPMG and provided a "major source of income" for KPMG's Chicago office. (Cmplt. ¶ 358.) KPMG served Spiegel in "various consulting capacities for many years," including taking a primary role in creating the SPEs and accounting for Spiegel's asset transfers to those SPEs during the Class Period. (*Id.* ¶ 358, 59.) KPMG personnel were regularly present at Spiegel's corporate headquarters and had continual access to, and knowledge of, Spiegel's confidential financial and business information through conversations with Spiegel employees and review of Spiegel's non-public records. (*Id.* ¶ 405.)

Plaintiffs seek to hold KPMG liable under § 10(b) and Rule 10b-5 based on audits the firm performed for Spiegel from 1998 through 2000. Plaintiffs claim that KPMG (1) issued false and misleading audit opinions on Spiegel's financial statements for the years 1998, 1999, and 2000; (2) failed to correct false and misleading public statements issued by Spiegel; and (3) failed to tell the SEC the true reason that Spiegel did not timely file its 2001 Form 10-K. (Cmplt. ¶¶ 401-04, 407.) Plaintiffs seek to hold KPMG liable for reviewing Spiegel's quarterly financial statements on Forms 10-Q and for being an alleged "co-conspirator with respect to the wrongs complained of" in the Complaint. (*Id.* ¶¶ 273, 278, 283.)

## 1.   False and Misleading Statements

KPMG first argues that Plaintiffs have failed to identify "who" made the allegedly false and misleading statements, relying instead on improper group pleading. (KPMG Mem., at 6.)[34] The court has already determined that Plaintiffs cannot attribute conduct to all "defendants" without some showing that all defendants may be accountable for it. To the extent Plaintiffs have grouped KPMG in with all other defendants in this case, the Complaint must be amended to reflect why each such allegation applies specifically to KPMG. (See, e.g., Cmplt. ¶ 63, alleging that "Defendants prepared and approved forecasts" for Spiegel Catalog and Newport News, and ¶ 93, charging "defendants" with "unilaterally increas[ing] the interchange rate," none of which could apply to KPMG.) In addition, Plaintiffs do not dispute that KPMG is a "secondary actor" and, as such, cannot be accused of aiding and abetting another's § 10(b)/Rule 10b-5 violation – i.e., KPMG may only be liable for a primary violation under the statute. (KPMG Mem., at 21) (citing Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191 (1994)). See also U.S. v. O'Hagan, 521 U.S. 642, 664 (1997). Thus, the allegations against KPMG are dismissed to the extent they accuse the accounting firm of failing to correct Spiegel's public statements, of having responsibility for alleged misrepresentations in Spiegel's quarterly financial statements, and of being a "co-conspirator with respect to the wrongs complained of" in the Complaint. (Cmplt. ¶ 451.)

Many of Plaintiffs' allegations, however, clearly specify KPMG's primary responsibility in the fraud. For example, the Complaint alleges that KPMG audited Spiegel's financial statements during the Class Period and issued false and misleading opinions based on those audits. KPMG's specific role in the fraud is extensively detailed in paragraphs 356-416, including violations of GAAP and Generally Accepted Accounting Standards ("GAAS"). (Id. ¶¶ 39, 356-416.) In addition,

---

[34]     KPMG LLP's Memorandum of Law in Support of Motion to Dismiss is cited as "KPMG Mem., at __."

Plaintiffs claim that KPMG misstated Spiegel's true earnings and net worth, and set forth the specific dates of the alleged misstatements. (*Id.* ¶ 407.) KPMG argues that the affirmative statements in its 1998, 1999, and 2000 audit opinions are merely that – opinions. (KPMG Reply, at 11.)[35] Those opinions, however, must be prepared in accordance with strict accounting standards. They must also be based on present or pre-existing underlying factual data, so they cannot fairly be considered non-actionable expressions of future intent. *See Asher*, 2003 WL 21825498, at *6 (defining forward-looking statements). As to whether the statements are material, that presents a mixed question of law and fact and requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of these facts to him and these assessments are peculiarly ones for the trier of fact." *Kaufman*, 1999 WL 688780, at *8 (quoting *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 466 (7th Cir. 1981)).

KPMG finally claims that Plaintiffs have failed to present any evidence as to when KPMG acquired information showing that Spiegel's financial statements were not in conformity with GAAP. Such evidence, KPMG says, is required to mitigate the danger of lawsuits alleging "fraud by hindsight." (KPMG Reply, at 9) (citing *Arazie v. Mullane*, 2 F.3d 1456, 1466-67 (7th Cir. 1993)) (affirming dismissal where stockholders failed to refer to any document, meeting, or transaction that could or should have put the defendant on notice that the New Jersey Casino Control Commission objected to a $50 million loan from defendant's Atlantic City casino to service its own debt on casinos located in Nevada). The court finds that the allegations suffice on this issue as well; indeed, given the magnitude of the alleged financial errors, the discrepancies would likely be apparent from KPMG's review of basic documents required to perform its audits.

---

[35]     KPMG LLP's Reply Memorandum of Law in Further Support of Motion to Dismiss is cited as "KPMG Reply, at __."

## 2.    Scienter

KPMG next claims that Plaintiffs have failed to plead intentional fraud, either by motive and opportunity, or by strong circumstantial evidence of recklessness. Plaintiffs claim that KPMG had a "powerful financial motivation" to commit fraud because Spiegel was an important client and a major source of income for the firm. Not only did KPMG want to keep receiving audit fees from Spiegel, it also wanted to continue in its "various [other] consulting capacities." (Pl. KPMG Resp., at 33-34.)[36] As for opportunity, Plaintiffs note that KPMG personnel were routinely at Spiegel's corporate headquarters and had access to confidential financial and business information. (*Id.* at 34.) KPMG correctly notes that fees alone do not provide a motive to commit fraud:

> The complaint does not allege that [the auditor] had anything to gain from any fraud by [its client]. An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses [the auditor] would suffer from the perception that it would muffle a client's fraud.

(KPMG Mem., at 10) (quoting *DiLeo*, 901 F.2d at 629). *See also Danis v. USN Communications, Inc.*, 121 F. Supp. 2d 1183, 1195 (N.D. Ill. 2000) ("[i]t is not reasonable to infer that Deloitte would be willing to risk its accounting reputation for the sake of USN, one of its many clients"). Plaintiffs claim that KPMG was financially reliant upon Spiegel but the allegation is based solely on "information and belief." (Pl. KPMG Resp., at 34.) Without more, the court agrees that Plaintiffs have not alleged that KPMG had a motive to defraud sufficient to establish scienter.

Plaintiffs nonetheless argue that they have established scienter with strong circumstantial evidence of recklessness. As applied to outside auditors, recklessness means that "the accounting firm practices amounted to no audit at all, or to an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no

---

[36]    Lead Plaintiffs' Opposition to KPMG's Motion to Dismiss is cited as "Pl. KPMG Resp., at __."

reasonable accountant would have made the same decisions if confronted with the same facts." *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 247 F. Supp. 2d 987, 998 (N.D. III. 2002) (quoting *First Merchants*, 1998 WL 781118, at *10).  Plaintiffs first point to a variety of GAAP and GAAS violations as evidence of KPMG's recklessness, including failure to maintain an independent mental attitude, failure to properly study internal controls to ensure reliance thereon was justified, and failure to determine whether the estimates Spiegel used in preparing its financial statements were adequate.  (Cmplt. ¶¶ 361, 369, 377-80, 410.)  Allegations that a defendant violated such accounting practices "are generally insufficient, standing alone, to create a strong inference of scienter.  *Wafra Leasing*, 247 F. Supp. 2d at 998.  They are, however, relevant in proving scienter "when the complaint also identifies 'red flags,' or specific, highly suspicious facts and circumstances available to the auditor at the time of the audit, and alleges that these facts were ignored, either deliberately or recklessly."  *Id.* (quoting *Riggs Partners, LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721, at *9 (N.D. III. Oct. 25, 2002)).

Plaintiffs identify some 17 red flags which, they say, should have alerted KPMG to the fact that Spiegel was artificially inflating its financial results.  For example, Spiegel allegedly (1) overstated its gains by $240 million and underreported its debt by $3 billion; (2) failed to consolidate its financial statements with those of the SPEs despite retaining the risks and rewards of ownership over the credit card receivables; (3) used "easy credit to pump up sales" but failed to disclose the significant risks associated with extending credit primarily to sub-prime borrowers; (4) utilized assumptions, estimations, and forecasts to calculate "receivable gains" that were grossly inconsistent with the credit characteristics of the underlying assets; (5) used a "net down" process to skew its credit portfolio towards high-risk customers and deprived FCNB of the ability to control that risk; (6) used "recency" accounting to enable customers with delinquent accounts to nonetheless make purchases; (7) falsely characterized its credit card receivables as non-recourse

when, in truth, Spiegel was potentially liable to repay billions of dollars to SPE noteholders at a rate of $20 million per month; (8) failed to disclose trust trigger violations; (9) maintained inappropriate written accounting policies and procedures for significant FCNB activities, including asset sales and other securitization transactions; and (10) inaccurately reported its allowance for loan and lease losses on credit card receivables. (Pl. KPMG Resp., at 23-26.)

Contrary to KPMG's suggestion, these allegations go well beyond a claim that Spiegel had inadequate internal control policies and procedures. *Cf. Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1009 n.5 (S.D. Cal. 2000) (allegations of "weak internal accounting controls" at the audited company were "boilerplate 'red flags'" and could not support a strong inference of scienter). KPMG argues that the "red flags" are merely the accounting violations themselves and, as such, cannot give rise to a strong inference of scienter. (KPMG Reply, at 19) (citing *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 133 (D. Mass. 2003)). That is not true of all the red flags, however, and is not a basis for dismissal here. Indeed, to the extent Spiegel allegedly overstated its gains by $240 million and understated its debt by $3 billion, KPMG, as Spiegel's auditor, is hard-pressed to argue it did not notice the allegedly questionable financial practices causing such a discrepancy. *See Rehm*, 954 F. Supp. at 1256 ("the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors").

KPMG claims that Plaintiffs have "gross[ly] mischaracteriz[ed] a quote from Spiegel's 2001 Form 10-K as evidence of the improperly recorded gains; specifically, Plaintiffs allege that Spiegel admitted that receivables it sold "without recourse" could actually be re-sold by the company:

> The majority of the Company's credit card receivables are sold to trusts that, in turn, sell certificates and notes representing undivided interests in the trusts to investors. The receivables are sold without recourse. The Company plans *to continue* to utilize asset-backed securities ("ABS") to fund the growth of receivables. . . In the event that the financial performance of an ABS transaction falls below the required minimum threshold, early amortization ("Pay out Event") of these transactions may

occur. Early amortization under an ABS transaction would require the Company to obtain financing *or sell these receivables* through other sources.

(Ex. B to KPMG Reply, 2001 Form 10-K, at 18-19) (emphasis added). KPMG denies that this language demonstrates an ability to re-sell existing receivables, arguing that the 10-K was referring only to the sale of *future* receivables in the event of a pay out event. (KPMG Reply, at 23 and Ex. B.) KPMG evidently understands the expression "these receivables" in the last line of the quoted material to mean "such receivables" or "receivables of this nature." Plaintiffs understand the words to mean "the same [previously-sold] receivables." The proper interpretation of the 10-K, however, is a question of fact and cannot form the basis of dismissal.

KPMG next objects that Plaintiffs have not included sufficient information detailing particular conversations that KPMG personnel heard or documents they saw which prove KPMG's knowledge of improper accounting practices at Spiegel. (KPMG Mem., at 14.) The numerous "red flags," together with the alleged GAAP and GAAS violations, however, suffice in that regard. Plaintiffs have alleged that KPMG personnel had extensive access to Spiegel and its financial records and failed to notice or react to substantial accounting problems at Spiegel which ultimately led to its bankruptcy. *Compare In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 673 (3d Cir. 2002) ("discovery of discrete errors after subjecting an audit to piercing scrutiny post-hoc does not, standing alone, support a finding of intentional deceit or recklessness"). KPMG insists that "an independent accountant's relationship and acquired familiarity with its client does not impute the accountant with knowledge of every idiosyncratic detail associated with the client's business." *Reiger*, 117 F. Supp. 2d at 1009. Given the magnitude of Spiegel's financial problems, however, Plaintiffs' allegations support a strong inference of scienter at this stage of the proceedings.

KPMG also argues that the Complaint "affirmatively negate[s] any inference of scienter" by including allegations that KPMG performed accounting work on behalf of Spiegel. For example, the Complaint alleges that KPMG "performed various analyses of [Spiegel's] assumptions";

"compared [the model's] charge-off and finance yield rates to the BOD forecast"; "reviewed the actual rates from FCNB's Performance Reports"; and "[u]s[ed] [a] lower yield rate and a higher charge-off rate in the model" for the 2000 quarterly reviews, which "was . . . considered by KPMG a 'conservative' approach." (Cmplt. ¶ 362; KPMG Mem., at 19.) Plaintiffs' allegations that KPMG performed reviews it deemed reasonable or conservative are not inconsistent with Plaintiffs' allegations that KPMG was reckless in failing to see the extensive fraud at Spiegel, particularly in light of allegations that Spiegel overstated its gains by millions of dollars and understated its debt by billions of dollars.

Nor is KPMG entitled to dismissal because it threatened to issue a going concern statement in the 2001 Form 10-K and "never backed down." (KPMG Mem., at 20) (citing *Drabkin v. Alexander Grant & Co.*, 905 F.2d 453, 455-56 (D.C. Cir. 1990)) ("[i]ssuing a going concern opinion may not insulate an accounting firm from liability, but it must cut strongly in its favor"). That does not speak to KPMG's actions prior to taking a stand on the 2001 Form 10-K, particularly since KPMG never told the SEC that Spiegel's stated reasons for failing to file the Form 10-K were allegedly false. *See* 15 U.S.C. § 78j-1 (requiring auditors to report "illegal acts" it discovers during the course of an audit). At this stage of the proceedings, the court cannot say that Plaintiffs will be unable to prove any set of facts demonstrating KPMG's liability prior to that time. Thus, except as stated in this opinion, KPMG's motion to dismiss is denied.

### F. Spiegel Holdings, Inc.

The Complaint mentions SHI in only eight of the 477 paragraphs: paragraphs 28 and 417 explain that SHI owns 99.9% of Spiegel's voting stock, representing 90% of Spiegel's ownership, and that the Otto Family owns almost all the stock of SHI; paragraphs 451-54 allege that SHI was a "controlling person" with the "power and influence to cause the Company to engage in the unlawful conduct complained of herein"; and paragraph 477 alleges that SHI is liable under § 20(a)

due to its liability under § 10(b). (Cmplt. ¶¶ 28, 417, 451-54, 475, 477.) Plaintiffs do not identify any false statements made by SHI, arguing instead that SHI may be liable for statements made by Spiegel because of its "special relationship or status with" the company. (Pl. SHI Resp., at 6)[37] (citing *Strassman v. Fresh Choice, Inc.*, No. C-95-20017 RPA, 1995 WL 743728, at *13 (N.D. Cal. Dec. 7, 1995)) (finding in pre-PSLRA case that group pleading doctrine could apply to venture capital firm that was the defendant company's largest shareholder where the venture capital firm's principal served on the defendant's board of directors and "the plaintiff can show that the firm's agent participated in the preparation and dissemination of company documents containing misrepresentations"). Dr. Otto effectively controlled both SHI and Spiegel, the argument goes, so misstatements made by Spiegel may be attributed through Dr. Otto to SHI.

The problem with this theory is that Dr. Otto is not a director, officer, or employee of SHI, so it is not clear that his actions as a Spiegel director may be imputed to SHI. The court is reluctant to extend the group pleading doctrine so far as to encompass a situation where knowledge is first imputed to a director and key shareholder of the distressed company, and then imputed from him to another company – a mere shareholder of the first – of which the director is a key shareholder. To the extent Plaintiffs have generally alleged misconduct by "defendants," moreover, that is wholly insufficient to state a fraud claim against SHI in particular. *See Sears, Roebuck and Co.*, 291 F. Supp. 2d at 726) (quoting 15 U.S.C. § 78u-4(b)(2)) (PSLRA requires complaint to "state with particularity the facts giving rise to [a] strong inference that the defendant acted with" scienter).

Even assuming Spiegel's misstatements can be attributed to SHI, Plaintiffs have failed to allege that SHI acted with the requisite scienter. Plaintiffs argue that "SHI's scienter is . . . evinced by the financial benefits it more than likely enjoyed as a result of the significant performance-based compensation received by defendant Otto as a direct and proximate result of [Spiegel's]

---

[37] Lead Plaintiffs' Opposition to Spiegel Holdings, Inc.'s Motion to Dismiss the Consolidated Amended Complaint is cited as "Pl. SHI Resp., at __."

misrepresentations that artificially inflated the value of Spiegel stock." (Pl. SHI Resp., at 11.) The PSLRA requires some showing of scienter by each individual defendant. *See, e.g., Napier v. Bruce*, No. 02 C 8319, 2004 WL 1194747, at *6 (N.D. Ill. May 27, 2004). The mere fact that Dr. Otto may have had the requisite scienter does not establish that SHI did as well, absent some showing that SHI (as opposed to Dr. Otto) knew about, and benefitted from, the fraud. *See Premier Capital*, 2003 WL 21960357, at *5 ("[c]onclusory allegations that defendants acted with knowledge that the representations were false and misleading do not satisfy the PSLRA's pleading requirements"). Plaintiffs point to Spiegel's asset securitizations which enabled the company to "generate hundreds of millions of dollars of much needed cash and book hundreds of millions of dollars of profit." (Pl. SHI Resp., at 11.) There are no allegations, however, that SHI had anything to do with the asset securitizations, or that SHI was in any way involved in preparing Spiegel's financial statements or approving or determining the content of those statements.

Nor have Plaintiffs presented strong circumstantial evidence of recklessness by SHI. Plaintiffs attribute recklessness to SHI as follows:

> Spiegel's credit card business was critical to Spiegel's existence and the breakdown thereof which resulted in Spiegel's eventual decision to not file its 2001 Form 10-K with the SEC was a disastrous scenario going to the heart of Spiegel's business that a controlling entity like SHI – which is controlled by one of the grand orchestrators of the fraud, Otto – was reckless to have ignored. In short, for SHI to deny knowledge of Spiegel's saga, which comprises this case, would be disingenuous.

(Pl. SHI Resp., at 12.) Nothing in this argument or the Complaint itself suggests that SHI knew or should have known about the problems at Spiegel. To the contrary, Plaintiffs have not identified any document or conversation between Dr. Otto and SHI that would have put SHI on notice of the alleged fraud. Plaintiffs have not satisfied the heightened pleading requirements of the PSLRA and have not alleged any basis for § 10(b) liability against SHI. As a result, they similarly have failed to allege a viable § 20(a) claim against this defendant. *See Tellabs*, 303 F. Supp. 2d at 969 (to establish § 20(a) claim, plaintiffs must allege a primary violation of § 10(b)).

71

## III. Motion to Modify Discovery Stay

The PSLRA requires that discovery in a securities fraud class action be stayed while a motion to dismiss is pending "unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B). "The goal of the PSLRA's discovery stay is to prevent the unnecessary imposition of discovery costs in both money and time on defendants in securities fraud cases, given that such costs often coerce settlements by innocent parties." *Singer v. Nicor, Inc.*, No. 02 C 5168, 2003 WL 22013905, at *2 (N.D. Ill. Apr. 23, 2003). Plaintiffs claim that they will suffer undue prejudice unless they receive the following information in this case:

1. All documents produced to the third parties, including the Independent Examiner, the SEC, the NASDAQ, the Office of Comptroller of Currency, or any other governmental agency concerning the securities fraud alleged in the Complaint . . .

2. All transcripts of hearings or depositions and notes of interviews concerning the securities fraud alleged in the Complaint.

(Pl. Mem., at 10.)[38] Plaintiffs argue that modification of the stay will not burden Defendants because they have already compiled the information and produced it to the Independent Examiner. (*Id.* at 8) (citing *Nicor*, 2003 WL 22013905, at *2) (requiring production of documents previously provided to the government and other agencies, noting that "since these documents have already been found and compiled and plaintiffs will pay production costs, defendants will not be unduly burdened by producing them to plaintiffs now"). In addition, Plaintiffs claim that they will be unduly prejudiced if they do not receive the documents now because "all of the other investigations and proceedings concerning Spiegel and the defendants will be moving ahead while discovery in the Securities Action remains at a standstill." (*Id.* at 12) (citing *In re WorldCom, Inc. Sec. Litig.*, 234

---

[38] Plaintiffs' Memorandum of Law in Support of their Motion to Modify the PSLRA's Discovery Stay is cited as "Pl. Mem., at __."

F. Supp. 2d 301, 305 (S.D.N.Y. 2002) (lead plaintiff "would be prejudiced by its inability to make informed decisions about its litigation strategy in a rapidly shifting landscape," and "would essentially be the only major interested party in the criminal and civil proceedings against WorldCom without access to documents that currently form the core of those proceedings").

Defendants dispute Plaintiffs' claimed showing of undue prejudice, arguing that "courts have regularly rejected the argument that providing documents to governmental agencies while enforcing the PSLRA's mandatory stay pending resolution of motions to dismiss is somehow unduly prejudicial." (Def. Resp., at 6)[39] (citing In re AOL Time Warner, Inc. Sec. Litig., No. 1500, 02 Civ. 5575 (SWK), 2003 WL 21729842, at *2 (S.D.N.Y. July 25, 2003)) (where defendants assured court that they would preserve evidence in the case, "Lead Plaintiff has not demonstrated that exceptional circumstances are present in this case requiring production of documents previously produced to various government agencies"). Defendants also note that the only other action currently pending is the SEC's case against Spiegel, which is not even a party to this lawsuit. (Def. Resp., at 5-6.)

To the extent the court has now ruled on the motions to dismiss and upheld, at least to some degree, the claims against all but one defendant, there is no longer any basis for staying discovery as to the items requested by Plaintiffs. The motion to modify the discovery stay is therefore granted.

## CONCLUSION

For the reasons stated above, Defendants' joint motion to strike (Docket No. 60-1) is granted in part and denied in part. Plaintiffs must specify the particular defendants responsible for each particular act, and must identify all allegations made on information and belief and state the

---

[39]    Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion to Modify the PSLRA's Mandatory Stay of Discovery is cited as "Def. Resp., at __."

facts on which the belief is based. The motions to dismiss filed by Mr. Moran and Mr. Sievers (Docket No. 57-1), Mr. Cannataro (Docket No. 68-1), and KPMG (Docket No. 53-1) are granted in part and denied in part. Plaintiffs must add an allegation regarding Spiegel's ability to obtain effective waivers of the various trust trigger violations based on fraudulently altered information, and must delete claims against Mr. Moran and Mr. Sievers relating to solicitations made during the Fall of 2001 after both men had retired. Plaintiffs have stated a claim against Mr. Cannataro based on his alleged involvement in the decision to not file the 2001 Form 10-K, but claims purportedly arising from the July 24, 2001 and September 6, 2001 press releases, the statements he made at the November 27, 2001 Audit Committee meeting, and the Form 10-Qs he signed for the quarters ending June 30, 2001 and September 29, 2001 are all dismissed. The allegations against KPMG are similarly dismissed to the extent they accuse the accounting firm of failing to correct Spiegel's public statements, of having responsibility for alleged misrepresentations in Spiegel's quarterly financial statements, and of being a "co-conspirator with respect to the wrongs complained of" in the Complaint.

The motions to dismiss filed by Dr. Otto, Dr. Crüsemann, Dr. Müller, and Mr. Hansen (Docket No. 55-1) and by Mr. Zaepfel (Docket No. 76-1, 76-2) are denied, and SHI's motion to dismiss (Docket No. 66-1) is granted. Plaintiffs' motion to modify the discovery stay (Docket No. 48-1) is also granted. Plaintiffs have until July 28, 2004 to file an amended complaint consistent with this opinion, and Defendants have until August 27, 2004 to answer or otherwise plead. Rule 16 conference is set for September 15, 2004, at 9:30 a.m.

ENTER:

Dated: July 8, 2004

REBECCA R. PALLMEYER
United States District Judge

74