UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE SPIEGEL, INC. SECURITIES LITIGATION, | No. 02 C 8946<br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are six individuals who allege federal securities violations on behalf of "all those who purchased" Spiegel, Inc. stock between February 16, 1999 and June 4, 2002 (the "Class Period"). Spiegel is an international specialty retailer that markets apparel and home furnishings to customers through catalogs, more than 550 specialty retail and outlet stores, and e-commerce sites. Defendants James R. Cannataro, Michael R. Moran, James W. Sievers, Martin Zaepfel, Michael Otto, Horst R. A. Hansen, Michael E. Crüsemann, and Peter Müller are all current or former officers and directors of Spiegel. Defendant KPMG LLP was Spiegel's independent public accountant. Plaintiffs allege that Defendants engaged in a fraudulent scheme to boost product sales by issuing credit cards to high-risk creditors; securitizing the credit card receivables through phony sales to trusts, which allowed Spiegel to understate its debt by more than $3 billion and overstate its earnings by $240 million; and improperly delaying the collapse of the securitizations to hide Spiegel's financial distress. Plaintiffs claim that these actions violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("SEA" or the "Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

On July 8, 2004, this court addressed Defendants' joint motion to strike and their six separate motions to dismiss Plaintiffs' October 31, 2003 second Consolidated Amended Complaint. The court held that the complaint satisfied the pleading requirements of Rule 8, but that "Plaintiffs must specify the particular defendants responsible for each particular act and cannot simply attribute to 'defendants' conduct that clearly could not encompass all Defendants in this case." *In re Spiegel, Inc. Sec. Litig.*, No. 02 C 8946, 2004 WL 1535844, at *17 (N.D. Ill. July 8, 2004). The

court also instructed Plaintiffs to "identify the allegations in the Complaint that are made on information and belief and to state the facts on which the belief is based." *Id.* at *18.

With respect to the motions to dismiss, the court found no basis to dismiss any of the allegations against Dr. Otto, Dr. Crüsemann, Dr. Müller, Mr. Hansen, or Mr. Zaepfel. *Id.* at *20-27, *36-37. The court ordered Plaintiffs to delete claims against Mr. Moran and Mr. Sievers relating to Spiegel's pre-approved credit card solicitations made during the Fall of 2001 (which in Plaintiffs' view were improperly skewed towards high risk customers) because both men had retired by then, but otherwise denied Mr. Moran's and Mr. Sievers' motion to dismiss. *Id.* at *27-34. At the same time, the court dismissed most of the allegations against Mr. Cannataro, except with respect to his alleged involvement in the Company's decision to not file its 2001 Form 10-K, which Plaintiffs characterize as a ploy to avoid revealing KPMG's February 7, 2002 advice that Spiegel may not be able to continue as a "going concern." *Id.* at *12, *34-36. The court also granted a motion to dismiss filed by Spiegel Holdings, Inc. ("SHI")[1] because Plaintiffs failed to attribute any alleged misstatements to SHI or to establish that it acted with the requisite scienter. *Id.* at *42-43.

As for KPMG, the court agreed that "[t]o the extent Plaintiffs have grouped KPMG in with all other defendants in this case, the Complaint must be amended to reflect why each such allegation applies specifically to KPMG." *Id.* at *38. The court also dismissed the allegations against KPMG "to the extent they accuse the accounting firm of failing to correct Spiegel's public statements, of having responsibility for alleged misrepresentations in Spiegel's quarterly financial statements, and of being a 'co-conspirator with respect to the wrongs complained of' in the Complaint." *Id.* The court otherwise denied KPMG's motion to dismiss, finding that Plaintiffs sufficiently alleged that it made false and misleading statements and acted with scienter. *Id.* at *38-42.

---

[1] SHI owns 99.9% of Spiegel's Class B voting shares, representing 90% of Spiegel's ownership. The remaining 10% consists of publicly-held Class A non-voting shares.

On August 4, 2004, Plaintiffs filed their third Consolidated Amended Complaint ("Complaint"). Only KPMG objects to the new Complaint, arguing that the allegations of scienter are deficient, and that the Complaint does not comply with this court's July 8 Order. For the reasons set forth here, KPMG's motion to dismiss is granted.

## DISCUSSION

The extensive procedural and factual background of this case is set forth in this court's July 8, 2004 Memorandum Opinion and Order. See *In re Spiegel*, 2004 WL 1535844, at *1-15. This opinion assumes the reader's familiarity with that earlier decision and will recite relevant facts only as necessary to resolve KPMG's current motion to dismiss.

The purpose of such a motion is to test the sufficiency of the plaintiffs' complaint, not to decide its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). A motion to dismiss will be granted only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Plaintiffs alleging fraud must do so "with particularity," FED. R. CIV. P. 9(b), meaning that they must identify "the who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990). The particularity requirement ensures that plaintiffs "conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

In addition to complying with Rule 9(b), Plaintiffs must also follow the strict pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*, which was enacted to discourage claims of "so-called 'fraud by hindsight.'" *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1155 (N.D. Ill. 2004) (quoting *In re Brightpoint, Inc. Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *3 (S.D. Ind. Mar. 29, 2001)). The PSLRA

3

requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). See also Chu v. Sabratek Corp., 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000).

KPMG argues that Plaintiffs' new Complaint must be dismissed because it does not sufficiently allege scienter as required to state a claim under § 10(b) of the Securities Exchange Act and Rule 10b-5 of the Securities and Exchange Commission ("SEC"), and because it fails to incorporate changes mandated by this court's July 8, 2004 Order. The court considers each argument in turn.

I.  **Scienter**

To state a claim under § 10(b) of the Securities Exchange Act and SEC Rule 10b-5, plaintiffs must allege that a defendant "(1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff[s] relied, and (6) that reliance proximately caused plaintiff[s'] injuries." In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 280 (7th Cir. 1996). KPMG argues that Plaintiffs have failed to plead scienter because their primary allegations in that regard – that Spiegel overstated its gains by $240 million and understated its debt by $3 billion – are untrue and because the statements Spiegel did make could not have alerted KPMG to the fact that Spiegel was artificially inflating its financial results.

The Seventh Circuit has not addressed the proper test for scienter in light of the PSLRA and, as noted in the court's July 8, 2004 Order, the district courts in this Circuit are split. Many courts agree that the PSLRA adopts the standard enunciated by the Second Circuit in cases such as Press v. Chemical Investment Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999), requiring plaintiffs to allege (1) facts showing that defendants had both motive and opportunity to commit fraud; or (2)

4

facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *In re Spiegel*, 2004 WL 1535844, at *24 (collecting cases). *See also Davis v. SPSS, Inc.*, No. 04 C 3427, 2005 WL 1126550, at *12 (N.D. Ill. May 10, 2005) (noting that "[a] standard adopted by the Second Circuit is most often cited.") More recently, courts have rejected the Second Circuit test in favor of the following:

> Plaintiffs may use "motive and opportunity" or "circumstantial evidence" to establish scienter under the PSLRA, only if Plaintiffs' allegations support a strong inference that each Defendant acted recklessly or knowingly.

*Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941, 961 (N.D. Ill. 2004) (St. Eve, J.) *See also Hallberg v. American Agencies General Agencies, Inc.*, No. 04 C 3245, 2005 WL 563211, at *5 (N.D. Ill. Mar. 8, 2005) (Filip, J.) The court has already determined that Plaintiffs failed to plead intentional fraud under the motive and opportunity rubric, *see In re Spiegel*, 2004 WL 1535844, at *39, and for purposes of this motion to dismiss, KPMG focuses solely on Plaintiffs' claim of scienter based on strong circumstantial evidence of recklessness.

As applied to outside auditors, recklessness means that "the accounting firm practices amounted to no audit at all, or to an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 247 F. Supp. 2d 987, 998 (N.D. Ill. 2002) (quoting *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *10 (N.D. Ill. Nov. 4, 1998)). In the July 8, 2004 Order, the court concluded that the various Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Accounting Standards ("GAAS") violations identified by Plaintiffs were "insufficient, standing alone, to create a strong inference of scienter." *In re Spiegel*, 2004 WL 1535844, at *39 (quoting *Wafra Leasing*, 247 F. Supp. 2d at 998).

The court noted, however, that Plaintiffs had identified some 17 "'red flags,' or specific, highly suspicious facts and circumstances available to the auditor at the time of the audit [that] were [allegedly] ignored, either deliberately or recklessly." *Id.* at *39-40 (quoting *Wafra Leasing*, 247 F. Supp. 2d at 998) (GAAP and GAAS violations are relevant in proving scienter when coupled with red flags). For example, Spiegel allegedly overstated its gains by $240 million and underreported its debt by $3 billion; failed to consolidate its financial statements with those of the Special Purpose Entities ("SPEs") despite retaining the risks and rewards of ownership over the credit card receivables; and falsely characterized its credit card receivables as non-recourse when, in truth, Spiegel was potentially liable to repay billions of dollars to SPE noteholders at a rate of $20 million per month. *Id.* at *40.

### A. Overstated Gains and Underreported Debt

In KPMG's view, the primary red flag was Spiegel's overstated gains and underreported debt. Plaintiffs deny that this was a "primary" red flag, but do argue strenuously that the improperly recorded gains are evidenced by Spiegel's admission in its 2001 Form 10-K that receivables it sold "without recourse" could actually be re-sold by the Company. To understand this issue, it is useful first to revisit Spiegel's alleged asset securitization practices.

#### 1. Spiegel's Securitizations

Credit card securitization is a process that allows banks and other issuers of credit cards to convert their receivables into cash. (Cmplt. ¶¶ 4 n.1, 71.) In a typical securitization, the owner of credit card receivables sells them – at a discount, presumably – to one or more Special Purpose Entities ("SPEs"), which commonly take the form of trusts. Investors in a securitization receive certificates or notes that give them the right to a certain return on their investment. The issuer of the certificates receives cash upon the sale of the receivables to the SPEs, and also retains an interest in the receivables. (*Id.* ¶ 71.) This "retained interest" is subordinated in favor of payment

to the investors and includes only those "interests in the trust that remain after all investors are paid and all other obligations of the trust are satisfied." (*Id.* ¶ 71 n.2.) There are generally two types of retained interests: (1) a claim to excess principal receivables in the trusts; and (2) interest-only strips ("I/O strips"), representing a right to receive the interest portion of the receivables after all investors in the trust have been paid their interest. (*Id.* ¶ 72.) See also *In re Spiegel*, 2004 WL 1535844, at *6.

Plaintiffs explain that the retained interest protects investors in the following way: "[b]y not selling all of the interests of the trusts to investors, the issuer provides an additional layer of protection for investors since the retained interest is subordinated in favor of the payment to the investors." (*Id.* ¶ 71 n.2.) In addition, investors in a securitization are protected by certain "credit enhancements," such as cash collateral accounts and insurance policies, that ensure payment of an investor's principal and interest if the cash flow from the securitized receivables proves insufficient. (Cmplt. ¶ 71.) The trust documents also contain trust performance requirements, sometimes called "triggers" or "pay out events" which, if violated, result in trust investors receiving an immediate payout of all collected cash receipts until the obligation to them is satisfied. When such "rapid amortization" occurs, the trust no longer has the use of principal proceeds to purchase newly-generated receivables. The issuer, similarly, loses the benefit of excess cash flows, which must all go immediately to repay principal to investors. (*Id.*) The Spiegel trusts had eight trust triggers, including Spiegel's failure to make certain payments or transfers of funds, and failure of the receivables to meet certain minimum performance standards in maintaining (1) an adequate "profit ratio," i.e., the "difference between portfolio yield and base rate" (the "excess spread trigger"); (2) no more than a prescribed maximum level of delinquent accounts (the "delinquency ratio trigger"); and (3) an appropriate limit on defaults in the portfolio (the "default rate trigger"). (*Id.* ¶ 71 n.4.) See also *In re Spiegel*, 2004 WL 1535844, at *6.

7

Spiegel first began securitizing its credit card receivables through FCNB in the early 1990s. Plaintiffs describe FCNB's securitization transactions during the Class Period as follows:

> A Spiegel customer using a preferred card or an FCNB bankcard at a Spiegel merchant purchases an item and creates a receivable in favor of FCNB. The merchant looks to FCNB to pay the amount of the charge, less an interchange fee. And FCNB then looks to the customer to pay principal, interest (at typical credit card rates), late fees and other charges.
>
> Rather than holding the receivable on its financial statements, FCNB sells it to an intermediary special purpose entity ("SPE"). By selling the receivable, FCNB is relieved of the obligation to maintain capital against it, as well as the obligation to fund the receivable. However, with Spiegel's securitizations, Spiegel remained in control over the cardholder's account and adjust[ed] payment terms or fees.
>
> The SPE then resells the receivable to a so-called qualified special purpose entity ("QSPE") . . . structured as a common law master trust. Each QSPE sells multiple series of certificates or notes to investors at different times.
>
> Each series also assigns the retained interest to Spiegel Acceptance Corp. ("SAC") (a wholly owned subsidiary of Spiegel) or to FCNB. FCNB then transfers part of its retained interest to Financial Services Acceptance Corporation ("FSAC") (also a Spiegel affiliate). These retained interests generate "finance revenue" for Spiegel that essentially comes from excess cash flows after required payments to the investors in the trusts and deductions are made.

(Cmplt. ¶ 75.) *See also S.E.C. v. Spiegel*, No. 03 C 1685, 2003 WL 22176223, at *49 (N.D. Ill. Sept. 15, 2003).

Explaining further, Plaintiffs allege that FCNB transferred its FCNB Bankcard[2] receivables to First Consumers Master Trust ("FCMT") which, in turn, issued a collateral certificate representing a beneficial interest in the receivables of FCMT to First Consumers Credit Card Note Trust ("FCCCNT"). FCCCNT then sold a series of notes to investors in public offerings, collateralized by the certificates issued by FCMT and FCCCNT, and used the proceeds from the offering to retire the collateral certificates. (Cmplt. ¶ 226.) A similar technique was used to transfer FCNB Preferred Card receivables to Spiegel Master Trust ("SMT") and then to Spiegel Credit Card Master Trust

---

[2] The FCNB Bankcard was a general-purpose MasterCard or Visa that could be used at various merchant locations. *In re Spiegel*, 2004 WL 1535844, at *3.

("SCCMT") which, in turn, sold a series of notes to investors in public offerings. (*Id.* ¶ 227.) Plaintiffs identify two public debt offerings during the Class Period: (1) the Spiegel Credit Card Master Note Trust ("SCCMNT") Series 2000-A, issued on December 19, 2000; and (2) the SCCMNT Series 2001-A, issued on July 19, 2001. Three additional securitization transactions during that period were private placements. All told, Spiegel's five securitization transactions in late 2000 and 2001 resulted in "financings or commitments of approximately $3.4 billion."[3] (*Id.* ¶ 76.) See also *In re Spiegel*, 2004 WL 1535844, at *7.

### 2. The 2001 Form 10-K

Plaintiffs allege that Spiegel admitted in its 2001 Form 10-K that receivables it sold "without recourse" could actually be re-sold by the Company. The language at issue states:

> The majority of the Company's credit card receivables are sold to trusts that, in turn, sell certificates and notes representing undivided interests in the trusts to investors. The receivables are sold without recourse. The Company plans *to continue* to utilize asset-backed securities ("ABS") to fund the growth of receivables. . . In the event that the financial performance of an ABS transaction falls below the required minimum threshold, early amortization ("Pay out Event") of these transactions may occur. Early amortization under an ABS transaction would require the Company to obtain financing *or sell these receivables* through other sources.

(Cmplt. ¶ 299; 2001 Form 10-K, Ex. B to KPMG Mem., at 18-19)[4] (emphasis added). KPMG argues, as it did in its previous motion to dismiss, that the 10-K was referring only to the sale of receivables generated after a pay out event, and not to previously-sold receivables as claimed by Plaintiffs. (KPMG Mem., at 6-7.) In the July 8, 2004 Order, this court considered these arguments and resolved the issue in favor of Plaintiffs:

---

[3] It appears that there were no public debt offerings of the FCMT or FCCCNT trusts during the Class Period. All of the trusts went into rapid amortization in early March 2003. The privately placed securitizations have either been paid in full or "will be in the near future." The publicly-offered SCCMNT Series 2000-A and SCCMNT Series 2001-A, however, "each have approximately $300 million owing to investors and are currently being paid down in rapid amortization at the rate of approximately $30 million a month." (Cmplt. ¶ 77.)

[4] Defendant KPMG LLP's Memorandum of Law in Support of Motion to Dismiss Third Consolidated Amended Complaint is cited as "KPMG Mem., at __."

> KPMG evidently understands the expression "these receivables" in the last line of the quoted material to mean "such receivables" or "receivables of this nature." Plaintiffs understand the words to mean "the same [previously-sold] receivables." The proper interpretation of the 10-K, however, is a question of fact and cannot form the basis of dismissal.

*In re Spiegel*, 2004 WL 1535844, at *41.

KPMG urges that the court has taken the words "these receivables" out of context and has improperly ignored the statement that "[t]he receivables are sold without recourse." (KPMG Mem., at 6, 7.) KPMG concedes that "[i]f the focus is limited only to the words 'these receivables' near the end of the paragraph, an ambiguity may very well exist." When the paragraph is read as a whole, however, KPMG urges that "Spiegel's language cannot reasonably be construed to constitute an admission that the sale of receivables to the securitization trusts were not true sales." (*Id.* at 7.) As KPMG read this paragraph, it sets forth two effects of an early amortization: (1) "Spiegel could not sell new receivables into the securitization trusts, so that Spiegel would have to find another avenue for the financing or sale of new receivables"; and (2) "the distribution of proceeds generated by those [new] receivables would be applied to pay down the principal of the securitization." (*Id.*) With respect to the first effect, KPMG further explains that:

> Unlike a mortgage or auto loan, the average life of a credit card receivable is measured in months, not years. Use of a revolving structure gives the issuer medium- to long-term financing and it gives the investor a predictable schedule of principal and interest payments. During the revolving period, monthly principal collections are used by the securitization trusts to purchase new receivables. In the event of a pay out event, the purchase of "these" new receivables would cease and Spiegel would have to find another avenue for the financing or sale of "these" new receivables.

(*Id.* at 7 n.5.)

Plaintiffs claim that the "law of the case" doctrine should apply to bar KPMG from reasserting this identical argument already addressed by the court. (Pl. Resp., at 6-11.)[5] The

---

[5] Plaintiffs' Opposition to KPMG's Motion to Dismiss Consolidated Amended Complaint is cited as "Pl. Resp., at __."

10

court's understanding of the "law of the case" doctrine differs. That doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905, 911-12 (7th Cir. 2005) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988)). "The twin goals of this doctrine are to ensure that the parties marshal all of their facts and arguments so that a dispute may be resolved in one pass, and to conserve judicial resources." *Peoples v. United States*, 403 F.3d 844, 846 (7th Cir. 2005). The doctrine is, however, "no more than a presumption, one whose strength varies with the circumstances; it is not a straightjacket." *Alston v. King*, 157 F.3d 1113, 1116 (7th Cir. 1998). "[A]ll federal courts retain power to reconsider [issues] if they wish," *United States v. Shannon*, 94 F.3d 1065, 1076 (7th Cir. 1996), and district courts have "the discretion to make a different determination of any matters that have not been taken to judgment or determined on appeal. Pre-judgment orders, such as motions to dismiss, are interlocutory and may be reconsidered at any time." *Cameo Convalescent Ctr., Inc. v. Percy*, 800 F.2d 108, 110 (7th Cir. 1986). Thus, the court is free to consider KPMG's argument here.

The court concludes that it erred earlier in its characterization of the interpretation of the language in Spiegel's 2001 Form 10-K as raising a question of fact. "Even in a case where the facts are undisputed, the interpretation of documents remains a question of law." *Burgess v. J.C. Penney Life Ins. Co.*, 167 F.3d 1137, 1139 (7th Cir. 1999). *See also Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 908 (7th Cir. 1995) ("The interpretation of documents . . . is, when no factual disputes intrude and no collation of possibly inconsistent documents is required, traditionally an issue of law.") Upon further review of the disputed language, the court now concludes that the 2001 Form 10-K cannot reasonably be interpreted as an admission that receivables Spiegel sold "without recourse" could actually be re-sold by the Company. As KPMG notes, only a strained interpretation of the Form 10-K leads to the conclusion that Spiegel, "<u>in the same paragraph</u>,

11

contradicted the 'without recourse' statement and supposedly 'admitted' that 'these receivables' could be sold again." (KPMG Mem., at 7) (emphasis in original). *See also Thompson v. Illinois Dep't of Professional Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) ("where a plaintiff attaches documents [to a complaint] and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim.") KPMG is also correct that this plain-meaning interpretation of the relevant language is significant: Aside from this purported "admission," Plaintiffs have not provided any other basis for their allegation that Spiegel overstated its gains by $240 million and understated its debt by $3 billion, much less that KPMG should have been aware of that enormous discrepancy.[6]

### B. The Other "Red Flags"

Plaintiffs argue that even without the $240 million/$3 billion discrepancy, there are 16 remaining "red flags" that also should have alerted KPMG to the problems with Spiegel's financial statements. These include:

(1) Spiegel's use of "easy credit to pump up sales" and "failure to disclose to its shareholders the true nature of the risk from extending credit to sub-prime borrowers";

(2) Spiegel's improper recognition of "receivable gains" and "servicing fees" from the Company's securitizations of credit card receivables;

(3) Spiegel's forecasts for calculating its "receivable gains" were grossly inconsistent with the credit characteristics of the underlying assets;

---

[6] Indeed, KPMG's successor auditor, BDO Seidman, found no such multi-billion dollar discrepancy. Spiegel's post-bankruptcy balance sheet for the period ending January 3, 2004, which BDO Seidman audited and Spiegel filed with the SEC, shows total liabilities of $1.87 billion. (KPMG Mem., at 9; Form 8-K dated 1/3/04, Ex. E to KPMG Mem.) As KPMG notes, if there had truly been an understatement of debt in the amount of $3.5 billion, the Form 8-K would reflect a debt of $5.37 billion. To the extent the Form 8-K for the period ending January 3, 2004 is not part of the pleadings, it is not the basis for dismissal in this case, but Plaintiffs' response to KPMG's arguments in this regard is not satisfying.

(4) Spiegel's use of the "net down" process "skewed its credit portfolio toward high-risk customers and deprived FCNB of the ability to control credit risk, for the primary purpose of boosting sales figures";

(5) FCNB's elimination of back-end screening "so that a high percentage of Spiegel customers getting credit from FCNB did not satisfy FCNB's credit requirements at the time FCNB actually extended credit to them";

(6) Spiegel's "ponzi scheme" to sustain revenues "through the continuous issuance of additional credit cards to sub-prime risk customers, enticed to purchase goods and services on credit they could not otherwise obtain";

(7) Spiegel's securitization of more than $3.0 billion of credit card receivables "primarily founded on extremely lax credit standards while exposing itself to an increased risk of loss from account charge-offs, delinquencies, and defalcations";

(8) FCNB's numerous, material internal control deficiencies that "prevented Spiegel from making and keeping books, records, and accounts that accurately and fairly reflected its transactions";

(9) Spiegel's false characterization of credit card receivables as non-recourse, "when, in truth, Spiegel was potentially liable to repay billions of dollars to SPE noteholders at the rate of approximately $20 million a month";

(10) Spiegel's blatant misrepresentation in its Form 10-K for fiscal year ended December 30, 2000 that "the FCNB Preferred credit programs realized improved yields and lower charge-offs from reduced delinquencies";

(11) Spiegel's failure to "disclose to the shareholders trust trigger violations based on the payment rate, default rate, and delinquency rate during fiscal year 2000 that resulted in automatic pay-out events, but for waivers";

(12) FCNB's allowing customers to make purchases when they were delinquent in their payments and over their credit limits;

(13) Spiegel's maintenance of "inappropriate written accounting policies and procedures for significant FCNB activities, including sales of assets and other securitization activities";

(14) Spiegel's material internal control weaknesses and deficiencies that did not "accurately provide even the most basic data needed for financial reporting purposes";

(15) Spiegel's failure to utilize a valuation model that comported with industry guidelines; and

13

(16) Spiegel's improper reporting of its allowance for loan and lease losses on credit card receivables.

(Pl. Resp., at 18-19.)

KPMG claims that numbers 2 and 9 do not constitute red flags because they presuppose the existence of the $240 million/$3 billion discrepancy purportedly created by Spiegel's false labeling of the sale of receivables as "non-recourse." In addition, Plaintiffs have now agreed to remove KPMG from the operative allegations suggesting knowledge of Spiegel's "easy credit to pump up sales," "net down process," "back-end screening," "ponzi scheme" to sustain revenues, and "recency" accounting, as referenced in numbers 1, 4, 5, 6, 7, and 12. (KPMG Reply, at 17.)[7] Several of the "red flags" (e.g., numbers 13-16), appear to be merely the accounting violations themselves and, as such, cannot give rise to a strong inference of scienter. See Wafra Leasing, 247 F. Supp. 2d at 998 (allegations that a defendant violated GAAP and GAAS accounting practices "are generally insufficient, standing alone, to create a strong inference of scienter.") Other "red flags," moreover, (including numbers 13-16) presume KPMG's knowledge solely based on the fact that "KPMG's personnel were regularly present at Spiegel's corporate headquarters throughout the year." (Cmplt. ¶ 404.)

As for the alleged inconsistency between the actual and reported charge-off rates in fiscal year 2000 (number 10), KPMG notes that this "red flag" is based on a mistake made by the

---

[7] Defendant KPMG LLP's Reply in Support of Motion to Dismiss Third Consolidated Amended Complaint is cited as "KPMG Reply, at __."

Independent Examiner.[8] Specifically, ¶ 374 of the Complaint draws the following language directly from the Independent Examiner's Report:

> Spiegel's Form 10-K for the fiscal year ended December 30, 2000 noted that "the FCNB Preferred credit programs realized . . . lower charge-offs from reduced delinquencies." This information is not consistent with the actual . . . charge-off rates experienced by the preferred portfolio in 2000 . . . The charge-off rate in January 2000 was 10.32% and decreased to a low of 6.76% in April 2000, however, it began to increase after the April low to 13.01% in December 2000.

(Cmplt. ¶ 374; 2000 Form 10-K, Ex. C to KPMG Mem., at 13.) *See also Spiegel*, 2003 WL 22176223, at *100. The Independent Examiner purports to be quoting from page 14 of the 2000 Form 10-K; in fact, he quotes from page 13 where Spiegel is discussing the charge-off rates for 1999, not 2000. For 2000, Spiegel reports that "[r]etained-interest income was negatively impacted by an increase in charge-offs on securitized receivables compared to last year." (KPMG Mem., at 11 n.8; 2000 Form 10-K, Ex. C to KPMG Mem, at 12.)

Plaintiffs insist that a determination whether the Independent Examiner was wrong in reporting an inconsistency between the actual and reported charge-off rates in fiscal year 2000 cannot be made on a motion to dismiss. (Pl. Resp., at 20.) To the extent the Independent Examiner does appear to be quoting data regarding 1999 and not 2000, however, his assessment does not constitute a red flag supporting a strong inference of scienter on the part of KPMG.

---

[8] On March 7, 2003, the SEC filed a civil action against Spiegel, charging that the Company violated federal securities laws by (1) failing to file its 2002 Form 10-K (due on April 1, 2002) and 2002 Form 10-Q (due in mid-May 2002); and (2) failing to disclose advice from KPMG on February 7, 2002 that the Company may not be able to continue as a "going concern"; i.e., that there was "substantial doubt about the Company's ability to continue as a going concern." *In re Spiegel*, 2004 WL 1535844, at *2; (Cmplt. ¶¶ 168, 181, 197, 205.) Without admitting any of the charges, Spiegel immediately consented to the entry of a partial final judgment of permanent injunction. On March 11, 2003, Judge James B. Zagel appointed Stephen J. Crimmins, an attorney with Pepper Hamilton, LLP in Washington, D.C., as Independent Examiner to review Spiegel's financial records "from January 1, 2000 to date" and to provide a written report of Spiegel's financial condition and identify any material accounting irregularities. *Id.* Judge Zagel ordered that the Independent Examiner's Report be disclosed to the public on September 15, 2003. *Id.* (citing *Spiegel*, 2003 WL 22176223).

KPMG also disputes that Spiegel's failure to disclose trust trigger violations in fiscal year 2000 (number 11) is a red flag. KPMG did note in its year-end 2000 audit workpapers that two securitization trusts had exceeded their triggers in 2000, and that another trigger on SMT 1999-A was projected by Spiegel to be exceeded in February of 2001. (Cmplt. ¶¶ 264, 266.) Plaintiffs claim that Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("SFAS") 78 and Staff Accounting Bulletin ("SAB") 99 required Spiegel to disclose these circumstances to its shareholders, even though Spiegel had obtained a waiver and two amendments to the Pooling and Servicing Agreements that reset various trust triggers.[9] (*Id.* ¶¶ 257, 260, 262-64.) KPMG argues that SFAS 78[10] applies to debt covenants and not to trust triggers. (KPMG Reply, at 11 n.9.) The court agrees that debt covenants are not identical to trust triggers but, as the Independent Examiner found, "it is appropriate to look to the guidance pertaining to debt covenants [because] they were substantively analogous to [the trust triggers], given the impact of violations upon Spiegel and its shareholders." *Spiegel*, 2003 WL 22176223, at *64.

Even if SFAS 78 does apply by analogy, KPMG says, it still does not require disclosure of the trust triggers:

> Under SFAS No. 78, "[a] callable obligation does not have to be recorded as a current liability if the creditor waives the right to demand repayment after the balance sheet date but before the financial statements are issued." *In re Skaff*, SEC Release No. 41313, 1999 SEC LEXIS 787, at *27 (Apr. 20, 1999) (order

---

[9] It is not clear who agreed to the waivers or the amendments. The Pooling & Servicing Agreements relate to SMT 1999-A and SMT 1999-B. *See Spiegel*, 2003 WL 22176223, at *66. (Cmplt. ¶¶ 260, 262.)

[10] SFAS 78, entitled "Classification of Obligations that are Callable by the Creditor", "require[s] that a long-term obligation that is or will be callable because of the debtor's violation of the debt agreement be classified as a current liability if the debt covenant is not waived or the violation is not cured within a specified grace period." HANDBOOK OF SEC ACCOUNTING AND DISCLOSURE, § B10, Accounts and Short-Term Notes Payable. (*See also* Cmplt. ¶ 288.)

16

instituting proceedings). That is precisely what is alleged to have occurred here with respect to the trust triggers (Compl. ¶ 265).[11]

(KPMG Mem., at 11 n.9.) See also In re Skaff, SEC Release No. 41313, 1999 WL 228426, at *8 (Apr. 20, 1999). Plaintiffs respond only that "the resolution of th[is] issue would require weighing competing arguments, and possibly expert testimony, about the proper interpretation of GAAP as applied to the disputed facts of this case [and] is not appropriate at this stage of the litigation." (Pl. Resp., at 20.)

Even assuming that the trust trigger violations constitute a red flag, the court is no longer convinced that Plaintiffs have alleged KPMG's scienter based on strong circumstantial evidence of recklessness. Most of Plaintiffs' purported red flags, including the primary ones relating to overstated gains and understated debt, do not support such a conclusion. Plaintiffs disagree, arguing that the "tidal wave of fraud" was "readily apparent" to both the Independent Examiner and

---

[11] Paragraph 265 of the Complaint states:

To avoid activating the delinquency ratio payout trigger on SMT 1999-B in October 2000, Defendants, except for Cannataro, charged-off accounts in order to reduce delinquencies and thereby reduce the delinquency ratio below the payout threshold. As noted in FCNB's October 2000 Trust Financing Commentary regarding the SMT 1999-B:

> "The 3-month average Delinquency Ratio trigger is set at 4.75%. In September 2000, the 3-month average was 4.73%. The current forecast indicates the delinquency ratio will exceed the trigger level by the end of November if no action is taken. FCNB will attempt to secure relief from this trigger by mid-November. In order to remain below this trigger level in October, FCNB will accelerate approximately $10 million additional charge-offs during October. This will not impact full year 2000 results."

Through its acceleration of charge-offs in the fourth quarter of 2000, Defendants, except for Cannataro, used an artificial means to avoid violating the delinquency trust trigger on its preferred portfolio. By charging off these receivables, Defendants, except for Cannataro, improperly reduced delinquencies in Spiegel's Monthly Noteholder Statements and avoided violating the delinquency trigger.

(Cmplt. ¶ 265.)

the Office of the Comptroller of the Currency (the "OCC").[12] (Pl. Resp., at 21.) In Plaintiffs' view, the fact that the Independent Examiner's report and the OCC Consent Order both identify "the fraudulent accounting practices and sales tactics that ultimately forced Spiegel into bankruptcy and robbed Plaintiffs of the value of their shares should be considered by this Court." (Id.)

As KPMG notes, however, the Independent Examiner "enjoyed subpoena power, obtained a copy of the OCC's confidential examination report, obtained waivers of the attorney-client privilege from Spiegel and Otto Versand,[13] conducted 50 interviews throughout the United States, Canada, and Germany, and reviewed 473 Boxes totaling 801,300 documents," which "does not in any way resemble the information base (or information-gathering procedures) an auditor would be provided in the course of an audit." (KPMG Reply, at 18.) See also Spiegel, 2003 WL 22176223, at *106-09. In addition, Plaintiffs "rely on a hindsight chronology" to suggest that KPMG should have known of Spiegel's allegedly inadequate internal control policies and procedures as found by the OCC at the end of 2001 and into 2002, when KPMG issued its last Class Period audit opinion at least ten months earlier. (Id.)

Nor can scienter be inferred from KPMG's failure to report that Spiegel decided to not file its 2001 Form 10-K because Spiegel "knew that if KPMG's 'going concern' qualification in the audit of the 2001 financials was made public, Spiegel's house of cards would come tumbling down." (Pl.

---

[12] In or about February 2002, the OCC initiated an enforcement action against FCNB, substantially lowering FCNB's rating largely due to concern about "the low quality of the bank's receivables" and "a great many deficiencies in the bank's operations." See Spiegel, 2003 WL 22176223, at *24. Without admitting any wrongdoing, on May 14, 2002, FCNB signed a Stipulation and Consent to the Issuance of a Consent Order (the "OCC Consent Order"), which the Comptroller of the Currency of the United States accepted on May 15, 2002. See In the Matter of First Consumers Nat'l Bank, Enforcement Action No. 2002-04, 2002 WL 1483604 (O.C.C. May 14, 2002). That Order required that FCNB be liquidated by December 2002, and placed "significant restrictions" on credit for both new and existing FCNB customers. Spiegel, 2003 WL 22176223, at *24.

[13] Otto Versand (GmbH & Co.) is a Hamburg-based company controlled by the Otto family that is "the largest mail order group in the world." (Cmplt. ¶ 28.) See also In re Spiegel, 2004 WL 1535844, at *3 (citing Spiegel, 2003 WL 22176223, at *3, 7).

Resp., at 22-23.) Even the Independent Examiner acknowledged that Spiegel's decision "came against the recommendation of . . . its auditors at KPMG." *Spiegel*, 2003 WL 22176223, at *109. (*See also* Cmplt. ¶¶ 192, 195, 400.)

That leaves KPMG's alleged GAAP and GAAS violations. Plaintiffs identify some 18 violations of various sections of the Codification of the Statements on Auditing Standards ("AU"); Statement on Auditing Standards ("SAS") No. 57; GAAS Standards of Reporting; GAAS General Standards; and GAAS Standards of Field Work. (Pl. Resp., at 13-15.) As stated, accounting violations, standing alone, do not create a strong inference of scienter. *Wafra Leasing*, 247 F. Supp. 2d at 998. Moreover, KPMG notes that Plaintiffs have merely copied certain alleged GAAS violations from the Independent Examiner's Report. (KPMG Reply, at 14-15.) With one exception, however, the Independent Examiner never accused KPMG of violating those standards. (*Id.* at 15.)

The Independent Examiner did opine that KPMG's work in auditing Spiegel's 1.3% increase in the principal charge-off rate variable assumption for the last quarter of fiscal year 2000 did not comport with AU § 326.01 or with SAS No. 57. *Spiegel*, 2003 WL 22176223, at *98. Specifically, the Independent Examiner stated that the residual asset valuation model assumption should have been 0.82% greater (i.e., 13% instead of 12.18%). *Id.* KPMG "strongly disagrees" with this assessment and argues, in any event, that the Independent Examiner "does not contend that KPMG's alleged violation . . . was intentional, or even reckless, and Plaintiffs, for their part, have failed to allege any facts giving rise to any inference (much less a 'strong' one) of *scienter* in connection with that audit work." (KPMG Reply, at 15 n.8.)

Having reviewed the matter with some care, the court now concludes that Plaintiffs have not sufficiently identified "'red flags,' or specific, highly suspicious facts and circumstances available to the auditor at the time of the audit" that KPMG "ignored, either deliberately or recklessly." *Wafra Leasing*, 247 F. Supp. 2d at 998. Thus, neither those purported red flags nor the alleged GAAP

19

and GAAS violations suffice to create a strong inference of scienter for purposes of alleging a claim under § 10b and Rule 10b-5.

## II. Compliance with July 8, 2004 Order

Having determined that Plaintiffs have not properly alleged a securities fraud claim against KPMG, the court need not address whether Plaintiffs have otherwise complied with the July 8, 2004 Memorandum Opinion and Order. Plaintiffs have already agreed to amend several of the disputed paragraphs (6, 8, 10, 11, 12, 14, 21(a), 21(e), 95, 184, 204, 272, 277, 278, 286, 290, 293, 294, 308, and 456) by changing the term "Defendants" to "Spiegel" and/or removing KPMG from the specified list of Defendants. Plaintiffs should further amend the Complaint to reflect the court's ruling that KPMG is no longer a proper defendant in this case.

## CONCLUSION

For the reasons stated above, KPMG's motion to dismiss (Docket No. 116-1) is granted.

ENTER:

Dated: July 29, 2005

REBECCA R. PALLMEYER
United States District Judge